1  MATTHEW W. GRIMHSAW, #210424
   grimshaw@marshackhays.com
2  DAVID A. WOOD, #272406
   dwood@marshackhays.com
3  LAILA MASUD, #311731
   lmasud@marshackhays.com
4  MARSHACK HAYS LLP
   870 Roosevelt, Irvine, CA 92620
5  Telephone: 949-333-7777
   Facsimile: 949-333-7778
6
   Proposed Attorneys for
7  BIOXXEL, LLC.

8

9               UNITED STATES BANKRUPTCY COURT

10        CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

11

12 In re                          Case No. 8:21-bk-10256-TA

13 BIOXXEL, LLC,                   Chapter 11

14          Debtor and            DEBTOR AND DEBTOR-IN-
            Debtor-in-Possession.  POSSESION'S EMERGENCY MOTION
15                                 FOR ORDER AUTHORIZING USE OF
                                   CASH COLLATERAL AND
16                                 DETERMINING THAT ITS SECURED
                                   CREDITOR IS ADEQUATELY
17                                 PROTECTED; MEMORANDUM OF
                                   POINTS AND AUTHORITIES AND
18                                 DECLARATION OF JOSHUA TEEPLE IN
                                   SUPPORT

19                                 Hearing:
                                   Date:    February 10, 2021
20                                 Time:    10:00 a.m.
                                   Ctrm:    5B[1]
21                                 Address: 411 W. Fourth Street
                                            Santa Ana, CA 92701
22

23 / / /

24 _____

25 [1] Pursuant to General Order 20-06, no in person hearings will be held in any matter until further notice. The
   Court will continue to hear matters via telephone and video. Until further notice, because of the COVID-19
26 pandemic, all of Judge Albert's hearings will be conducted using ZoomGov audio and video. Hearing
   participants and members of the public may view and listen to hearings before Judge Albert using ZoomGov
27 free of charge.  Video and audio connection information for each hearing will be provided on Judge Albert's
   publicly posted hearing calendar, which may be viewed online at: http://ecf-
28 ciao.cacb.uscourts.gov/CiaoPosted/?jid=TA. For more details on appearing via ZoomGov, please see the
   "Notice of Video and Telephonic Appearance Procedures" in the Telephonic Instructions section of this page.

TO THE HONORABLE THEODOR C. ALBERT UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED PARTIES: Debtor-in-Possession, BIOXXEL, LLC, (the "Debtor") in the above-captioned cases, files this motion for an order authorizing it to use cash collateral and determining that its secured creditor is adequately protected  ("Motion").

## 1.    Summary of Argument

The Debtor is the legal and equitable owner of an approximately 100,000 square-foot industrial building located at 30590 Cochise Circle, Murrieta, California ("Property"). When this case was commenced, Debtor's secured lender was in the process of foreclosing on the Property. This bankruptcy was filed to preserve the significant equity cushion that exists in the Property, thereby preserving the value for unsecured creditors. Shortly before the filing of the petition, the Debtor hired Joshua Teeple of Grobstein Teeple LLP to act as its chief restructuring officer ("CRO"). The CRO has retained Onyx Asset Advisors, LLC ("Onyx") to market and sell the Property as soon as possible (subject to approval by this Court). Simply put, this case was filed in order to sell the Property via a fully transparent sales process subject to this Court's approval.

Currently, the Debtor leases portions of the Property to seven (7) different tenants ("Tenants"), who operate their respective businesses from the Property. The rent generated from these leases is subject to the lien held by Debtor's lender and therefore is cash collateral. The Debtor needs to use this cash collateral to continue operating pending a sale but cannot do so without the lender's consent or a court order.

By this Motion, Debtor seeks an order allowing it to use cash collateral and confirming that the lender is adequately protected. Debtor's lender is owed approximately $6.8 million. The Property is worth approximately $12 million. As such, the lender is protected by an equity cushion that exceeds $5 million.

/ / /

/ / /

/ / /

MOTION FOR USE OF CASH COLLATERAL

4811-5333-2374, v. 2

## 2.    Background

### A.    Debtor's organizational structure and operations

The Debtor is a California limited liability corporation that owns the Property. In turn, the Debtor is owned by Bioxxel Investment Holding Inc., ("BIHI") and Pharmaxx, Inc. ("Pharmaxx").[2] Both BIHI and Pharmaxx are owned by Mr. Phoung Nguyen ("Mr. Nguyen"). Mr. Nguyen owns and operates four (4) of the Tenants. Specifically, the four (4) insider related tenants include: (1) Pharmaxx; (2) International Pharmaceutical Distribution Co., Ltd.; (3) ExxelUSA, Inc.; and (4) Pharmaxx Medical Inc. (collectively the "Insider Tenants").

In light of the interrelated entities and ownership, Mr. Nguyen believed that it was in the best interest of all parties that a CRO be appointed. To effectuate an orderly management transition, Mr. Nguyen executed a corporate resolution authorizing the appointment of the CRO (the "CRO Resolution"). A true and correct copy of the CRO Resolution and related corporate documents are attached as Exhibit "1" to the declaration of Joshua Teeple ("Teeple Declaration"). In light of the CRO Resolution, the Debtor amended its articles of incorporation to allow for the appointment and management by the CRO ("Bylaw Amendments"). A true and correct copy of the Bylaw Amendments are attached as Exhibit "2" to the Teeple Declaration.

In order to maximize value and to have a completely transparent and orderly liquidation of the Debtor's assets, including the sale of the Property, free and clear of liens and interests pursuant to 11 U.S.C. §363(f), and subject to overbid and Court approval, Mr. Nguyen and the CRO authorized the Debtor to file this instant Chapter 11.

### B.    Debtor's Chapter 11 and the Bankruptcy Purpose

Pre-petition, the Debtor became delinquent on its senior secured obligation(s) owed to BREF1 30590 Cochise, LLC ("BREF"). Accordingly, there was a foreclosure sale scheduled for February 3, 2021, at 9:30 a.m., as the outstanding balance owed to BREF was approximately $6.78

---

[2] Originally, Debtor was owned 50.0% by BIHI, and Avid Global Corporation ("Avid"). Unfortunately, there was a dispute amongst BIHI and Avid that culminated in litigation. Ultimately, in November 2020, an assignment of member interest and indemnification and hold harmless agreement ("Ownership Agreement") was executed. Pursuant to the Ownership Agreement, Avid "assign[ed], transfer[ed], and otherwise hypothecate[d] its entire Member Interest in [Debtor] to BIHI and Pharmaxx effective November 30, 2020, thereby giving BIHI and Pharmaxx 100% interest in [Debtor]."

4811-5333-2374, v. 2

1    million. A true and correct copy of the payoff demand from BREF dated February 1, 2021, is

2    attached to the Teeple Declaration as Exhibit "3." The Debtor believed that the Property may have

3    substantial equity, and thus, on February 2, 2021, the Debtor filed a voluntary Chapter 11 petition

4    under Title 11 of the United States Bankruptcy Code ("Petition Date"). A true and correct copy of

5    this Court's webPACER Docket for Case No. 8:21-bk-10256-TA as of February 4, 2021, is attached

6    to the Teeple Declaration as Exhibit "4."

7            Pre-petition, the Debtor obtained an appraisal from WESTATES Appraisal Group Inc., dated

8    January 28, 2021 ("January Appraisal") which indicated that the Property has a value of

9    approximately $12.18 million. A true and correct copy of the January Appraisal is attached as

10   Exhibit "5" to the Teeple Declaration. The January Appraisal was performed in conjunction with a

11   purchase and sale agreement to sell the Property for $14 million ("January PSA"). A true and correct

12   copy of the January PSA is attached as Exhibit "6" to the Teeple Declaration. Unfortunately, pre-

13   petition, the proposed buyer backed out of the January PSA after being informed of the February 3,

14   2021, foreclosure sale. The CRO, and his professionals (including Onyx) are currently analyzing the

15   valuation opinions expressed January Appraisal, which appear to be both comprehensive and well-

16   reasoned.

17           In his due diligence, the CRO also obtained a preliminary title report dated on January 6,

18   2021 ("January 2021 PTR"), and a summary property report dated February 3, 2021 ("February

19   2021 Property Report"). These records indicate that BREF's lien is the only recorded lien against the

20   Property other than recorded property tax liens. True and correct copies of the January 2021 PTR

21   and the February 2021 Property Report are attached as Exhibits "7" and "8,"[3] to the Teeple

22   Declaration. Thus, as of the Petition Date, given the BREF payoff demand of $6.78 million, the

23   CRO believes that there may be substantial equity in the Property that can be captured for the benefit

24   of secured, administrative, and unsecured creditors.[4]

25   _____

26   [3] The CRO has ordered an updated preliminary title report, but as of the filing of the instant Motion, it has not
     been provided. If an updated preliminary title report is obtained prior to the hearing on the Motion, the CRO
27   will file it with this Court.

28   [4] The CRO is informed and believes that pursuant to the Ownership Agreement, the Debtor agreed and
     executed a second deed of trust in favor of Avid in the amount of $3.4 million. The CRO has been informed
     that the deed of trust has been submitted to the Riverside County Recorder's office. But, as of the Petition

MOTION FOR USE OF CASH COLLATERAL

4811-5333-2374, v. 2

## C.    Rental Operations

As described above, as of the Petition Date there were seven (7) tenants occupying the Property, including the Insider Tenants. A summary of the Tenants are as follows:

(1) II-VI Optical (third party tenant);

(2) Royal Health USA (third party tenant);

(3) MedLab Pharma, Inc., (third party tenant);

(4) Pharmaxx (insider tenant);

(5) International Pharmaceutical Distribution Co., Ltd.;

(6) ExxelUSA, Inc., (insider tenant); and

(7)  Pharmaxx Medical Inc., (insider tenant).

*See* Teeple Decl., ¶22.

The CRO is informed and believes, that pre-petition only the three non-insider tenants had leases and were paying monthly rent. *Id.*, ¶23. The total monthly revenue from these leases is approximately $40,000. *Id.*, ¶24. Immediately upon his appointment, the CRO communicated to Mr. Nguyen that post-petition, the Insider Tenants must pay monthly rent. *Id.*, ¶25. Currently, the CRO is in the process of negotiating a market rate month-to-month lease with the Insider Tenants. *Id.*, ¶26. The CRO has prepared two separate proposed budgets (subject to negotiated adjustments) ("Budgets"). True and correct copies of the Budgets are attached as Exhibit "10" to the Teeple Declaration.

The first budget is predicated on the premise that the Insider Tenants occupy all remaining space in the Property. *Id.*, ¶27. Recently, the CRO has been informed that the Insider Tenants only occupy a certain portion of space. *Id.*, ¶27. Thus, the second budget is based on what the Insider Tenants state is the amount of space currently being used. *Id.*, ¶27. Note, that the fixed operational expenses (excluding interest) are identical in both proposed budgets. *Id.*, ¶27. Given the reduction in monthly income generated via rents, the interest payments to BREF have been reduced accordingly.

Date, it does not appear to be recorded against the Property. To the extent this information changes, the CRO will promptly inform the Court. Regardless, even if the second deed of trust was recorded prior to the Petition Date, such recordation could likely be avoided, recorded, and preserved pursuant to 11 U.S.C. §§ 547, 548, 550, and 551.

1   *Id.*, ¶27. The CRO and his professionals will be touring the Property on Monday, February 8, 2021,

2   to calculate the exact amount of space being used. *Id.*, ¶27. The Debtor will update the Court at the

3   hearings on the instant Motions. *Id.*, ¶27. Once the CRO finalizes the lease negotiations with Mr.

4   Nguyen, the Debtor will file a motion with this Court to approve the Insider Tenant leases pursuant

5   to 11 U.S.C. § 363. *Id.*, ¶28.

6           **D.     Other first day motions**

7           Contemporaneously with this instant Motion, the Debtor will be filing an emergency motion

8   to, among other things, prohibit utility providers from terminating services ("Utility Motion"). At

9   this point in time, the Debtor does not have any employees, and does not anticipate requesting any

10  other emergency relief. And, contemporaneously with this instant Motion, the Debtor will be filing

11  an application to employ Onyx as the Estate's real estate broker. The CRO is cognizant that a sale

12  needs to occur and is moving quickly to ensure that it does.

13  **3.    Legal Argument**

14          **A.     The Court may authorize Debtor to use cash collateral**

15          A debtor may use, sell, or lease property of the estate in the ordinary course of business

16  without court approval. 11 U.S.C. §363(c)(1). But a debtor "may not use, sell or lease cash

17  collateral…. unless: (A) each entity that has an interest in such cash collateral consents; or (B) the

18  court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions

19  of this section." 11 U.S.C. §363(c)(2); *see, e.g., Secured Leasing Partners, LP v. ProAlert, LLC (In*

20  *re ProAlert, LLC)*, 314 B.R. 436, 440 (B.A.P. 9th Cir. 2004).

21          Here, the Debtor seeks to use cash collateral to pay the expenses set forth in the Budgets. *See*

22  Teeple Decl., Ex. 10, pgs. 262-263.[5] The Debtor has an immediate need to use cash collateral ensure

23  that it can perform its various obligations under the leases. *Id.* For example, the Debtor needs to pay

24

25

26  [5] As indicated in the Budget and in the above narrative, pre-petition the Insider Tenants did not pay rent. The
    CRO is in the process of negotiating a month-to-month lease with the Insider Tenants, and believes that the
    market rate for the space is approximately $0.64 per square foot (based on an analysis performed by Onyx).
27  Thus, the proposed rental income for the Insider Tenants is predicated on the assumption that the Insider
    Tenants were occupying a certain amount of space. The CRO and his professionals will be physically touring
28  the Property to confirm the amount of space used. Thus, the rental income projected in the Budget may be
    adjusted accordingly, and may affect the amount of interest paid to BREF.

MOTION FOR USE OF CASH COLLATERAL

4811-5333-2374, v. 2

1    for utilities, insurance, security, and other expenses relating to the Property during the marketing and

2    sale process. *Id.* Indeed, if the Debtor is unable to pay the necessary expenses to maintain the

3    Property during the sale process, then the purpose of this Chapter 11 will be frustrated, and creditors

4    will suffer as their claims will go unsatisfied. *Id.*

5         The CRO and Debtor submit that the expenses are within the ordinary course, and will only

6    serve to preserve and protect the collateral. The Budgets are essentially "bare boned" to cover only

7    the needed expenses to maintain operations, and the fees incurred by the CRO (the other

8    professionals have agreed to accrue professional fees until a sale of the Property has been realized).

9    *Id.* Indeed, the CRO and Debtor have provided to the secured creditor a copy of the Budgets, and

10   have begun negotiations for a consensual cash collateral budget. But, in abundance of caution, the

11   Debtor files this Motion to obtain Court approval to use cash collateral.

12        **B.    BREF is adequately protected by its equity cushion**

13        To the extent that an entity has a valid security interest in the revenues generated by property

14   of the estate, those revenues constitute "cash collateral" under §363(a). The bankruptcy court can

15   authorize use of said cash collateral under § 363(c)(2)(B) if the court determines that the debtor has

16   provided "adequate protection" of the secured creditor's interest in the cash collateral. *See e.g., In re*

17   *Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). Although the term "adequate protection" is not

18   explicitly defined, §361 provides that when adequate protection is required, it may be provided by:

19            (1) Requiring the trustee to make a cash payment or periodic cash
20            payments to such entity, to the extent that the … use … under section 363
              of this title … results in a decrease in the value of such entity's interest in
21            such property;

22            (2) providing to such entity an additional or replacement lien to the extent
              that such … use … results in a decrease in the value of such entity's
23            interest in such property; or

24            (3) Granting such other relief … as will result in the realizing by such
              entity of the indubitable equivalent in such entity's interest in such
25            property.
     11 U.S.C. §361.

26        Section 361 does not define "interest in property" of which a secured creditor is entitled to

27   adequate protection. But the statute plainly provides that a qualifying interest demands protection

28   only to the extent that the use of the creditor's collateral will result in a decrease in the "value of

4811-5333-2374, v. 2

1  such entity's interest in such property." 11 U.S.C. §§ 361, 363(e). *See e.g., First Federal Bank of*

2  *California v. Weinstein (In re Weinstein)*, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); *In re Deico*

3  *Elecs., Inc.*, 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992); *General Electric Mortgage Corp. v. South*

4  *Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 n.4 (Bankr. D. Utah 1982). The phrase

5  "value of such entity's interest" was addressed by the Supreme Court in *United Savings Assoc. of*

6  *Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740

7  (1988). *Timbers* instructs that a secured creditor is entitled to adequate protection only against the

8  diminution in the value of the collateral securing the creditor's allowed secured claim. *Id*. at 630

9  Therefore, where the value of the collateral is not diminishing by its use, sale, or lease, the creditor's

10 interest is adequately protected. Ultimately, what constitutes adequate protection must be decided on

11 a case-by-case basis. *See, In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994);

12 *O'Connor*, 808 F.2d at 1396; *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300

13 B.R. 861, 865 (Bankr. W.D. Pa. 2003); *In re Columbia Gas Sys., Inc.*, 146 B.R. 114 (Bankr. D. Del.

14 1992).

15      Court's recognize that an equity cushion[6] provides adequate protection to a secured creditor.

16 *See In re Mellor*, 734 F.2d 1396 (9th Cir. 1984). There is no minimum amount or percentage of

17 equity cushion that constitutes adequate protection, but rather, the adequacy of the cushion depends

18 on the circumstances of each case. *See In re Tucker*, 5 B.R. 180, 183 (Bankr. S.D.N.Y. 1980); *see*

19 *also In re McGowan*, 3 B.R. 241, 243 (Bankr. E.D. Pa 1980) (holding a cushion of 10% is adequate);

20 *In re Kost*, 102 B.R. 829, 831-32 (Bankr. D. Wyo 1989) (providing a survey of cases where 20% or

21 more is considered adequate).

22      The Ninth Circuit has provided guidance as to the amount of an equity cushion that is

23 sufficient. In *Mellor*, the court held that a 20% equity cushion adequately protected the secured

24 creditor. *Mellor*, 734 F.2d at 1400. In doing so, the court cited with approval various cases holding

25 that an equity cushion of 10%-20% is sufficient to protect a creditor. *Id.* at 1401 (citing *In re*

26

27

28 [6] According to *Mellor*, the term "equity cushion" means "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effective." 734 at 1400 n.2.

4811-5333-2374, v. 2

1  *McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% equity cushion protects a

2  creditor) and *In re Rodgers Devel. Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (holding that a

3  15%-20% equity cushion protects a creditor). Moreover, courts in this district understand *Mellor*'s

4  teaching that an equity cushion from 10%-20% is sufficient to adequately protect a creditor. *See,*

5  *e.g.*, *In re DBI Housing, Inc.*, 2013 Bankr. LEXIS 2146, *10 (Bankr. C.D. Cal. 2013) (holding that a

6  16% equity cushion adequately protects a creditor).

7          Here, the equity cushion is more than sufficient to protect BREF's interest in the Property.

8  The Property is currently valued at more than $12.1 million; BREF is owed approximately $6.78

9  million. *Compare* Teeple Decl., Ex. 3, pg. 16; *with* Ex. 5, pgs. 20-221. Thus, pursuant to the January

10 2021 Appraisal there is over $5.3 million in equity in the Property, which translates to an equity

11 cushion of approximately 44%. *Id.*  In other words, the equity cushion is more than twice was courts

12 consider sufficient to adequately protect a lender. *See, e.g. Mellor*, 734 F.2d at 1401. Indeed, based

13 on the Debtor's initial communications with counsel for BREF, while the parties may disagree to the

14 exact amount of the "equity cushion," it appears that the parties agree that there is a significant

15 equity cushion to warrant a finding of adequate protection. The Debtor submits that BREF is

16 adequately protected.

17      **C.    The proposed form of order – FRBP 4001(d)(1)(A)**

18          Rule 4001(d)(1)(A) of the Federal Rules of Bankruptcy Procedure requires that a motion for

19 the authority to use cash collateral or for approval of a cash collateral agreement be accompanied by

20 a proposed form of order. The proposed form of order is appended to the Teeple Declaration as

21 Exhibit "11." Thus, the Debtor has complied with the FRBP.

22      **D.    Required Local Form F4001-2.STMT.FINANCE**

23          As required by Local Bankruptcy Rule 4001-2(a), the Debtor will be filing the required local

24 form for approval of the use of cash collateral.

25 / / /

26 / / /

27 / / /

28

MOTION FOR USE OF CASH COLLATERAL

4811-5333-2374, v. 2

## 4.    Conclusion

The Debtor requests that the Court enter and order authorizing the use of cash collateral to pay the expenses shown in the Budgets and determining that BREF is adequately protected by the equity cushion in the Property.

Dated:  February 5, 2021                    MARSHACK HAYS LLP


                                     By:  _/s/ David A. Wood_
                                          MATTHEW W. GRIMSHAW
                                          DAVID A. WOOD,
                                          LAILA MASUD,
                                          Proposed Attorneys for
                                          BIOXXEL, LLC

MOTION FOR USE OF CASH COLLATERAL

4811-5333-2374, v. 2

# Declaration of Joshua Teeple

I, JOSHUA TEEPLE, declare as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration.

2.      If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.      The facts set forth below are true of my personal knowledge.

4.      I am a founding partner of Grobstein Teeple LLP ("GT").

5.      I am the Chief Restructuring Officer ("CRO") of BioXXel, LLC, (collectively, the "Debtor") in the above-captioned case.

6.      I make this Declaration in support of Debtor's motion for order: (a) prohibiting the Utility Providers (defined below) from (i) altering, refusing or disconnecting service on account of outstanding prepetition invoices, or (ii) requiring additional adequate assurance of payment as condition to providing utility services; (b) deeming utilities adequately assured of future performance; and (c) establishing procedures for resolving a request by any Utility Provider for additional assurance of payment, pursuant to 11 U.S.C. § 366(b) ("Motion").

7.      All terms not defined herein are used as they are defined in the Motion.

8.      The Debtor is a California limited liability corporation that owns the Property.

9.      I am informed and believe that the Debtor is owned by Bioxxel Investment Holding Inc., ("BIHI") and Pharmaxx, Inc. ("Pharmaxx").

10.     I am informed and believe that both BIHI and Pharmaxx Inc., are owned by Mr. Phuong Nguyen.

11.     I am informed and believe that Mr. Nguyen owns and operates the Insider Tenants.

12.     I am informed and believe that in light of the interrelated entities and ownership, Mr. Nguyen believed that it was in the best interest of all parties that a CRO be appointed.

13.     A true and correct copy of the CRO Resolution and related corporate documents are attached here as Exhibit "1."

/ / /

DECLARATION OF JOSHUA TEEPLE

1    14.    A true and correct copy of the Bylaw Amendments are attached here as Exhibit
2    "2."

3    15.    I am informed and believe that pre-petition, the Debtor became delinquent on its
4    senior secured obligation(s) owed to BREF1 30590 Cochise, LLC ("BREF"). I was informed
5    that there was a foreclosure sale of the Property scheduled for February 3, 2021, at 9:30 a.m. as
6    the outstanding balance owed to BREF was approximately $6.78 million. A true and correct
7    copy of the payoff demand from BREF dated February 1, 2021, is attached here as Exhibit "3."

8    16.    A true and correct copy of this Court's webPACER Docket for Case No. 8:21-bk-
9    10256-TA as of February 4, 2021, is attached here as Exhibit "4."

10    17.    I am informed that pre-petition, the Debtor obtained an appraisal from
11    WESTATES Appraisal Group Inc., dated January 28, 2021 ("January Appraisal") which
12    indicated that the Property has a value of approximately $12.18 million. A true and correct copy
13    of the January Appraisal is attached here as Exhibit "5."

14    18.    I am informed and believe that the January Appraisal was performed in
15    conjunction with a purchase and sale agreement to sell the Property for $14 million ("January
16    PSA"). A true and correct copy of the January PSA is attached here as Exhibit "6."

17    19.    I am informed and believe that pre-petition, the proposed buyer backed out of the
18    January PSA after being informed of the February 3, 2021, foreclosure sale. My professionals
19    (including my proposed real estate broker Onyx) and I are currently analyzing the January
20    Appraisal. Our initial review indicates that the January Appraisal appears to be comprehensive,
21    but we do not currently have an opinion as to its accuracy or if the $14 million purchase offer
22    was bona fide.

23    20.    My professionals and I also obtained a preliminary title report dated on January 6,
24    2021 ("January 2021 PTR"), and a summary property report dated February 3, 2021 ("February
25    2021 Property Report"), that indicate the only lien recorded against the Property is the senior
26    secured lien held by BREF (other than recorded property tax liens). True and correct copies of
27    the January 2021 PTR and the February 2021 PTR are attached here as Exhibits "7" and "8."

28    / / /

DECLARATION OF JOSHUA TEEPLE

21.     Thus, given the apparent significant value of the Property and the BREF payoff demand of $6.78 million, I am informed and believe that there may be substantial equity in the Property that can be captured for the benefit of the Debtor's secured, administrative, and unsecured creditors.

22.     I am informed and believe that as of the Debtor's Petition Date there were seven (7) tenants occupying the Property, including the Insider Tenants. A summary of the Tenants are as follows:

(1) II-VI Optical (third party tenant);

(2) Royal Health USA (third party tenant);

(3) MedLab Pharma, Inc., (third party tenant);

(4) Pharmaxx (insider tenant);

(5) International Pharmaceutical Distribution Co., Ltd.;

(6) ExxelUSA, Inc., (insider tenant); and

(7) Pharmaxx Medical Inc., (insider tenant).

23.     I have been informed that pre-petition only the three non-insider tenants had leases and were paying monthly rent.

24.     I have been informed and believe that the total monthly revenue from these non-insider leases is approximately $40,000. True and correct copies of the Debtor's proposed Budgets which sets forth estimated revenues and expenses are attached as Exhibit "10."

25.     Immediately upon my appointment, I communicated to Mr. Nguyen and his counsel that, post-petition, the Insider Tenants must pay monthly rent.

26.     Currently, my professionals and I are in the process of negotiating market rate month-to-month leases with the Insider Tenants.

27.     I have estimated what the Insider Tenant monthly rent may be based on our current knowledge which amount is reflected in the Debtor's proposed Budgets (subject to negotiated adjustments). The first budget is predicated on the premise that the Insider Tenants occupy all remaining space in the Property. Recently, my professionals and I have been informed that the Insider Tenants only occupy a certain portion of space. Thus, the second budget is based

on what the Insider Tenants state is the amount of space currently being used. Note, that the fixed operational expenses (excluding interest) are identical in both proposed Budgets. Given the reduction in monthly income generated via rents, the interest payments to BREF have been reduced accordingly. My professionals and I will be touring the Property on Monday, February 8, 2021, to calculate the exact amount of space being used. The Debtor will update the Court at the hearings on the instant Motion.

28.    When my professionals and I finalize the lease negotiations with Mr. Nguyen, the Debtor will file a motion with this Court to approve the Insider Tenant leases pursuant to 11 U.S.C. § 363.

29.    My objective in this case is to sell the Property in a manner which maximizes the value of the Property for the benefit of secured, administrative, and unsecured creditors.

30.    To do so, it is critical that Debtor be allowed to use BREF's cash collateral to continue operating. As a result, I request that the Court enter an order substantially similar to the proposed order attached as Exhibit "11."

31.    I believe that the expenses set forth in the Budgets are within the ordinary course and will only serve to preserve and protect the collateral. The Budgets are essentially "bare boned" to cover only the expenses needed to maintain operations and 75% of the fees incurred by me in my capacity as CRO.  The other Estate professionals have agreed to accrue professional fees until a sale of the Property has been realized.

32.    My counsel and I have provided to the secured creditor a copy of the Budgets and have begun negotiations for a consensual cash collateral budget. But, in abundance of caution, the Debtor files this Motion to obtain Court approval to use cash collateral.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February _5_, 2021.



JOSHUA TEEPLE

DECLARATION OF JOSHUA TEEPLE

**EXHIBIT "1"**

## JOINT WRITTEN CONSENT OF THE MANAGER
## AND MEMBERS OF BIOXXEL LLC

The undersigned, being the managers and members of Bioxxel, LLC (the "Company") and pursuant to the provisions of applicable California law, hereby consent to the adoption of the following resolutions and to the actions authorized in such resolutions being taken by the Chief Restructuring Officer in lieu of a meeting thereof:

**IT IS FURTHER RESOLVED** that the CRO be, and hereby is, authorized to determine, based upon the Company's financial circumstances as of the date hereof, any subsequent events, and advice of counsel, whether it is desirable and in the best interests of the Company, its creditors, members and other interested parties, that a voluntary petition ("Petition") be filed by the Company under the provisions of chapter 11 of the Bankruptcy Code;

**IT IS FURTHER RESOLVED** that, if the CRO determines that a Petition should be filed, then such Petition shall be filed as submitted by the CRO and the same hereby is approved and adopted in all respects, and the CRO is hereby authorized and directed, on behalf of and in the name of the Company, to execute and verify such Petition and to cause the same to be filed with the United States Bankruptcy Court for Central District of California;

**IT IS FURTHER RESOLVED** that the CRO be, and hereby is, authorized to execute and file all petitions, schedules, lists, and other pleading and papers, and to take any and all actions which he may deem necessary and proper in connection with such bankruptcy proceedings under said chapter 11 and in that regard to retain and employ assistance by legal counsel, other professionals, or such individuals as he may deem necessary and proper with a view to the successful conclusion of such bankruptcy proceedings.

**IT IS FURTHER RESOLVED** that the CRO be, and hereby is, authorized to make all decisions relating to the Company or its management after the execution of this Resolution;

**IT IS FURTHER RESOLVED** that Marshack Hays LLP be, and hereby is, retained as attorneys for the Company. Marshack Hays may take such actions as are directed by the CRO, including but not limited to, the filing of a bankruptcy petition under Title 11 of the United States Code of the prosecution of such a case to its conclusion.

Dated: February 2, 2021

_____
Josh Teeple, as Manager and Chief Restructuring Officer of Bioxxel LLC

BIOXXEL INVESTMENT HOLDING, INC.
Member of Bioxxel LLC

By: _____
Name: Phuong Nguyen
Title: President

PHARMAXX, INC.
Member of Bioxxel LLC

By: _____
Name: Phuong Nguyen
Title: President

1

**EXHIBIT "2"**

**Third Amendment**
**to Operating Agreement**
**For BIOXXEL, LLC**

The Operating Agreement for Bioxxel, LLC, a California Limited Liability Company ("Company"), is hereby amended as follows:

1.    Article III, Section 3.1.A, shall now read as follows:

The business and affairs of the Company shall be exercised and managed by a single Manager, who shall also have the title "Chief Restructuring Officer." The Manager shall have sole and exclusive decision-making authority for and on behalf of the Company. The Manager and Chief Restructuring Officer shall be Josh Teeple of Grobstein Teeple, LLP.

2.    Article III, Section 3.1.B, is deleted.

3.    Article III, Section 3.2.B, is deleted.

4.    The first sentence of Article III, Section 3.6, shall now read as follows:

The annual meeting of Members may be held for the purposes of transacting or considering business that may properly come before the meeting.

5.    Article III, Section 3.9, shall read as follows:

3.9    MEMBERS INABILITY TO CHANGE MANAGEMENT

Members waive and forgo the ability to elect a Manager other than Josh Teeple unless he becomes incapacitated, in which case a new Manager and Chief Restructuring Officer will be appointed. In no event, however, shall a Member be entitled to act as a Manager.

6.    The undersigned, as the Members of the Company, hereby approve and adopt the above-described amendments to the Operating Agreement.

In Witness Whereof, the undersigned has executed this Third Amendment effective as of February 2, 2021.

BIOXXEL INVESTMENT HOLDING, INC.,

By:_____
Name: Phuong Nguyen
Title: President

PHARMAXX, INC.,

By:_____
Name: Phuong Nguyen
Title: President

**EXHIBIT "3"**

# BREF1 30590 COCHISE, LLC

26895 Aliso Creek Road, Suite B537
Aliso Viejo, CA  92656

**Date:** February 1, 2021

**To:** Bioxxel, LLC

**Re:** Payoff Demand

**Property Address:** 30590 Cochise Circle, Murrieta, CA

**Borrower: Bioxxel, LLC**

**Beneficiary:** BREF1 30590 Cochise, LLC

| | |
|---|---|
| **Note Principal** | $4,542,356.35 |
| Accrued Interest (as of 2/2/21) | $1,490,546.39 |
| Accrued Default Interest (as of 2/2/21) | $834,483.58 |
| Late Fees | $187,722.82 |
| Exit Fee | $29,100.00 |
| Less Payments from 10/5/18 - 2/1/21 | -$593,104.27 |
| **Total (as of 2/2/21)** | **$6,491,104.87** |
| **Trustee's Fees & Costs** | $48,874.13 |
| **Attorney's Fees** | $19,127.28 |
| **TSG** | $5,830.50 |
| **Taxes & Advances** | $213,988.80 |
| **Reconveyance Processing Fee** | $500.00 |
| **Demand Fee** | $100.00 |
| **Wire Processing Fee** | $25.00 |
| **Total Due** (as of 2/2/21) | **$6,779,550.58** |

**Per Diem - $2,541.07 beginning on 2/3/21**

**This Payoff Statement expires at 5:00 pm (PST) on February 2, 2021.**

**Wire Instructions:**

| | |
|---|---|
| Bank: | First Republic Bank |
| Account Name: | BREF1 30590 Cochise LLC |
| Account #: | **80007140348** |
| ABA #: | **321081669** |
| Reference: | Cochise |

EXHIBIT "3"
PAGE 16

**EXHIBIT "4"**

2/4/2021                               CM/ECF - U.S. Bankruptcy Court (v5.2.1 - LIVE)

**DsclsDue, PlnDue, Incomplete**

## U.S. Bankruptcy Court
## Central District of California (Santa Ana)
## Bankruptcy Petition #: 8:21-bk-10256-TA

*Date filed:* 02/02/2021
*341 meeting:* 03/12/2021

*Assigned to:* Theodor Albert
Chapter 11
Voluntary
Asset

**Debtor**
**BioXXel, LLC**
23832 Rockfield Boulevard, Suite 245
Lake Forest, CA 92630
ORANGE-CA
Tax ID / EIN: 81-3738225

represented by **David Wood**
Marshack Hays LLP
870 Roosevelt Ave
Irvine, CA 92620
949-333-7777
Fax : 949-333-7778
Email: dwood@marshackhays.com

**U.S. Trustee**
**United States Trustee (SA)**
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4593
(714) 338-3400

represented by **Michael J Hauser**
411 W Fourth St Suite 7160
Santa Ana, CA 92701-4593
714-338-3417
Fax : 714-338-3421
Email: michael.hauser@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 02/02/2021 | 1<br>(13 pgs; 3 docs) | Chapter 11 Voluntary Petition Non-Individual. Fee Amount $1738 Filed by BioXXel, LLC List of Equity Security Holders due 02/16/2021. Summary of Assets and Liabilities (Form 106Sum or 206Sum ) due 02/16/2021. Schedule A/B: Property (Form 106A/B or 206A/B) due 02/16/2021. Schedule C: The Property You Claim as Exempt (Form 106C) due 02/16/2021. Schedule D: Creditors Who Have Claims Secured by Property (Form 106D or 206D) due 02/16/2021. Schedule E/F: Creditors Who Have Unsecured Claims (Form 106E/F or 206E/F) due 02/16/2021. Schedule G: Executory Contracts and Unexpired Leases (Form 106G or 206G) due 02/16/2021. Schedule H: Your Codebtors (Form 106H or 206H) due 02/16/2021. Schedule I: Your Income (Form 106I) due 02/16/2021. Schedule J: Your Expenses (Form 106J) due 02/16/2021. Declaration About an Individual Debtors Schedules (Form 106Dec) due 02/16/2021. Declaration Under Penalty of Perjury for Non-Individual Debtors (Form 202) due 02/16/2021. Statement of Financial Affairs (Form 107 or 207) due 02/16/2021. Chapter 11 Statement of Your Current Monthly Income (Form 122B) Due: 02/16/2021. Statement About Your Social Security Numbers (Form 121) due by 02/16/2021. Schedule J-2: Expenses for Separate Household of |

EXHIBIT "4"
PAGE 17

|  |  |  |
|---|---|---|
|  |  | Debtor 2 (Form 106J-2) due 02/16/2021. Cert. of Credit Counseling due by 02/16/2021. Corporate Resolution Authorizing Filing of Petition due 02/16/2021. Corporate Ownership Statement (LBR Form F1007-4) due by 02/16/2021. Statement of Related Cases (LBR Form F1015-2) due 02/16/2021. Petition Preparer Notice, Declaration, and Signature - Form 119 due by 02/16/2021. Disclosure of Compensation of Bankruptcy Petition Preparer (Form 2800) due 02/16/2021. Disclosure of Compensation of Attorney for Debtor (Form 2030) due 02/16/2021. Declaration by Debtors as to Whether Income was Received from an Employer within 60-Days of the Petition Date (LBR Form F1002-1) due by 02/16/2021. Incomplete Filings due by 02/16/2021. (Wood, David) WARNING: See docket entry no. 4 for correction. DEADLINES TERMINATED: Statement of SSN, Certif of Credit Counseling, BPP Ntc Dcl Signgature, Discl Comp of BPP, Dcl Debtor Empl Income. Schedules C,I,J, Schedule J-2, Decl Re Schedules, Statement (Form 122B). Modified on 2/3/2021 (Shimizu, Tina). (Entered: 02/02/2021) |
| 02/02/2021 |  | Receipt of Voluntary Petition (Chapter 11)(8:21-bk-10256) [misc,volp11] (1738.00) Filing Fee. Receipt number 52409692. Fee amount 1738.00. (re: Doc# 1) (U.S. Treasury) (Entered: 02/02/2021) |
| 02/03/2021 | 2 | Request for a Certified Copy Fee Amount $11. The document will be sent via email to :pkraus@marshackhays.com: Filed by Debtor BioXXel, LLC (RE: related document(s)1 Voluntary Petition (Chapter 11)). (Wood, David) (Entered: 02/03/2021) |
| 02/03/2021 |  | Receipt of Request for a Certified Copy(8:21-bk-10256-TA) [misc,paycert] ( 11.00) Filing Fee. Receipt number 52410332. Fee amount 11.00. (re: Doc# 2 ) (U.S. Treasury) (Entered: 02/03/2021) |
| 02/03/2021 | 3 | Certified Copy Emailed to pkraus@marshackhays.com (Entered: 02/03/2021) |
| 02/03/2021 | 4 | Notice to Filer of Correction Made/No Action Required: **Incorrect schedules/statements recorded as deficient. THE PROPER DEFICIENCY HAS BEEN ISSUED.** (RE: related document(s)1 Voluntary Petition (Chapter 11) filed by Debtor BioXXel, LLC) (Shimizu, Tina) (Entered: 02/03/2021) |
| 02/03/2021 | 5 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Tullius, Jennifer. (Tullius, Jennifer) (Entered: 02/03/2021) |
| 02/03/2021 | 6 (2 pgs) | Order Setting Scheduling And Case Management Conference - Hearing Will Be Held On March 10, 2021 at 10:00 A.M., Rm 5B, Ronald Reagan Federal Building, 411 W. Fourth Street, Santa Ana, CA 92701/ Via ZoomGov: Re: Voluntary Petition |

EXHIBIT "4"
PAGE 18

2/4/2021                                        CM/ECF - U.S. Bankruptcy Court (v5.2.1 - LIVE)

|  |  |  |
|---|---|---|
|  |  | Non-Individual (BNC-PDF) (Related Doc # [1]) Signed on 2/3/2021 (Deramus, Glenda) (Entered: 02/03/2021) |
| 02/03/2021 | 7 | Hearing Set (RE: related document(s)1 Voluntary Petition (Chapter 11) filed by Debtor BioXXel, LLC) Status hearing to be held on 3/10/2021 at 10:00 AM at Crtrm 5B, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Theodor Albert (Deramus, Glenda) (Entered: 02/03/2021) |
| 02/03/2021 | 8 (2 pgs) | Meeting of Creditors 341(a) meeting to be held on 3/12/2021 at 03:00 PM at UST-SA1, TELEPHONIC MEETING. CONFERENCE LINE:1-866-919-0527, PARTICIPANT CODE:2240227. (Beezer, Cynthia) (Entered: 02/03/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/04/2021 15:07:09 | | |
| **PACER Login:** | mh4052870:3453976:0 | **Client Code:** 1657-002 |
| **Description:** | Docket Report | **Search Criteria:** 8:21-bk-10256-TA Fil or Ent: filed From: 11/6/2002 To: 2/4/2021 Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 2 | **Cost:** 0.20 |

EXHIBIT "4"
PAGE 19

**EXHIBIT "5"**



# REAL ESTATE APPRAISAL REPORT OF:

A Multi-User, 122,388 SF Industrial Building Property
located at 30590 Cochise Circle, unincorporated Riverside County Area,
Associated with the City of Murrieta, CA 92563
Client's File #: 10491 / Client's Borrower: Pharmagold Investment LLC

## CLIENT PREPARED FOR:

First Choice Bank c/o
Mr. Michael Martin
17785 Center Court, Suite 750, Cerritos, CA 90703
(626) 435-3078
*The US Small Business Administration is an additional intended user and*
*addressee of this Appraisal Report*

## PREPARED BY:

## WESTATES Appraisal Group, Inc.
*R.E. Valuation and Consulting*

## VALUATION / APPRAISAL DATES:

**Effective Date of Value (DOV):**  January 21, 2021
**Date of Report (DOR):**  January 28, 2021

The Client makes no warranties or representations regarding this document or the conclusions contained herein.  The report is prepared for
the sole use and benefit of the Client and is based, in part, upon documents, writings, and information owned and possessed by the Appraiser
or the Client.  Any persons or entity other than the Client should not rely upon the information and conclusions contained in this report
without independent verification.

**WESTATES Appraisal Group, Inc.**
*R.E. Valuation and Consulting*
P.O. Box 890822, Temecula, CA 92592
(951) 302-7797 / Fax (951) 346-9270 / appraisals@WESTATEScorp.com

January 28, 2021

Mr. Michael Martin
First Choice Bank
17785 Center Court, Suite 750, Cerritos, CA 90703

Subject:        Appraisal of a Multi-User, 122,388 SF Industrial Building Property
30590 Cochise Circle, Murrieta, CA 92563

Dear Mr. Michael Martin:

At your request, we performed a USPAP-compliant appraisal of the above-referenced property. The appraised value date is January 21, 2021, the date of our most recent property inspection. The date of this USPAP Standard 2-compliant report is January 28, 2021. According to your communicated instructions, the purpose of this appraisal is to provide our subject property value opinions under the following requested scenarios:

•      **Market Value As Is**
•      **Insurable Value (of the Improvements)**

The intended use of this appraisal report is to assist First Choice Bank in its loan program. The users of this appraisal report will be First Choice Bank or designated representatives. ***The US Small Business Administration is an additional intended user and addressee of this Appraisal Report***.

The appraised subject is the leased fee interest in a 100% leased/occupied multi-user industrial building property. The property is currently 70% owner-occupied and 30% leased to four tenants. The 1995-built concrete tilt-up, 2-story, stairwell (2) and elevator (1) served building has estimated 122,388 SF net rentable and gross building areas (NRA and GBA). The building interior is demised with 43,456 SF / 36% of NRA of 2-story office improvement build-out, approximately 8,000 SF / 6% of NRA of warehouse area having a 20' clear height and 2 roll-up loading doors, and the remaining 70,932 SF / 58% of NRA is currently built out as "clean room" space with vinyl flooring, dropped ceiling tiles, air conditioning, and multiple power and compressed air attachments throughout the building. The I-P – Industrial Park-zoned level, irregular shaped site is 17.47-acres / 760,993 SF, partly paved and landscaped surrounding the building. The property has a 13% site coverage ratio and 327 parking spaces for a 2.7:1 parking ratio. The low coverage ratio indicates surplus land area discussed in the report. The property condition overall is estimated as average.

i

EXHIBIT "5"
PAGE 21

Based on analysis presented in the following report, it is my opinion that on January 21, 2021 the **Market Value As Is** of the leased fee interest in the subject property, conditioned on the Assumptions and Limiting Conditions within the report, was estimated at:

## $12,180,000

The **Market Value As Is** is based on the following reasonable but *Extraordinary Assumptions* that may have affected the assignment results:

• **national, regional and local economies have very recently been, and are reportedly being, negatively impacted by the current Covid-19/Corona Virus, but there are no definitive indicators relating to real estate.  Generally, the majority of current indicators and expectations are for a one to two annual quarter severe decline before a rebound; in the absence of measurable real estate evidence in available data, this appraisal assumes the market expectations explained in the pertinent valuation conclusions in this report.  And as disclosed in our typical Assumptions and Limiting Conditions (#17) "The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy.  These forecasts are, therefore, subject to changes with future conditions", and;**

• **only one lease agreement of the four leased spaces was provided for review.  The provided lease agreement did not include any addendums that reflect the actual current leased space size noted in the owner-provided rent roll; the owner-provided rent roll was used for analysis purposes.  Market rent was applied to the three remaining spaces since leases were not provided resulting in no leased fee market equivalency adjustment assumptions for these spaces, and;**

• **the subject's 70,932 SF / 58% of NRA "clean room" space was originally developed for a prior specific user (Abbott Laboratories).  The majority of this space is not currently in use and, according to market participants we spoke to during the course of this appraisal, would likely not be used by a typical future owner or tenant.  It was determined that the Highest and Best Use of this space would be to remove the equipment, the ductwork, and ceiling and revert the space to typical industrial warehouse area to satisfy market demand at this time, and;**

• **the subject's 43,456 SF / 36% of NRA of two-story office build-out is super-adequate for the market at this time.  Though roughly half of the office space (24,500 SF on the ground floor) is currently leased to a tenant for another 19 months, there are no other potential users in the current market for such large office space inclusive of the subject's currently unused upper floor office space.  Additionally, the subject building location, configuration, access, and surrounding properties are not conducive to multi-tenant office users.  It would likely take a significant time period and cost to demise the space further and lease/absorb the space.  As a result, the subject's office space is considered in the analysis, but not all square foot contributes full value or is comparable to typically built-out industrial building properties.**

If the property were placed on the market for sale on the **Market Value As Is** date at or near the value estimated in this report, the marketing time would normally be approximately six to nine months. However, the current Covid-19/Coronavirus pandemic may extend marketing times an additional one to two quarters, thus the concluded marketing time frame is estimated to be nine to twelve months. The estimated exposure time would also have been approximately nine to twelve months.

The building improvement **Insurable Value** calculation is estimated as: $10,630,000.

This appraisal report has been prepared in conformity with:  1) OCC: 12 CFR, Part 34, Real Estate Lending and Appraisals;  2) Interagency Appraisal and Evaluation Guidelines, dated December 10, 2010;  3) Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Standards Board of the Appraisal Foundation; 4) FIRREA 12 CFR PART 323 regulations, and;  5) First Choice Bank's appraisal reporting guideline requirements.

The appraisers do not have any current or prospective interest in the subject property or parties involved. Also, the appraisers have not performed any services regarding the subject property within the three-year period immediately preceding acceptance of this assignment, as appraisers or in any other capacity.

The following narrative report presents the data and analyses on which our conclusions were based. This letter of transmittal and contained information is invalid if not accompanied with, and part of, the entire appraisal report.

Respectfully submitted,

Terence M. Connolly, MAI, ASA, AI-GRS
CGREA #AG009708, Exp. 11/2/22
951-302-7797

Jeffrey W. LaDue
CGREA #AG033573, Exp. 4/1/22
951-852-2941

EXHIBIT "5"
PAGE 23

# TABLE OF CONTENTS

**PREFACE**

Letter of Transmittal ............................................................................................. i

Table of Contents ................................................................................................. iv

Executive Summary of Important Facts and Conclusions ................................... vi

Contingencies and Limitations of Scope ............................................................. vi

Final Values Summary .......................................................................................... vii


**INTRODUCTION**

**NATURE OF THE ASSIGNMENT**.........................................................................1

Purpose of the Appraisal ................................................................................ 1

Intended Use / Intended User(s) of the Appraisal.......................................... 1

Property Interest Appraised ............................................................................ 1

Scope of the Appraisal .................................................................................... 1

**PROPERTY IDENTIFICATION AND HISTORY** ..................................................6

Property Classification and Legal Description ............................................... 6

Property Ownership and Recent History ........................................................ 6

**MARKET AREA DESCRIPTION** ..........................................................................8

Greater Overall Regional Conditions............................................................. 8

City Description - Murrieta............................................................................. 13

Neighborhood Description .............................................................................. 14

**INDUSTRIAL MARKET OVERVIEW** .................................................................18

**PROPERTY DESCRIPTION** .................................................................................24

Site Data and Description ............................................................................... 24

Environmental Observations........................................................................... 25

Flood Zone ...................................................................................................... 27

Earthquake Zone ............................................................................................. 27

Zoning ............................................................................................................. 28

Assessed Values and Taxes ............................................................................. 30

Improvement Description ................................................................................ 31

Estimated Remaining Economic Life ............................................................. 32

**ANALYSIS AND VALUATION** ............................................................................44

Highest and Best Use Analysis....................................................................... 46

Highest and Best Use of the Site As Vacant.................................................... 46

## TABLE OF CONTENTS

Legally Permissible ........................................................................... 47

Highest and Best Use as Improved ................................................... 48

Conclusion - Highest and Best Use ................................................... 49
Pertinent Subject Analysis and Valuation Methods ...................... 49

# MARKET VALUE AS IS ........................................................... 51

INCOME CAPITALIZATION APPROACH ......................................... 52
Methodology ................................................................................ 52
Subject Existing Contract Revenue ............................................. 52
Appraiser's Reconstructed Rent Roll .......................................... 53
Lease Abstract ............................................................................ 54
Market Rental Data ..................................................................... 55
Lease Comparable Adjustment Grid ............................................ 58
Market Rental Conclusion ........................................................... 63
Vacancy and Collection Loss ....................................................... 63
Operating Expenses ..................................................................... 64
Total Expenses ............................................................................ 66
Overall Capitalization Rate (OAR) Derivation .............................. 67
Direct Capitalization Rate Conclusion .......................................... 69
DIRECT CAPITALIZATION SUMMARY .......................................... 70

SALES COMPARISON APPROACH ................................................. 71
Methodology ................................................................................ 71
Comparable Sale Adjustment Grid ............................................... 73
Improved Sale Comparable Adjustment Analysis ......................... 78

RECONCILIATION OF THE MARKET VALUE AS IS ......................... 83

Market Value "As Is" Conclusion ................................................... 84

# ASSUMPTIONS AND LIMITING CONDITIONS ....................... 86

# CERTIFICATION ................................................................... 90

# ADDENDA ............................................................................. 91

## SUMMARY OF APPRAISAL FACTS & CONCLUSIONS

**Property Name/Type:**    Multi-User, 122,388 SF Industrial Building Property

**Address/Location:**    30590 Cochise Circle, Murrieta, CA 92563.

**Property Description:**    The appraised subject is the leased fee interest in a 100% leased/occupied multi-user industrial building property. The property is currently 70% owner-occupied and 30% leased to four tenants. The 1995-built concrete tilt-up, 2-story, stairwell (2) and elevator (1) served building has estimated 122,388 SF net rentable and gross building areas (NRA and GBA). The building interior is demised with 43,456 SF / 36% of NRA of 2-story office improvement build-out, approximately 8,000 SF / 6% of NRA of warehouse area having a 20' clear height and 2 roll-up loading doors, and the remaining 70,932 SF / 58% of NRA is currently built out as "clean room" space with vinyl flooring, dropped ceiling tiles, air conditioning, and multiple power and compressed air attachments throughout the building. The I-P – Industrial Park-zoned level, irregular shaped site is 17.47-acres / 760,993 SF, partly paved and landscaped surrounding the building. The property has a 13% site coverage ratio and 327 parking spaces for a 2.7:1 parking ratio. The low coverage ratio indicates surplus land area discussed in the report. The property condition overall is estimated as average.

**Legal Vested Owner:**    BIOXXEL, LLC

**APN:**    963-070-017

**Census Tract:**    432.42

**Site Size:**    17.47-acres or 760,993 SF

**Flood Information:**    The subject property is located in Flood Zone D, Community Panel Number 060245. Zone D is an unstudied area where base flood elevations (BFEs) are unknown.

**Zone:**    I-P – Industrial Park

**Highest And Best Use:**    As Vacant:    To develop with a legally permissible, conforming property.

As Improved:    To renovate the subject building interior to typical industrial warehouse space and operate as a partially owner-occupied, partially leased industrial property.

## SUMMARY OF APPRAISAL FACTS & CONCLUSIONS

**Interest Appraised:**    The leased fee interest

**Date of Report:**    January 28, 2021

**Remaining Economic Life:**    40-years (of the improvements)

## INDICATED APPROACH VALUES:

| FINAL VALUES SUMMARY | Estimated Value | Effective Date |
|---|---|---|
| **Market Value As Is:** | **$12,180,000** | January 21, 2021 |
| **As Is Marketing and Exposure Time:** | nine to twelve months | |
| **Insurable Value of the Building Improvements:** | $10,630,000 | January 21, 2021 |

## SUMMARY OF APPRAISAL FACTS & CONCLUSIONS

The **Market Value As Is** is based on the following reasonable but *Extraordinary Assumptions* that may have affected the assignment results:

• **national, regional and local economies have very recently been, and are reportedly being, negatively impacted by the current Covid-19/Corona Virus, but there are no definitive indicators relating to real estate. Generally, the majority of current indicators and expectations are for a one to two annual quarter severe decline before a rebound; in the absence of measurable real estate evidence in available data, this appraisal assumes the market expectations explained in the pertinent valuation conclusions in this report. And as disclosed in our typical Assumptions and Limiting Conditions (#17) "The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions", and;**

• **only one lease agreement of the four leased spaces was provided for review. The provided lease agreement did not include any addendums that reflect the actual current leased space size noted in the owner-provided rent roll; the owner-provided rent roll was used for analysis purposes. Market rent was applied to the three remaining spaces since leases were not provided resulting in no leased fee market equivalency adjustment assumptions for these spaces, and;**

• **the subject's 70,932 SF / 58% of NRA "clean room" space was originally developed for a prior specific user (Abbott Laboratories). The majority of this space is not currently in use and, according to market participants we spoke to during the course of this appraisal, would likely not be used by a typical future owner or tenant. It was determined that the Highest and Best Use of this space would be to remove the equipment, the ductwork, and ceiling and revert the space to typical industrial warehouse area to satisfy market demand at this time, and;**

• **the subject's 43,456 SF / 36% of NRA of two-story office build-out is super-adequate for the market at this time. Though roughly half of the office space (24,500 SF on the ground floor) is currently leased to a tenant for another 19 months, there are no other potential users in the current market for such large office space inclusive of the subject's currently unused upper floor office space. Additionally, the subject building location, configuration, access, and surrounding properties are not conducive to multi-tenant office users. It would likely take a significant time period and cost to demise the space further and lease/absorb the space. As a result, the subject's office space is considered in the analysis, but not all square foot contributes full value or is comparable to typically built-out industrial building properties.**

# NATURE OF THE ASSIGNMENT

## Purpose of the Appraisal

The purpose of this appraisal was to estimate the **Market Value As Is** of the subject property as of the appraisal date.  Also requested and estimated was the **Insurable Value** of the improvements.

## Intended Use / Intended User(s) of the Appraisal

The intended use of this appraisal report is to assist First Choice Bank in its loan program.  The users of this appraisal report will be First Choice Bank or designated representatives.  ***The US Small Business Administration is an additional intended user and addressee of this Appraisal Report***.

## Property Interest Appraised

Real property consists of the interest, benefits, or rights in real estate.  The interest in the property that is the subject of the "as is" valuation consists of the leased fee.  The pertinent interest and other possible interests if referenced are described in the definitions section.

## Scope of the Appraisal

USPAP's *Scope of Work Rule* "necessary to produce credible assignment results" was established and adhered to for this appraisal assignment.  The scope was determined based on the information needs of the intended users determined from: the engagement letter included in the addenda, the RFP, and any subsequent discussions with the client.  The assignment required investigating sufficient data relative to the subject property to derive an opinion of value.  The depth of the analysis was intended to be appropriate in relation to the significance of the appraisal problem.  This report is intended to communicate clearly, accurately, and in a manner that is not misleading, the appraisal results, which are also considered to contain sufficient information to enable the intended user to understand it properly.

Inspection and information contacts for this assignment were the subject property owner Phuong Nguyen and his assistant Alan, as well as the Client representative Khin Vong of First Choice Bank. The property interior and exterior were inspected per the client's request.  Required documents were provided during the client engagement and/or by the owner representative during the appraisal.

Municipal records were searched and any owner or representative information was used in the current and historical property assessments and ownership data, as well as the physical and legal conditions.  A preliminary title report from Ticor Title dated 1/6/21 was provided for review.  The legal descriptions in this report are from the title report copied in the appraisal addenda.  The subject's background and history were researched with all due diligence expected of a professional real estate appraiser in the course of performing appraisal services.  The Riverside County Planning department provided subject zoning information.  The subject property was analyzed as if through the eyes of the hypothetical, "most probable" buyer.

General and specific local market and property type trends and conclusions were derived or supported from discussions with brokers and other market participant interviews.  Some of these brokers were identified in a Market Overview section following in this report.  The subject's neighborhood and market area were examined to determine existing and proposed inventory, demand, and marketability of properties within the subject's classification.  A wide variety of available / listed and closed sales of properties and, if appropriate, available and executed rent transactions were researched, confirmed, and analyzed.  Commercial real estate brokers specializing in the subject area and property type, and any available buyers, sellers or owners were interviewed.  Fee subscription data services, brokerage and other property data websites, and recorded public records and similar sale and rent data sources were also used.  Also if appropriate, detailed market analysis of available data was performed to estimate absorption.

A diligent attempt was made to verify every comparable lease, sale or listing data presented in this report.  Public records and / or published subscription sources were reviewed for every property used as a comparable.  Additionally, any available participant to the transaction, such as an owner, property manager, or leasing or sale broker was contacted via phone call or email to also verify terms.  In the absence of personal contact, the public records and all other available data was also analyzed for consistency and reasonableness or market support.  There were assumed to be no conditions influencing the subject or sale and/or comparable data that were not readily apparent, not reported, or could not be ascertained from confirmation and could therefore not be considered; this appraiser reserves the right to reconsider comparisons or amend the appraisal and valuation should any other value-influencing information besides what was readily apparent or available during the appraisal or confirmation process becomes available.

General and specific local market and property type trends and conclusions were derived or supported from discussions with brokers and other market participant interviews.  Some of these brokers were identified in a Market Overview section following in this report.

This appraisal report is intended to be an "appraisal assignment".  That is, the intention was that the appraisal service was performed in such a manner that the results of the analysis, opinion, or conclusion be that of a disinterested third party.  This appraisal report, which has a prior USPAP-outlined summary content as requested by the Client First Choice Bank, complies with current USPAP reporting requirements.  Portions of the supporting data are in the appraisal report work file.  This report has been prepared for use in a federally related transaction.  The appraiser is not responsible for unauthorized use of this report.

## DEFINITIONS AND SOURCES

**Market Value** means the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not effected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1)    buyer and seller are typically motivated;

(2)    both parties are well informed or well advised, and acting in what they consider their own best interests;

(3)    a reasonable time is allowed for exposure in the open market;

(4)    payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5)    the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(SOURCE: Office of the Comptroller of the Currency (OCC), 12 CFR, Part 34, Subpart C-Appraisals, 34.42 Def. (g); FIRREA Title XI, Section 34.42 (f), and Federal Deposit Insurance Corporation (FDIC) Final Rules, 12, CFR Part 323.2(f))

**Market Value "As Is"** means an estimate of the market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date of the property inspection.

**Prospective Value Estimate** or similar terms labeled exactly as requested by the client mean forecast values expected at specified future dates.  Of note, Advisory Opinion 17 (AO-17) of USPAP states a prospective value opinion must be on the basis of an extraordinary assumption that the property will be improved as of a future date, as proposed and that a prospective value opinion without future verb tenses is improper.

The **fee simple** estate is defined as:

Absolute ownership unencumbered by any other interest or estate; subject only to the limitations imposed by the four government powers of taxation, eminent domain, police power, and escheat.

(SOURCE:        Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th Edition, 2015)

The **leased fee interest** is defined as:

> A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease).

(SOURCE:        Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th Edition, 2015)


**Insurable Value** (or similar title) means the portion of the value of an asset or asset group that is acknowledged or recognized under the provisions of an applicable loss insurance policy.  This replacement or reproduction cost estimate typically excludes any deductions for deterioration and non-insurable items.


**Exposure Time**:  a USPAP requirement to estimate an opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

(SOURCE:  "Definitions" *USPAP 2020-2021 Edition*, © The Appraisal Foundation, Page 4).


**Marketing Time**: an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal.

(SOURCE:    "Marketing Time Opinions" *USPAP Advisory Opinion 7 (AO-7) 2016-2017 Edition*, © The Appraisal Foundation, Page 88).

# PROPERTY IDENTIFICATION AND HISTORY

## Property Classification and Legal Description

The appraised subject is the leased fee interest in a 100% leased/occupied multi-user industrial building property. The property is currently 70% owner-occupied and 30% leased to four tenants. The 1995-built concrete tilt-up, 2-story, stairwell (2) and elevator (1) served building has estimated 122,388 SF net rentable and gross building areas (NRA and GBA). The building interior is demised with 43,456 SF / 36% of NRA of 2-story office improvement build-out, approximately 8,000 SF / 6% of NRA of warehouse area having a 20' clear height and 2 roll-up loading doors, and the remaining 70,932 SF / 58% of NRA is currently built out as "clean room" space with vinyl flooring, dropped ceiling tiles, air conditioning, and multiple power and compressed air attachments throughout the building. The I-P – Industrial Park-zoned level, irregular shaped site is 17.47-acres / 760,993 SF, partly paved and landscaped surrounding the building. The property has a 13% site coverage ratio and 327 parking spaces for a 2.7:1 parking ratio. The low coverage ratio indicates surplus land area discussed in the report. The property condition overall is estimated as average.

The property is located at 30590 Cochise Circle within an unincorporated area of Riverside County adjacent to, and having a mailing address from the City of Murrieta, California. The assessor's parcel number, or APN, is: 963-070-017. The subject legal description from the title report is copied in this appraisal report addenda. It is briefly summarized as:

*PARCEL 12 OF PARCEL MAP NO. 23199, IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, ON FILE IN BOOK 170 PAGES 73 THROUGH 76 INCLUSIVE, OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, A CERTIFICATE OF CORRECTION BEING RECORDED MAY 15, 1992 AS INSTRUMENT NO. 177301 OF OFFICIAL RECORDS.*

## Property Ownership and Recent History

The property ownership information is derived from the title report described in the Scope section of this appraisal. Accordingly, the subject property is vested in:

BIOXXEL, LLC

The subject property has not sold within the past three-year mandatory reporting period. The subject is reportedly not currently in escrow or listed for sale. However, there is reportedly a current non-arms-length transaction involving the subject property. According to Mr. Vong at First Choice Bank, the current transaction involves a partner buyout of the property. Upon conclusion of the current transaction, the property will be under a different ownership entity, but will not have transferred as an arms-length sale.

## Regional Location Map



## Neighborhood Location Map

# MARKET AREA DESCRIPTION

Social, economic, governmental, and environmental forces can influence subject and area property values.  However, the following section reflects trends and market information that is current but generalized and pertaining to the overall economy.  Direct real estate value influences specific to the subject and its property type are typically more pertinent from the immediate surrounding data.  The following relates to the boundaries of that general area of influence.

## Greater Overall Regional Conditions

The following comments in this section are excerpted from the Federal Reserve Board "Beige Book[1]" that provides a current overview of the overall economic condition of the western United States:

Economic activity in the Twelfth District continued to expand at a modest pace during the reporting period of mid-November through December. Overall employment levels and the existing modest pace of price inflation were largely stable, and wages increased slightly. Retail sales picked up, but activity in the consumer and business services sectors was mixed. Manufacturing activity increased somewhat, and conditions in the agriculture sector strengthened slightly. Contacts reported continued strong activity in residential real estate markets, while conditions in the commercial sector weakened. Lending activity continued at high levels.

## Employment and Wages

Employers in most reporting sectors maintained generally stable staff head counts, following a sustained period of employment volatility due to the pandemic. Some contacts reported increased employee turnover but also highlighted little difficulty finding qualified applicants. Others reported labor shortages in the construction and building materials manufacturing sectors, which was intensified in some areas by reconstruction efforts following the wildfire season. Contacts in tourism and food services noted employment cuts in response to the recent surge in COVID-19 cases and resulting renewal of mobility restrictions in some areas. A contact in automotive services reported reduced numbers of workers and hours due to slower activity. A few contacts in the financial sector mentioned operational efficiencies that led to the elimination of redundant positions. Demand for labor in the technology and health-care industries remained solid.

---

[1] **Prepared at the Federal Reserve Bank based on information collected before January 13, 2021. This document summarizes comments received from businesses and other contacts outside the Federal Reserve and is not a representation of the views of Federal Reserve officials.**

Wages increased slightly near year-end. Contacts reported little change in entry level wages, except for workers affected by minimum wage legislation. For higher-paying positions, employers noted either no noticeable changes to wages or only typical merit increases for existing employees. Some firms in the construction and manufacturing sectors offered extra vacation days and extended holiday season bonuses to help reduce turnover. There were a few reports of decreased wages for some financial service providers due to a reduction in interest margins. Others, however, mentioned slight increases in wages and rising pressures.

**Prices**

Most contacts reported stable and low price inflation over the reporting period. While manufacturers noted that input costs had increased, some highlighted that they had not passed those increases to end users. Consumer service providers generally did not change their price structures, but some business service providers implemented holiday season surcharges in response to strong demand. Prices for building materials rose significantly, while those for agricultural products rose modestly.

**Retail Trade and Services**

Retail sales picked up in general, but reports varied somewhat by region. Holiday sales were stronger than expected given the pandemic but weaker than past holiday seasons. Retailers in areas where local governments reinstated limitations on commerce and mobility in response to the recent virus surge saw a large negative impact on sales. Reports highlighting foot traffic varied widely, with some contacts noting empty stores and shopping malls, and others mentioning customers in long wait lines. Sales at auto dealerships were boosted somewhat by year-end tax incentives. Some specialty retailers, including for pet products, reported strong sales. Others mentioned weaker sales for discretionary products due to customers' focus on purchases for essential products. E-commerce volumes increased notably relative to brick-and-mortar stores, and contacts reported that the pandemic has further accelerated the shift toward online sales. Contacts in areas that depend more heavily on tourism, such as Alaska and Hawaii, reported that holiday retail sales were significantly below levels from past seasons.

Activity in the consumer and business services sector was mixed. Demand for logistics and delivery services rose further, with providers working at full capacity. Shipping service quotas were implemented on many big box companies, with some reported order backlogs and shipping delays due to increased online sales volume during the holiday period.

In health care, demand for elective procedures and mental health assistance continued to rebound from the pause earlier in the year, though providers expressed concerns about the recent surge in COVID-19 cases potentially limiting the volume of such services. Contacts in the tourism industry noted that demand for air travel and hotel rooms was still subdued. The pandemic continued to severely impact restaurant and dining services, with reports noting that many smaller restaurateurs have struggled to stay open. Production in the entertainment sector has returned slowly under strict safety protocols. Capacity utilization among automotive service providers remained low, and store hours were reduced to reflect the current environment. Demand for nonprofit services focused on housing assistance remained at average levels, while enrollment numbers for higher education stayed tepid.

### Manufacturing

Manufacturing activity increased modestly on balance. Production and capacity utilization for renewable energy equipment and supply chain services continued to grow at a strong pace, with some factories engaging in considerable overtime to meet pent-up demand. Production and capacity utilization in metals and wood products manufacturing remained robust, and contacts reported adequate access to materials. Demand for energy from manufacturers other than aerospace rebounded faster than power providers had anticipated. Aerospace manufacturing activity continued to be plagued by the pandemic-related drop in air travel demand. One contact also mentioned that pre-pandemic technical issues continued to hamper demand for manufactured aircraft parts.

### Agriculture and Resource-Related Industries

Agricultural activity increased slightly over the reporting period. Demand for agricultural products grown in California and the Pacific Northwest expanded both domestically and internationally, as exports benefitted from a depreciated dollar. Sales of wheat, fruit, raisins, and nuts to global markets picked up near year-end, with shipments of almonds reaching record highs according to a contact who provides transportation services for the agricultural sector. Inventories fell somewhat from the prior reporting period but remained high. Fires in California's Central Valley impacted production capacity for some farmers and livestock ranchers, but the total impact is yet to be determined.

**Real Estate and Construction**

Activity in residential real estate markets continued to grow robustly across the District, yet the pace of growth was slightly slower than in the previous reporting period. Demand for homes continued to be boosted by historically low mortgage rates and wider geographic searches by those able to work remotely. New construction and prices for housing rose further while inventories remained tight, especially for homes at more affordable price ranges. Contacts in the Mountain West noted that many homes were sold prior to completion. Across the District, contacts reported constraints on the availability of qualified construction labor, building materials, and lots with ready access to public utility services. Demand for residential rental units in metropolitan areas continued to fall. In contrast, contacts reported increased inquiries for suburban rental spaces. One contact in the Pacific Northwest highlighted an increase in the number of past due rent payments.

Demand for new commercial construction weakened, and contacts observed that high uncertainty continued to cloud plans in the District. Reports focused on increased vacancies in retail space but continued modest competition for warehouse space. Construction permitting for industrial and storage facilities was still in high demand, partially due to increasing rents. A contact in Utah noted increased demand for office and hotel space due to population growth in the area. One contact in California mentioned that the positive news concerning vaccines was a material input in their firm's decision to partially renew their commercial space lease.

**Financial Institutions**

Lending activity remained at high levels but the pace of new loan generation slowed somewhat. Reports indicated that expectations for a new round of government-backed lending programs with favorable terms have encouraged many business borrowers to postpone their loan applications slightly. Demand for new mortgages and refinancing remained strong. Deposits were robust and banks reported having significant liquidity, high asset quality, and generally healthy balance sheets. Nonetheless, some bankers expressed concern over potential loan losses should payment deferrals and loan forbearances be terminated, especially in relation to loans extended to restaurants, bars, and hotels. In venture capital markets, contacts noted increased investor interest in clean energy and other businesses oriented around environmental sustainability.

## Southern California

### Location and Climate

The Southern California market area, which includes Los Angeles, Orange, Ventura, San Bernardino, San Diego, and Riverside Counties, is located in the southwestern portion of the state. This economic region encompasses much of Southern California, with the exception of Imperial County located on the Mexican border, and includes an area with an interdependent economy that stretches from the Pacific Ocean to the Arizona border.

### Population

| County | 1980 | 1990 | 2000 | 2004 | 2010 | Most Recent |
|---|---|---|---|---|---|---|
| Los Angeles | 7,441,700 | 8,898,400 | 9,580,600 | 10,103,000 | 9,822,121 | 10,004,300 |
| Orange | 1,919,400 | 2,423,800 | 2,856,800 | 3,016,874 | 3,008,855 | 3,175,410 |
| **Riverside** | **653,800** | **1,195,800** | **1,553,000** | **1,776,700** | **2,179,692** | **2,495,300** |
| San Bernardino | 878,000 | 1,440,700 | 1,720,700 | 1,886,500 | 2,033,141 | 2,193,420 |
| San Diego | 1,850,300 | 2,480,100 | 2,835,600 | 3,017,200 | 3,091,579 | 3,342,800 |
| Ventura | 521,000 | 671,600 | 758,100 | 802,400 | 822,108 | 843,870 |
| Imperial | 93,400 | 108,300 | 142,361 | 156,430 | 174,244 | 180,907 |
| Region | 13,357,600 | 17,218,700 | 19,447,161 | 20,759,104 | 21,131,740 | 22,236,007 |
| Annualized Growth | Base | 2.89% | 1.29% | 1.69% | 0.36% | 5.23% |

Source: State of California, Department of Finance

All sources (in migration, natural increases) are expected to continue to contribute to the population growth of the region.

### Economic Base

Both the Los Angeles (including L.A., Orange, Riverside, and San Bernardino Counties) and San Diego regions have become highly diversified postindustrial economic centers. While there is still a great deal of rivalry and competition between the two metro areas, it has become increasingly apparent that the economies are becoming more intertwined. Recent growth in southern Orange and Riverside Counties and in northern San Diego County has had a blurring effect on many of the differences.

Predominant industries in the area include business and financial services, tourism, aerospace, telecommunications, medical technology, wholesale trade and distribution, health services, international trade, entertainment, the garment industry, and construction. The local economy was considered a mirror reflection of the national economy in terms of diversification, and has been historically thought to be highly resistant to downturns.

## Employment

The most recent change in growth in the number of jobs over the past 12 months is indicated by the following chart:

| County | November-19 | | November-20 | |
| --- | --- | --- | --- | --- |
| | TOTAL EMPLOYMENT | UNEMP. RATE | TOTAL EMPLOYMENT | UNEMP. RATE |
| Los Angeles | 4,963,400 | 4.1% | 4,459,100 | 10.6% |
| Orange | 1,588,300 | 2.6% | 1,490,700 | 6.4% |
| **Riverside** | **1,073,100** | **3.9%** | **1,015,000** | **7.8%** |
| San Bernardino | 944,700 | 3.5% | 893,600 | 8.0% |
| San Diego | 1,553,400 | 2.9% | 1,477,300 | 6.6% |
| Ventura | 411,300 | 3.4% | 386,700 | 6.3% |
| Imperial | 58,900 | 18.6% | 54,700 | 16.4% |
| Region | 10,593,100 | 5.6% | 9,777,100 | 8.9% |

Source: California EDD

## City Description - Murrieta

### Location

As stated, the subject property is located in an unincorporated area of Riverside County. However, the property address is Murrieta, the closest, most closely associated incorporated city associated with the subject.  As a result, the following discussions refer to the City of Murrieta. Generally, the city is within the southern area of the county, and 30 miles from the central business district of the county seat.

### Population

The current population of Murrieta is 112,941.  This represents a 10% increase from the 2012-reported population of 102,345.  The future population growth is expected to be stable to slightly increasing based on population trends.

21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank

13

**Transportation**

Access to the regional transportation system is provided by the 15 and 215 Freeways, which pass through the city and provide for excellent commuter and industry transportation.

**Employment Trends**

According to the State Department of Finance, current employment levels amount to 51,700, representing an 18% change from December 2010.  At this time, the unemployment rate amounts to 7.2%, lower than the unemployment reported for the County as a whole.

**Neighborhood Description**

**Location**

The subject property is located at the eastern terminus of Cochise Circle northeast of the city's main business district.  Cochise Circle is a small 2-lane road that provides access to the adjacent RV storage lot and the subject property.  The subject neighborhood is defined as Benton Road to the north, Van Gaele Lane to the east, Auld Road to the south, and Winchester Road / Highway 79 to the west.

**Transportation**

The neighborhood is served by the 15 and 215 Freeways, which are located west of the subject, respectively.  Major surface streets in the neighborhood include Murrieta Hot Springs (east/west) and Winchester Road / Highway 79 (north/south).  The nearest access to rail based transportation is approximately 15 miles from the subject, and this has no measurable impact on the neighborhood.  Scheduled bus service is not available in the immediate neighborhood of the subject.

| NEIGHBORHOOD LAND USE SUMMARY | |
| --- | --- |
| Built-Up | 20% |
| Single Family | 0% |
| Condominium | 0% |
| Apartment | 0% |
| Commercial | 10% |
| Industrial | 10% |
| Vacant | 80% |

## Neighborhood Land Uses

This is predominantly an industrial use neighborhood, with other land uses consisting of service commercial. Most of the developments in the neighborhood range in age from 5 to 25 years. The chart at the left provides a rough approximation of the land use percentages in the neighborhood. The general development density and uses are illustrated in the colored aerial map in the report. Also, please refer to the "surrounding properties" Site Data within the Property Description of this report.

The French Valley Regional Airport is located just south of the subject property. During the on-site inspection, several airplanes were noticed flying over the subject building on their approach to the airport.

## Demographics

According to information provided by the Census Bureau, this is an upper-income neighborhood with a current median family income of $108,266, 43.8% higher than the median family income for the MSA of $75,300. Within this census tract, 7.1% of the population reports income levels that fall below the poverty line.

## Housing Prices

According to Dataquick Information Services, the most recent median housing price for Zip Code 92563 is $490,000 (October 2020). This represents a $46,500 (10.5%) increase in the past year from $443,500 reported in October 2019.

**Neighborhood Demographics and Traffic Counts**

The following demographic and traffic count information from CoStar is specific to the subject property location and reflects the subject's neighborhood traffic and activity.

## Demographics »

| | 1 mile | 3 miles |
|---|---|---|
| Population | 5,943 | 73,934 |
| Households | 1,641 | 21,335 |
| Median Age | 32.40 | 34 |
| Median HH Income | $107,170 | $101,050 |
| Daytime Employees | 1,908 | 8,469 |
| Population Growth '20 - '25 | 5.94% | 8.29% |
| Household Growth '20 - '25 | 5.79% | 8.03% |

## Traffic »

| Collection Street | Cross Street | Traffic Vol | Last Mea... | Distance |
|---|---|---|---|---|
| Benton Rd | Temeku St | 5,749 | 2018 | 0.23 mi |
| Winchester Rd | Auld Rd SW | 31,003 | 2020 | 0.30 mi |
| Winchester Road | Benton Rd SE | 25,542 | 2020 | 0.32 mi |
| Winchester Rd | Benton Rd SW | 25,283 | 2020 | 0.51 mi |
| Auld Rd | Leon Rd W | 5,082 | 2018 | 0.51 mi |
| Leon Rd | Van Gaale Ln S | 1,402 | 2018 | 0.57 mi |
| Thompson Rd | Leon Rd W | 8,217 | 2018 | 0.79 mi |
| Briggs Rd | Los Alamos Rd S | 1,272 | 2018 | 0.80 mi |
| Red Oak St | Auld Rd S | 979 | 2018 | 0.88 mi |
| Auld Rd | Sumac St E | 1,717 | 2018 | 1.01 mi |

Made with TrafficMetrix® Products

**Market Area Conclusion**

The aforementioned information reflected the overall regional and market trends generally through the beginning of 2020. However, starting in the first quarter of 2020, the world, region, and local area are having an as of yet unmeasured impact from the Covid-19 outbreak. Effects of sickness caused by and combatting the virus generally impacted the U.S. economy effectively starting in March 2020. As of the date of this report writing, the overall and specific subject area and market impact are unknown. However, the conclusions in this report reflect analysis of the most pertinent data available as it applies to the subject as of the stated date of value.

Before the Corona Virus, real estate sectors generally experienced: 1) relatively strong apartment property occupancy and price increases, and; 2) fairly stable to increasing industrial property sale price, rental rate, and occupancy increases in most size single-user buildings and multi-tenant properties, but little new speculative and build-to-suit development, and; 3) anchored or well-located retail properties showing demand, though many older or secondary commercial properties saw selective interest, and 4) office properties seeing decent demand but the most over-built affects in vacancy and rent stabilization and trends; medical space showed stable to strong absorption and some rent increases.  To date, the Covid-19 affected real estate trends have varied.  However, the conclusions in this report reflect analysis of the most pertinent data as it applies to the subject.

# INDUSTRIAL MARKET OVERVIEW

# Overview

| 12 Mo Deliveries in SF | 12 Mo Net Absorption in SF | Vacancy Rate | 12 Mo Rent Growth |
|---|---|---|---|
| **125 K** | **(538 K)** | **6.5%** | **3.7%** |

The South Riverside Submarket is an attractive infill area because of its proximity to affluent consumers— both within the submarket as well as those in Orange County and San Diego. However, most industrial buildings are small or mid-sized and industrial development has been rare, especially relative to the neighboring Moreno Valley/Perris Submarket.

Vacancies have crept higher since bottoming out at 1.9% in 18Q3 and now sit at 6.5%. A 51,750-SF distribution building delivered in early 2020 and was fuly leased by

July. Also, several spec developments delivered in late 2018 and early 2019, but most of that new space has been leased or purchased for owner-occupancy. Instead, older space has become available. Rents have endured strong growth over the past five years, but growth has been decelerating for several quarters.

Investors remained active throughout 2020, even as the pandemic induced significant job losses and business closures.

## KEY INDICATORS

| Current Quarter | RBA | Vacancy Rate | Market Rent | Availability Rate | Net Absorption SF | Deliveries SF | Under Construction |
|---|---|---|---|---|---|---|---|
| Logistics | 13,382,333 | 9.2% | $0.95 | 11.0% | (823,611) | 0 | 141,560 |
| Specialized Industrial | 7,918,703 | 1.7% | $1.08 | 2.6% | 41,659 | 0 | 0 |
| Flex | 1,766,101 | 7.3% | $1.17 | 10.6% | (9,981) | 0 | 0 |
| **Submarket** | **23,067,137** | **6.5%** | **$1.01** | **8.1%** | **(791,933)** | **0** | **141,560** |

| Annual Trends | 12 Month | Historical Average | Forecast Average | Peak | When | Trough | When |
|---|---|---|---|---|---|---|---|
| Vacancy Change (YOY) | 2.9% | 6.2% | 7.1% | 14.5% | 2009 Q3 | 1.9% | 2018 Q3 |
| Net Absorption SF | (538 K) | 403,046 | (85,545) | 1,218,134 | 2002 Q2 | (397,851) | 2009 Q3 |
| Deliveries SF | 125 K | 439,089 | 124,264 | 1,402,857 | 2005 Q4 | 0 | 2013 Q2 |
| Rent Growth | 3.7% | 3.3% | 4.5% | 9.3% | 2017 Q1 | -9.3% | 2009 Q4 |
| Sales Volume | $191 M | $84M | N/A | $190.2M | 2020 Q4 | $17.5M | 2009 Q3 |

EXHIBIT "5"
PAGE 47

# Leasing

Vacancies were steady in 2020 after slightly growing in 2019. Yet the vacancy rate remains low at 6.5%. There have been few deliveries in the past 12 months and most space beocming available is comprised of older buildings.

South Riverside attracts a wide array of types of tenants and the largest leases tend to involve spaces between 20,000 SF and 50,000 SF. One recent exception comes from an undisclosed tenant that signed on to take a

65,625-SF warehouse in Temecula that was last occupied by OshKosh Defense. Walmart accounts for one of the largest leases singed since the start of 2019, when they signed on for 102,300 SF in Temecula.

Tenants in the submarket are primarily composed of businesses that serve local economies. However, access to Orange County and San Diego serves logistics operations well.

**NET ABSORPTION, NET DELIVERIES & VACANCY**



EXHIBIT "5"
PAGE 48

# Leasing

**VACANCY RATE**



**AVAILABILITY RATE**



EXHIBIT "5"
PAGE 49

# Leasing

**4 & 5 STAR MOST ACTIVE BUILDINGS IN SUBMARKET - PAST 12 MONTHS**

| Property Name/Address | Rating | RBA | Deals | Leased SF | 12 Mo Vacancy | 12 Mo Net Absorp SF |
|---|---|---|---|---|---|---|
| **Bldg 2**<br>22420 Temescal Canyon Rd | ★★★★☆ | 198,030 | 1 | 45,647 | 4.8% | 47,827 |
| **32543 Corydon Rd** | ★★★★☆ | 78,000 | 1 | 38,910 | 0% | 0 |
| **Temecula Heights Corporate…**<br>42301 Zevo Dr | ★★★★☆ | 228,912 | 2 | 228,912 | 3.2% | (10,253) |

EXHIBIT "5"
PAGE 50

# Leasing

**3 STAR MOST ACTIVE BUILDINGS IN SUBMARKET - PAST 12 MONTHS**

| Property Name/Address | Rating | RBA | Deals | Leased SF | 12 Mo Vacancy | 12 Mo Net Absorp SF |
|---|---|---|---|---|---|---|
| **43085 Business Park Dr** | ★★★☆☆ | 140,436 | 3 | 54,150 | 5.2% | 57,997 |
| **43214 Black Deer Loop** | ★★★☆☆ | 52,224 | 2 | 24,576 | 17.8% | 20,544 |
| **Building B** 26111 Ynez Rd | ★★★☆☆ | 33,122 | 12 | 14,611 | 20.3% | 6,344 |
| **Bldg B** 42245 Remington Ave | ★★★☆☆ | 55,800 | 3 | 14,052 | 7.0% | 5,687 |
| **Bldg B** 29980 Technology Dr | ★★★☆☆ | 19,283 | 3 | 5,065 | 8.2% | 4,189 |
| **42225 Remington Ave** | ★★★☆☆ | 68,000 | 3 | 7,870 | 0% | 1,812 |
| **Classic Pacific Business Park…** 1622 Illinois Ave | ★★★☆☆ | 51,118 | 4 | 17,590 | 6.8% | 1,782 |
| **Bldg 18** 9064 Pulsar Ct | ★★★☆☆ | 18,977 | 2 | 5,667 | 36.9% | 1,574 |
| **41740 Enterprise Cir N** | ★★★☆☆ | 34,425 | 2 | 10,755 | 6.2% | 850 |
| **Bldg C** 29990 Technology Dr | ★★★☆☆ | 20,693 | 4 | 9,392 | 6.5% | 0 |
| **Bldg B** 26323 Jefferson Ave | ★★★☆☆ | 14,564 | 2 | 855 | 0.2% | 0 |
| **41606-41610 Date St** | ★★★☆☆ | 53,286 | 2 | 10,560 | 1.8% | 0 |
| **Bldg 2** 27570 Commerce Center Dr | ★★★☆☆ | 25,857 | 2 | 3,049 | 12.4% | (601) |
| **41735 Elm St** | ★★★☆☆ | 32,090 | 3 | 5,979 | 3.8% | (661) |
| **26856 Adams Ave** | ★★★☆☆ | 6,167 | 2 | 2,550 | 45.9% | (888) |
| **Bldg 3** 27574 Commerce Center Dr | ★★★☆☆ | 20,746 | 4 | 5,959 | 18.5% | (1,106) |
| **40880 County Center Dr** | ★★★☆☆ | 41,120 | 5 | 8,861 | 1.2% | (1,248) |
| **Bldg 19** 9036 Pulsar Ct | ★★★☆☆ | 18,592 | 2 | 3,774 | 8.1% | (1,479) |
| **1654 Illinois Ave** | ★★★☆☆ | 42,222 | 3 | 7,892 | 8.1% | (1,910) |
| **9106 Pulsar Ct** | ★★★☆☆ | 67,062 | 3 | 15,527 | 5.3% | (5,947) |

EXHIBIT "5"
PAGE 51

# Rent

Rent growth in the submarket closely mirrors the metro's, with impressive gains in recent years. Average rent in South Riverside grew by 7.3% on average over the past five years, including 3.7% over the past 12 months. The strongest gains in rents are coming to newer, 4 & 5 Star properties. Average rents are about 22% above the metro average due to proximity to affluent households within the submarket in Orange and San Diego Counties.

Rentgains are projected to further slow in CoStar's Base Case scenario, as recent business closures coincide with drastic job losses across the metro, leading to lower demand for industrial properties.

**MARKET RENT GROWTH (YOY)**



Legend: Specialized Industrial | Logistics | Flex | South Riverside | Inland Empire

Copyrighted report licensed to Connolly Commercial - 330500

EXHIBIT "5"

PAGE 52

# Rent

South Riverside Industrial

**MARKET RENT PER SQUARE FEET**



EXHIBIT "5"

PAGE 53

# Construction

Industrial development continues to expand in the Inland Empire, but South Riverside has had only a few small and mid-sized projects built over the past ten years. Instead, the larger warehouses being built are in the neighboring Moreno Valley/Perris submarket, where land values are far less expensive.

Two of the largest buildings underway measure 28,000 SF and 22,926 SF, respectively. The former is being developed by locally-based SCI and is located in

Murrieta. It's available for lease and potentially divisible for two tenants. TRC is developing the smaller of the two buildings, which is located in Winchester. The building is part of a mixed-use retail and industrial site and will be adjacent to a Stater Bros.

One of the newest developments in the submarket is the Pulsar Industrial Court in Corona. The industrial park has four buildings ranging from 20,360 SF to 23,857 SF, and two of the buildings are vacant and available for lease.

**DELIVERIES & DEMOLITIONS**



CoStar™

EXHIBIT "5"
PAGE 54

# Construction

South Riverside Industrial

| All-Time Annual Avg. Square Feet | Delivered Square Feet Past 8 Qtrs | Delivered Square Feet Next 8 Qtrs | Proposed Square Feet Next 8 Qtrs |
|---|---|---|---|
| **49,036** | 0 | **0** | 0 |

**PAST 8 QUARTERS DELIVERIES, UNDER CONSTRUCTION, & PROPOSED**



**PAST & FUTURE DELIVERIES IN SQUARE FEET**

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 10

EXHIBIT "5"
PAGE 55

# Construction

**RECENT DELIVERIES**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 1 | Building C<br>9142 Pulsar Ct | ★★★☆☆ | 23,857 | 1 | May 2018 | Sep 2020 | -<br>Yanyan Ling |
| 2 | Building D<br>9158 Pulsar Ct | ★★★☆☆ | 20,360 | 1 | May 2018 | Sep 2020 | -<br>Chunming Ma |
| 3 | Building A<br>9118 Pulsar Ct | ★★★☆☆ | 21,442 | 1 | Jul 2018 | Jul 2020 | - |
| 4 | Building B<br>9130 Pulsar Ct | ★★★☆☆ | 21,007 | 1 | Jul 2018 | Jul 2020 | - |
| 5 | Remington Distribution...<br>42006 Remington Ave | ★★★☆☆ | 53,259 | 1 | Apr 2018 | Jan 2020 | Hamann Companies<br>Hamann Companies |
| 6 | Building M<br>495 Birch St | ★★★☆☆ | 8,154 | 1 | Sep 2018 | Dec 2019 | -<br>Sierra West Electric |
| 7 | Building N<br>485 Birch St | ★★★☆☆ | 9,978 | 1 | Sep 2018 | Dec 2019 | -<br>Kwang Wook Kim & Hui Zhang |
| 8 | Building P<br>475 Birch St | ★★★☆☆ | 18,411 | 1 | Sep 2018 | Dec 2019 | - |
| 9 | Building R<br>445 Birch St | ★★★☆☆ | 9,076 | 1 | Sep 2018 | Dec 2019 | - |
| 10 | Building S<br>455 Birch St | ★★★☆☆ | 9,076 | 1 | Sep 2018 | Dec 2019 | -<br>Ketan Automated Equipment |
| 11 | Building Q<br>465 Birch St | ★★★☆☆ | 16,010 | 1 | Sep 2018 | Oct 2019 | -<br>Gary M. & Elena J. Morris |
| 12 | Building I-5<br>30882 Wealth St | ★★★☆☆ | 5,247 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 13 | Building I-1<br>30914 Wealth St | ★★★☆☆ | 5,247 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 14 | Building I-2<br>30906 Wealth St | ★★★☆☆ | 5,548 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 15 | Building I-3<br>30898 Wealth St | ★★★☆☆ | 5,548 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 16 | Building I-4<br>30890 Wealth St | ★★★☆☆ | 6,448 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 17 | Building I-6<br>30874 Wealth St | ★★★☆☆ | 5,548 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 18 | Building I-7<br>30866 Wealth St | ★★★☆☆ | 5,548 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |
| 19 | Building I-8<br>30858 Wealth St | ★★★☆☆ | 6,490 | 1 | Oct 2017 | Mar 2019 | -<br>Joseph D & Lucile Dennis |
| 20 | Building I-9<br>30850 Wealth St | ★★★☆☆ | 4,336 | 1 | Oct 2017 | Mar 2019 | -<br>French Valley Airport Center LLC |

**UNDER CONSTRUCTION**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 1 | Building 2<br>SWC Chaney St. & Mintho... | ★★★☆☆ | 38,828 | 1 | Jan 2021 | Oct 2021 | - |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 11

EXHIBIT "5"
PAGE 56

# Construction

South Riverside Industrial

**UNDER CONSTRUCTION**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 2 | Building 1<br>SWC Chaney St. & Mintho... | ★★★☆☆ | 32,607 | 1 | Jan 2021 | Oct 2021 | -<br>Fairway Commercial Partners |
| 3 | 41537 Eastman Dr | ★★★☆☆ | 28,000 | 1 | Aug 2020 | Feb 2021 | -<br>SCI, Inc. |
| 4 | Building B1<br>NWC Benton Rd & Leon Rd | ★★★☆☆ | 22,925 | 1 | Feb 2020 | Mar 2021 | -<br>TRC |
| 5 | Building 3<br>SWC Chaney St. & Mintho... | ★★★☆☆ | 19,200 | 1 | Jan 2021 | Oct 2021 | -<br> |

**PROPOSED**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 1 | Building 4<br>Avenida Alvarado & Tierra... | ★★★★☆ | 33,843 | 1 | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 2 | Building 5<br>Avenida Alvarado & Tierra... | ★★★★☆ | 23,876 | - | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 3 | Building 6<br>Avenida Alvarado & Tierra... | ★★★★☆ | 20,336 | 1 | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 4 | Zeider's Industrial Big Y...<br>33325 Zeiders Rd | ★★★☆☆ | 20,000 | 1 | Jun 2021 | Jun 2022 | -<br>Todd Close |
| 5 | W Minthorn St | ★★★☆☆ | 20,000 | 1 | Dec 2021 | Nov 2022 | -<br>Robert Andrew Carson |
| 6 | Building 9<br>Avenida Alvarado & Tierra... | ★★★★☆ | 19,890 | 1 | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 7 | Building 10<br>Avenida Alvarado & Tierra... | ★★★★☆ | 19,813 | - | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 8 | Building 11<br>Avenida Alvarado & Via In | ★★★★☆ | 17,640 | 1 | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 9 | Building 8<br>Avenida Alvarado & Tierra... | ★★★★☆ | 17,491 | 1 | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 10 | Building 3<br>Avenida Alvarado & Tierra... | ★★★★☆ | 16,068 | 1 | Apr 2021 | Oct 2021 | -<br>Silagi Development & Management |
| 11 | Building 1<br>Avenida Alvarado & Tierra... | ★★★★☆ | 15,825 | 1 | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |
| 12 | Madison Ave. @ Elm St. | ★★★☆☆ | 13,631 | - | Jan 2021 | Oct 2021 | -<br>- |
| 13 | Building 7<br>Avenida Alvarado & Tierra... | ★★★★☆ | 12,006 | - | Apr 2021 | Oct 2021 | Silagi Development & Management<br>Silagi Development & Management |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 12

EXHIBIT "5"
PAGE 57

# Sales

Most sales in South Riverside tend to involve properties valued at under $5 million and the market price is $185/SF. While sales activity started to slow across the metro in mid-March 2020, South Riverside continued to draw attention from private investors throughout the yer. Sales volume totaled $190 million in 2020, compared to $151 million in 2019.

One recent outsized trade involves an institutional buyer. In April 2020, AEW Capital Management acquired a 228,900-SF warehouse in Temecula that was leased to Abbot Vascular and Interior Specialists at the time of

sale for $29 million ($127/SF). Abbot Vascular recently signed a five-year renewal on their lease while Interior Specialists' lease was up in October 2020.

The market cap rate in the submarket is 5.0%, but many properties trade 100-200 basis points higher. For example, in May 2020, a private investor acquired a fully-leased, 64,700-SF food processing building in Temecula at a 6% cap rate. Stos Partners, the seller, acquired the asset in April 2019 and estimated that it would invest $500,000 to reposition the 1985-vintage building.

**SALES VOLUME & MARKET SALE PRICE PER SF**



EXHIBIT "5"

PAGE 58

# Sales Past 12 Months

**South Riverside Industrial**

| Sale Comparables | Avg. Cap Rate | Avg. Price/SF | Avg. Vacancy At Sale |
|:---:|:---:|:---:|:---:|
| **57** | **5.7%** | **$89** | **6.5%** |

**SALE COMPARABLE LOCATIONS**



**SALE COMPARABLES SUMMARY STATISTICS**

| Sales Attributes | Low | Average | Median | High |
|---|---|---|---|---|
| Sale Price | $390,000 | $4,212,356 | $2,450,000 | $29,050,000 |
| Price/SF | $5.59 | $89 | $171 | $295 |
| Cap Rate | 5.4% | 5.7% | 5.7% | 6.0% |
| Time Since Sale in Months | 0.4 | 5.9 | 5.4 | 11.9 |
| **Property Attributes** | **Low** | **Average** | **Median** | **High** |
| Building SF | 2,000 | 49,685 | 15,000 | 715,000 |
| Ceiling Height | 8' | 19'6" | 18' | 30' |
| Docks | 0 | 3 | 0 | 25 |
| Vacancy Rate At Sale | 0% | 6.5% | 0% | 100% |
| Year Built | 1972 | 1998 | 1999 | 2020 |
| Star Rating | ★ ☆ ☆ ☆ ☆ | ★ ★ ☆ ☆ ☆ 2.4 | ★ ★ ☆ ☆ ☆ | ★ ★ ★ ★ ☆ |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 14

EXHIBIT "5"
PAGE 59

# Sales Past 12 Months

**RECENT SIGNIFICANT SALES**

| | Property Name - Address | Rating | Yr Built | Bldg SF | Vacancy | Sale Date | Price | Price/SF | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Temecula Heights Corpo...<br>42301 Zevo Dr | ★★★★☆ | 1998 | 228,912 | 0% | 4/20/2020 | $29,050,000 | $127 | - |
| 2 | 41980 Winchester Rd | ★★★★☆ | 1996 | 310,000 | 0% | 9/9/2020 | $25,000,000 | $81 | - |
| 3 | 27719 Diaz Rd | ★★★☆☆ | 1972 | 131,577 | 0% | 10/6/2020 | $14,000,000 | $106 | - |
| 4 | 27731 Diaz Rd | ★★★☆☆ | 1980 | 65,625 | 100% | 4/22/2020 | $10,800,000 | $165 | - |
| 5 | 28410 Vincent Moraga Dr | ★★★☆☆ | 1985 | 64,678 | 0% | 5/22/2020 | $10,425,000 | $161 | 6.0% |
| 6 | 43191 Rancho Way | ★★☆☆☆ | 2002 | 21,382 | 0% | 9/4/2020 | $5,515,000 | $258 | - |
| 7 | Bldg B<br>29980 Technology Dr | ★★★☆☆ | 2006 | 19,283 | 9.3% | 9/9/2020 | $4,900,000 | $254 | - |
| 8 | 27635 Diaz Rd | ★★★☆☆ | 1985 | 39,129 | 0% | 5/13/2020 | $4,678,000 | $120 | - |
| 9 | 26105 Sherman Rd | ★★☆☆☆ | 2006 | 15,000 | 0% | 3/10/2020 | $4,425,000 | $295 | - |
| 10 | Building C<br>9142 Pulsar Ct | ★★★☆☆ | 2020 | 23,857 | 0% | 9/22/2020 | $4,170,500 | $175 | - |
| 11 | 27973 Diaz Rd | ★★☆☆☆ | 1992 | 15,992 | 0% | 12/18/2020 | $4,075,000 | $255 | - |
| 12 | Ramona Egg Ranch<br>30150 Briggs Rd | ★★☆☆☆ | 1986 | 715,000 | 5.6% | 3/18/2020 | $4,000,000 | $5.59 | - |
| 13 | Building B<br>9130 Pulsar Ct | ★★★☆☆ | 2020 | 21,007 | 0% | 1/5/2021 | $3,760,000 | $179 | - |
| 14 | Building D<br>9158 Pulsar Ct | ★★★☆☆ | 2020 | 20,360 | 0% | 10/6/2020 | $3,594,000 | $177 | - |
| 15 | Building A<br>9118 Pulsar Ct | ★★★☆☆ | 2020 | 21,442 | 100% | 10/22/2020 | $3,427,520 | $160 | - |
| 16 | 42020 Winchester Rd | ★★☆☆☆ | 2003 | 19,427 | 0% | 7/16/2020 | $3,100,000 | $160 | - |
| 17 | 18257 Grand Ave | ★★☆☆☆ | 1989 | 10,275 | 0% | 3/9/2020 | $3,000,000 | $292 | - |
| 18 | 43391 Business Park Dr | ★★★☆☆ | 2002 | 25,495 | 0% | 2/26/2020 | $2,796,640 | $110 | - |
| 19 | 27840 Del Rio Rd | ★★☆☆☆ | 1983 | 15,239 | 0% | 8/10/2020 | $2,614,000 | $172 | - |
| 20 | 41680 Enterprise Cir S | ★★☆☆☆ | 1990 | 18,000 | 54.1% | 7/31/2020 | $2,480,000 | $138 | - |

# Supply & Demand Trends

**OVERALL SUPPLY & DEMAND**

| Year | Inventory | | | Net Absorption | | |
|------|-----------|-----------|----------|----------------|----------|--------------------|
|      | SF | SF Growth | % Growth | SF | % of Inv | Construction Ratio |
| 2025 | 23,672,256 | 117,128 | 0.5% | 37,545 | 0.2% | 3.1 |
| 2024 | 23,555,128 | 120,747 | 0.5% | 51,186 | 0.2% | 2.4 |
| 2023 | 23,434,381 | 121,431 | 0.5% | 57,360 | 0.2% | 2.1 |
| 2022 | 23,312,950 | 94,993 | 0.4% | (19,753) | -0.1% | - |
| 2021 | 23,217,957 | 150,820 | 0.7% | (667,230) | -2.9% | - |
| YTD | 23,067,137 | 0 | 0% | (791,933) | -3.4% | - |
| 2020 | 23,067,137 | 139,925 | 0.6% | 265,367 | 1.2% | 0.5 |
| 2019 | 22,927,212 | 226,765 | 1.0% | 66,148 | 0.3% | 3.4 |
| 2018 | 22,700,447 | 386,317 | 1.7% | 419,173 | 1.8% | 0.9 |
| 2017 | 22,314,130 | 240,667 | 1.1% | 140,674 | 0.6% | 1.7 |
| 2016 | 22,073,463 | 101,262 | 0.5% | 73,275 | 0.3% | 1.4 |
| 2015 | 21,972,201 | (6,098) | 0% | 143,657 | 0.7% | - |
| 2014 | 21,978,299 | 10,412 | 0% | 580,414 | 2.6% | 0 |
| 2013 | 21,967,887 | 11,366 | 0.1% | 382,725 | 1.7% | 0 |
| 2012 | 21,956,521 | (4,000) | 0% | 376,814 | 1.7% | - |
| 2011 | 21,960,521 | (38,284) | -0.2% | 617,360 | 2.8% | - |
| 2010 | 21,998,805 | 91,662 | 0.4% | 40,642 | 0.2% | 2.3 |
| 2009 | 21,907,143 | 779,335 | 3.7% | 159,021 | 0.7% | 4.9 |

**SPECIALIZED INDUSTRIAL SUPPLY & DEMAND**

| Year | Inventory | | | Net Absorption | | |
|------|-----------|-----------|----------|----------------|----------|--------------------|
|      | SF | SF Growth | % Growth | SF | % of Inv | Construction Ratio |
| 2025 | 7,932,693 | 3,583 | 0% | (9,404) | -0.1% | - |
| 2024 | 7,929,110 | 3,683 | 0% | (2,223) | 0% | - |
| 2023 | 7,925,427 | 3,722 | 0% | 1,461 | 0% | 2.5 |
| 2022 | 7,921,705 | 2,818 | 0% | (20,082) | -0.3% | - |
| 2021 | 7,918,887 | 184 | 0% | 13,399 | 0.2% | 0 |
| YTD | 7,918,703 | 0 | 0% | 41,659 | 0.5% | 0 |
| 2020 | 7,918,703 | 0 | 0% | 141,433 | 1.8% | 0 |
| 2019 | 7,918,703 | 11,952 | 0.2% | (94,468) | -1.2% | - |
| 2018 | 7,906,751 | 29,427 | 0.4% | (83,969) | -1.1% | - |
| 2017 | 7,877,324 | 13,023 | 0.2% | (4,001) | -0.1% | - |
| 2016 | 7,864,301 | (38,640) | -0.5% | 44,708 | 0.6% | - |
| 2015 | 7,902,941 | (19,429) | -0.2% | (24,518) | -0.3% | - |
| 2014 | 7,922,370 | (873) | 0% | 170,120 | 2.1% | - |
| 2013 | 7,923,243 | 0 | 0% | 85,433 | 1.1% | 0 |
| 2012 | 7,923,243 | 0 | 0% | 69,385 | 0.9% | 0 |
| 2011 | 7,923,243 | (4,000) | -0.1% | 127,226 | 1.6% | - |
| 2010 | 7,927,243 | 91,662 | 1.2% | 211,060 | 2.7% | 0.4 |
| 2009 | 7,835,581 | 82,410 | 1.1% | (24,855) | -0.3% | - |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 16

EXHIBIT "5"
PAGE 61

# Supply & Demand Trends

**LOGISTICS SUPPLY & DEMAND**

| Year | Inventory | | | Net Absorption | | |
|------|-----------|-----------|----------|----------------|-----------|--------------------|
|      | SF | SF Growth | % Growth | SF | % of Inv | Construction Ratio |
| 2025 | 13,970,663 | 112,830 | 0.8% | 52,441 | 0.4% | 2.2 |
| 2024 | 13,857,833 | 116,317 | 0.8% | 58,256 | 0.4% | 2.0 |
| 2023 | 13,741,516 | 116,956 | 0.9% | 59,992 | 0.4% | 1.9 |
| 2022 | 13,624,560 | 91,608 | 0.7% | 9,146 | 0.1% | 10.0 |
| 2021 | 13,532,952 | 150,619 | 1.1% | (658,487) | -4.9% | - |
| YTD | 13,382,333 | 0 | 0% | (823,611) | -6.2% | - |
| 2020 | 13,382,333 | 139,925 | 1.1% | 71,308 | 0.5% | 2.0 |
| 2019 | 13,242,408 | 214,813 | 1.6% | 239,181 | 1.8% | 0.9 |
| 2018 | 13,027,595 | 356,890 | 2.8% | 492,993 | 3.8% | 0.7 |
| 2017 | 12,670,705 | 227,644 | 1.8% | 126,830 | 1.0% | 1.8 |
| 2016 | 12,443,061 | 139,902 | 1.1% | 119,111 | 1.0% | 1.2 |
| 2015 | 12,303,159 | 13,331 | 0.1% | 97,657 | 0.8% | 0.1 |
| 2014 | 12,289,828 | 11,285 | 0.1% | 277,233 | 2.3% | 0 |
| 2013 | 12,278,543 | 11,366 | 0.1% | 282,391 | 2.3% | 0 |
| 2012 | 12,267,177 | (4,000) | 0% | 262,760 | 2.1% | - |
| 2011 | 12,271,177 | (34,284) | -0.3% | 425,988 | 3.5% | - |
| 2010 | 12,305,461 | 0 | 0% | (166,332) | -1.4% | - |
| 2009 | 12,305,461 | 696,925 | 6.0% | 200,005 | 1.6% | 3.5 |

**FLEX SUPPLY & DEMAND**

| Year | Inventory | | | Net Absorption | | |
|------|-----------|-----------|----------|----------------|-----------|--------------------|
|      | SF | SF Growth | % Growth | SF | % of Inv | Construction Ratio |
| 2025 | 1,768,900 | 715 | 0% | (5,492) | -0.3% | - |
| 2024 | 1,768,185 | 747 | 0% | (4,847) | -0.3% | - |
| 2023 | 1,767,438 | 753 | 0% | (4,093) | -0.2% | - |
| 2022 | 1,766,685 | 567 | 0% | (8,817) | -0.5% | - |
| 2021 | 1,766,118 | 17 | 0% | (22,142) | -1.3% | - |
| YTD | 1,766,101 | 0 | 0% | (9,981) | -0.6% | - |
| 2020 | 1,766,101 | 0 | 0% | 52,626 | 3.0% | 0 |
| 2019 | 1,766,101 | 0 | 0% | (78,565) | -4.4% | - |
| 2018 | 1,766,101 | 0 | 0% | 10,149 | 0.6% | 0 |
| 2017 | 1,766,101 | 0 | 0% | 17,845 | 1.0% | 0 |
| 2016 | 1,766,101 | 0 | 0% | (90,544) | -5.1% | - |
| 2015 | 1,766,101 | 0 | 0% | 70,518 | 4.0% | 0 |
| 2014 | 1,766,101 | 0 | 0% | 133,061 | 7.5% | 0 |
| 2013 | 1,766,101 | 0 | 0% | 14,901 | 0.8% | 0 |
| 2012 | 1,766,101 | 0 | 0% | 44,669 | 2.5% | 0 |
| 2011 | 1,766,101 | 0 | 0% | 64,146 | 3.6% | 0 |
| 2010 | 1,766,101 | 0 | 0% | (4,086) | -0.2% | - |
| 2009 | 1,766,101 | 0 | 0% | (16,129) | -0.9% | - |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 17

EXHIBIT "5"
PAGE 62

# Rent & Vacancy

South Riverside Industrial

## OVERALL RENT & VACANCY

| Year | Market Rent | | | | Vacancy | | |
|------|--------|-------|----------|--------------|-----------|---------|----------|
| | Per SF | Index | % Growth | Vs Hist Peak | SF | Percent | Ppts Chg |
| 2025 | $1.25 | 184 | 1.8% | 23.2% | 1,843,563 | 7.8% | 0.3% |
| 2024 | $1.22 | 181 | 2.5% | 21.0% | 1,766,131 | 7.5% | 0.2% |
| 2023 | $1.19 | 176 | 4.6% | 18.1% | 1,698,700 | 7.2% | 0.2% |
| 2022 | $1.14 | 169 | 7.8% | 13.0% | 1,636,762 | 7.0% | 0.5% |
| 2021 | $1.06 | 156 | 4.8% | 4.8% | 1,523,803 | 6.6% | 3.5% |
| YTD | $1.01 | 149 | 0.1% | 0.1% | 1,497,260 | 6.5% | 3.4% |
| 2020 | $1.01 | 149 | 4.0% | 0% | 705,327 | 3.1% | -0.6% |
| 2019 | $0.97 | 144 | 5.6% | -3.9% | 830,769 | 3.6% | 0.7% |
| 2018 | $0.92 | 136 | 7.7% | -9.0% | 670,152 | 3.0% | -0.2% |
| 2017 | $0.85 | 126 | 8.8% | -15.5% | 703,008 | 3.2% | 0.4% |
| 2016 | $0.79 | 116 | 9.3% | -22.3% | 602,471 | 2.7% | 0.1% |
| 2015 | $0.72 | 106 | 8.6% | -28.9% | 574,484 | 2.6% | -0.7% |
| 2014 | $0.66 | 98 | 7.8% | -34.5% | 724,239 | 3.3% | -2.6% |
| 2013 | $0.61 | 91 | 5.4% | -39.3% | 1,294,241 | 5.9% | -1.7% |
| 2012 | $0.58 | 86 | 2.1% | -42.4% | 1,665,600 | 7.6% | -1.7% |
| 2011 | $0.57 | 84 | -1.1% | -43.6% | 2,046,414 | 9.3% | -3.0% |
| 2010 | $0.58 | 85 | -6.0% | -42.9% | 2,702,058 | 12.3% | 0.2% |
| 2009 | $0.61 | 91 | -9.3% | -39.3% | 2,651,038 | 12.1% | 2.5% |

## SPECIALIZED INDUSTRIAL RENT & VACANCY

| Year | Market Rent | | | | Vacancy | | |
|------|--------|-------|----------|--------------|-----------|---------|----------|
| | Per SF | Index | % Growth | Vs Hist Peak | SF | Percent | Ppts Chg |
| 2025 | $1.33 | 182 | 1.7% | 22.1% | 203,023 | 2.6% | 0.2% |
| 2024 | $1.31 | 179 | 2.4% | 20.1% | 190,790 | 2.4% | 0.1% |
| 2023 | $1.28 | 175 | 4.5% | 17.3% | 185,621 | 2.3% | 0% |
| 2022 | $1.22 | 168 | 7.7% | 12.2% | 184,123 | 2.3% | 0.3% |
| 2021 | $1.13 | 156 | 4.2% | 4.2% | 161,755 | 2.0% | -0.2% |
| YTD | $1.08 | 149 | -0.3% | -0.3% | 133,287 | 1.7% | -0.5% |
| 2020 | $1.09 | 149 | 4.9% | 0% | 174,946 | 2.2% | -1.8% |
| 2019 | $1.04 | 142 | 5.3% | -4.7% | 316,379 | 4.0% | 1.3% |
| 2018 | $0.98 | 135 | 7.7% | -9.4% | 209,959 | 2.7% | 1.4% |
| 2017 | $0.91 | 126 | 9.3% | -15.9% | 96,563 | 1.2% | 0.2% |
| 2016 | $0.84 | 115 | 9.4% | -23.0% | 79,539 | 1.0% | -1.0% |
| 2015 | $0.76 | 105 | 8.3% | -29.6% | 162,887 | 2.1% | 0.1% |
| 2014 | $0.71 | 97 | 8.1% | -35.0% | 157,798 | 2.0% | -2.2% |
| 2013 | $0.65 | 90 | 5.4% | -39.9% | 328,791 | 4.1% | -1.1% |
| 2012 | $0.62 | 85 | 2.3% | -43.0% | 414,224 | 5.2% | -0.9% |
| 2011 | $0.61 | 83 | -1.3% | -44.3% | 483,609 | 6.1% | -1.7% |
| 2010 | $0.61 | 84 | -6.4% | -43.5% | 614,835 | 7.8% | -1.6% |
| 2009 | $0.66 | 90 | -9.9% | -39.7% | 734,233 | 9.4% | 1.3% |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 18

EXHIBIT "5"
PAGE 63

# Rent & Vacancy

**LOGISTICS RENT & VACANCY**

| Year | Market Rent | | | | Vacancy | | |
|------|--------|-------|----------|--------------|-----------|---------|----------|
|      | Per SF | Index | % Growth | Vs Hist Peak | SF        | Percent | Ppts Chg |
| 2025 | $1.17  | 191   | 1.9%     | 24.0%        | 1,474,333 | 10.6%   | 0.3%     |
| 2024 | $1.15  | 188   | 2.6%     | 21.8%        | 1,415,109 | 10.2%   | 0.3%     |
| 2023 | $1.12  | 183   | 4.7%     | 18.7%        | 1,358,210 | 9.9%    | 0.3%     |
| 2022 | $1.07  | 175   | 7.8%     | 13.4%        | 1,302,370 | 9.6%    | 0.5%     |
| 2021 | $0.99  | 162   | 5.2%     | 5.2%         | 1,220,992 | 9.0%    | 5.9%     |
| YTD  | $0.95  | 155   | 0.2%     | 0.2%         | 1,235,099 | 9.2%    | 6.2%     |
| 2020 | $0.95  | 154   | 3.6%     | 0%           | 411,488   | 3.1%    | 0.5%     |
| 2019 | $0.91  | 149   | 6.2%     | -3.5%        | 342,871   | 2.6%    | -0.2%    |
| 2018 | $0.86  | 140   | 8.1%     | -9.2%        | 367,239   | 2.8%    | -1.2%    |
| 2017 | $0.79  | 130   | 9.0%     | -16.0%       | 503,342   | 4.0%    | 0.7%     |
| 2016 | $0.73  | 119   | 9.7%     | -22.9%       | 401,984   | 3.2%    | 0.1%     |
| 2015 | $0.66  | 108   | 9.1%     | -29.7%       | 381,193   | 3.1%    | -0.7%    |
| 2014 | $0.61  | 99    | 8.0%     | -35.5%       | 465,519   | 3.8%    | -2.2%    |
| 2013 | $0.56  | 92    | 5.5%     | -40.3%       | 731,467   | 6.0%    | -2.2%    |
| 2012 | $0.53  | 87    | 2.2%     | -43.4%       | 1,002,492 | 8.2%    | -2.2%    |
| 2011 | $0.52  | 85    | -0.8%    | -44.6%       | 1,269,252 | 10.3%   | -3.7%    |
| 2010 | $0.53  | 86    | -5.6%    | -44.2%       | 1,729,524 | 14.1%   | 1.4%     |
| 2009 | $0.56  | 91    | -8.9%    | -40.9%       | 1,563,192 | 12.7%   | 3.5%     |

**FLEX RENT & VACANCY**

| Year | Market Rent | | | | Vacancy | | |
|------|--------|-------|----------|--------------|---------|---------|----------|
|      | Per SF | Index | % Growth | Vs Hist Peak | SF      | Percent | Ppts Chg |
| 2025 | $1.43  | 153   | 1.5%     | 22.4%        | 166,207 | 9.4%    | 0.3%     |
| 2024 | $1.41  | 150   | 2.2%     | 20.6%        | 160,232 | 9.1%    | 0.3%     |
| 2023 | $1.38  | 147   | 4.4%     | 17.9%        | 154,869 | 8.8%    | 0.3%     |
| 2022 | $1.32  | 141   | 7.5%     | 13.0%        | 150,269 | 8.5%    | 0.5%     |
| 2021 | $1.23  | 131   | 5.1%     | 5.1%         | 141,056 | 8.0%    | 1.3%     |
| YTD  | $1.17  | 125   | 0.3%     | 0.3%         | 128,874 | 7.3%    | 0.6%     |
| 2020 | $1.17  | 125   | 2.8%     | 0%           | 118,893 | 6.7%    | -3.0%    |
| 2019 | $1.14  | 121   | 3.3%     | -2.8%        | 171,519 | 9.7%    | 4.4%     |
| 2018 | $1.10  | 117   | 5.5%     | -5.9%        | 92,954  | 5.3%    | -0.6%    |
| 2017 | $1.04  | 111   | 6.0%     | -10.8%       | 103,103 | 5.8%    | -1.0%    |
| 2016 | $0.98  | 105   | 7.1%     | -15.9%       | 120,948 | 6.8%    | 5.1%     |
| 2015 | $0.92  | 98    | 6.6%     | -21.5%       | 30,404  | 1.7%    | -4.0%    |
| 2014 | $0.86  | 92    | 5.5%     | -26.3%       | 100,922 | 5.7%    | -7.5%    |
| 2013 | $0.82  | 87    | 4.9%     | -30.2%       | 233,983 | 13.2%   | -0.8%    |
| 2012 | $0.78  | 83    | 0.9%     | -33.4%       | 248,884 | 14.1%   | -2.5%    |
| 2011 | $0.77  | 82    | -2.4%    | -34.0%       | 293,553 | 16.6%   | -3.6%    |
| 2010 | $0.79  | 84    | -7.0%    | -32.4%       | 357,699 | 20.3%   | 0.2%     |
| 2009 | $0.85  | 91    | -9.4%    | -27.3%       | 353,613 | 20.0%   | 0.9%     |

Copyrighted report licensed to Connolly Commercial - 330500

CoStar

1/25/2021
Page 19

EXHIBIT "5"
PAGE 64

# Sale Trends

South Riverside Industrial

**OVERALL SALES**

| Year | Completed Transactions (1) | | | | | | Market Pricing Trends (2) | | |
|------|-------|--------|----------|-----------|-------------|--------------|----------|-------------|----------|
|      | Deals | Volume | Turnover | Avg Price | Avg Price/SF | Avg Cap Rate | Price/SF | Price Index | Cap Rate |
| 2025 | - | - | - | - | - | - | $237.46 | 276 | 4.8% |
| 2024 | - | - | - | - | - | - | $233.09 | 271 | 4.8% |
| 2023 | - | - | - | - | - | - | $226.26 | 263 | 4.8% |
| 2022 | - | - | - | - | - | - | $214.01 | 248 | 4.8% |
| 2021 | - | - | - | - | - | - | $193.43 | 225 | 4.9% |
| YTD | 5 | $5.2M | 0.9% | $2,330,000 | $170.64 | - | $184.98 | 215 | 5.0% |
| 2020 | 59 | $190.2M | 8.7% | $4,426,136 | $95.06 | 5.7% | $183.14 | 213 | 5.0% |
| 2019 | 99 | $179.4M | 8.2% | $3,813,454 | $116.86 | 6.1% | $168.38 | 195 | 5.1% |
| 2018 | 80 | $148.5M | 6.5% | $3,999,790 | $113.42 | 6.0% | $154.40 | 179 | 5.2% |
| 2017 | 108 | $83.7M | 4.8% | $1,986,094 | $121.75 | 6.3% | $138.40 | 161 | 5.3% |
| 2016 | 74 | $70.9M | 4.2% | $1,626,356 | $104.99 | 5.7% | $122.09 | 142 | 5.5% |
| 2015 | 82 | $78.7M | 5.8% | $2,181,249 | $78.85 | 6.5% | $107.18 | 124 | 5.8% |
| 2014 | 82 | $92.3M | 8.1% | $1,932,744 | $70.99 | 7.7% | $93.60 | 109 | 6.2% |
| 2013 | 88 | $38.2M | 3.9% | $940,608 | $76.27 | 7.1% | $83.66 | 97 | 6.5% |
| 2012 | 96 | $58.6M | 7.0% | $1,434,743 | $54.24 | 8.1% | $77.63 | 90 | 6.7% |
| 2011 | 70 | $44.8M | 4.5% | $1,137,476 | $59.57 | - | $75.51 | 88 | 6.9% |
| 2010 | 58 | $23.5M | 2.4% | $720,026 | $69.63 | 7.6% | $74.07 | 86 | 7.0% |

(1) Completed transaction data is based on actual arms-length sales transactions and levels are dependent on the mix of what happened to sell in the period.
(2) Market price trends data is based on the estimated price movement of all properties in the market, informed by actual transactions that have occurred.

**SPECIALIZED INDUSTRIAL SALES**

| Year | Completed Transactions (1) | | | | | | Market Pricing Trends (2) | | |
|------|-------|--------|----------|-----------|-------------|--------------|----------|-------------|----------|
|      | Deals | Volume | Turnover | Avg Price | Avg Price/SF | Avg Cap Rate | Price/SF | Price Index | Cap Rate |
| 2025 | - | - | - | - | - | - | $246.16 | 277 | 4.8% |
| 2024 | - | - | - | - | - | - | $241.73 | 272 | 4.8% |
| 2023 | - | - | - | - | - | - | $234.71 | 264 | 4.8% |
| 2022 | - | - | - | - | - | - | $222.00 | 250 | 4.8% |
| 2021 | - | - | - | - | - | - | $200.60 | 226 | 4.9% |
| YTD | - | - | - | - | - | - | $192.31 | 217 | 5.0% |
| 2020 | 25 | $39.2M | 3.1% | $2,005,959 | $165.51 | 5.7% | $190.53 | 215 | 5.0% |
| 2019 | 20 | $28.4M | 2.7% | $2,227,223 | $150.67 | 6.3% | $175.62 | 198 | 5.1% |
| 2018 | 31 | $63.1M | 8.2% | $3,811,673 | $107.36 | 5.3% | $160.45 | 181 | 5.2% |
| 2017 | 27 | $28.3M | 3.8% | $1,974,256 | $116.47 | 7.1% | $143.29 | 161 | 5.3% |
| 2016 | 26 | $25.1M | 5.0% | $1,709,461 | $100.79 | 5.6% | $125.71 | 142 | 5.5% |
| 2015 | 37 | $31.8M | 6.6% | $1,567,129 | $82.73 | 6.6% | $110.25 | 124 | 5.9% |
| 2014 | 22 | $18.5M | 3.8% | $1,304,881 | $87.39 | 7.2% | $96.56 | 109 | 6.2% |
| 2013 | 31 | $13.6M | 4.3% | $1,212,982 | $70.24 | 7.0% | $85.77 | 97 | 6.5% |
| 2012 | 39 | $11.2M | 4.3% | $841,489 | $64.90 | 8.3% | $79.64 | 90 | 6.8% |
| 2011 | 21 | $19.5M | 4.6% | $1,325,229 | $60.63 | - | $77.20 | 87 | 6.9% |
| 2010 | 19 | $10.4M | 2.5% | $849,722 | $63.46 | 7.6% | $75.74 | 85 | 7.1% |

(1) Completed transaction data is based on actual arms-length sales transactions and levels are dependent on the mix of what happened to sell in the period.
(2) Market price trends data is based on the estimated price movement of all properties in the market, informed by actual transactions that have occurred.

Copyrighted report licensed to Connolly Commercial - 330500



EXHIBIT "5"

PAGE 65

# Sale Trends

South Riverside Industrial

**LOGISTICS SALES**

| Year | Deals | Volume | Turnover | Avg Price | Avg Price/SF | Avg Cap Rate | Price/SF | Price Index | Cap Rate |
|------|-------|--------|----------|-----------|--------------|--------------|----------|-------------|----------|
| | | | Completed Transactions (1) | | | | Market Pricing Trends (2) | | |
| 2025 | - | - | - | - | - | - | $225.40 | 277 | 4.7% |
| 2024 | - | - | - | - | - | - | $221.16 | 272 | 4.7% |
| 2023 | - | - | - | - | - | - | $214.60 | 264 | 4.8% |
| 2022 | - | - | - | - | - | - | $202.95 | 250 | 4.8% |
| 2021 | - | - | - | - | - | - | $183.42 | 226 | 4.9% |
| YTD | 4 | $5.2M | 1.4% | $2,330,000 | $170.64 | - | $175.14 | 215 | 5.0% |
| 2020 | 29 | $143.9M | 13.0% | $6,384,742 | $83.14 | 5.7% | $173.32 | 213 | 5.0% |
| 2019 | 59 | $137.2M | 11.6% | $4,748,750 | $110.43 | 5.9% | $158.87 | 195 | 5.1% |
| 2018 | 38 | $69.7M | 5.7% | $4,414,558 | $109.65 | 6.4% | $145.75 | 179 | 5.2% |
| 2017 | 66 | $51.4M | 5.2% | $2,171,617 | $123.40 | 5.9% | $130.91 | 161 | 5.3% |
| 2016 | 32 | $22.1M | 2.1% | $1,204,172 | $108.71 | 5.4% | $115.65 | 142 | 5.5% |
| 2015 | 36 | $44M | 5.7% | $3,263,292 | $74.32 | 6.5% | $101.52 | 125 | 5.8% |
| 2014 | 52 | $59.5M | 10.8% | $2,028,624 | $63.00 | 7.7% | $88.40 | 109 | 6.2% |
| 2013 | 41 | $15.6M | 2.8% | $718,659 | $73.00 | 7.6% | $79.29 | 97 | 6.5% |
| 2012 | 42 | $42.3M | 8.3% | $1,797,518 | $50.10 | 8.0% | $73.47 | 90 | 6.7% |
| 2011 | 35 | $20.9M | 4.1% | $1,087,850 | $59.08 | - | $71.74 | 88 | 6.8% |
| 2010 | 23 | $6.3M | 1.8% | $568,688 | $76.25 | - | $70.33 | 86 | 6.9% |

(1) Completed transaction data is based on actual arms-length sales transactions and levels are dependent on the mix of what happened to sell in the period.
(2) Market price trends data is based on the estimated price movement of all properties in the market, informed by actual transactions that have occurred.

**FLEX SALES**

| Year | Deals | Volume | Turnover | Avg Price | Avg Price/SF | Avg Cap Rate | Price/SF | Price Index | Cap Rate |
|------|-------|--------|----------|-----------|--------------|--------------|----------|-------------|----------|
| | | | Completed Transactions (1) | | | | Market Pricing Trends (2) | | |
| 2025 | - | - | - | - | - | - | $290.90 | 262 | 5.0% |
| 2024 | - | - | - | - | - | - | $285.94 | 257 | 5.0% |
| 2023 | - | - | - | - | - | - | $277.86 | 250 | 5.0% |
| 2022 | - | - | - | - | - | - | $263.02 | 237 | 5.0% |
| 2021 | - | - | - | - | - | - | $238.05 | 214 | 5.1% |
| YTD | 1 | $0.00 | 0.4% | - | - | - | $227.59 | 205 | 5.2% |
| 2020 | 5 | $7.2M | 2.0% | $4,900,000 | $212.36 | - | $225.26 | 203 | 5.2% |
| 2019 | 20 | $13.8M | 7.3% | $2,065,500 | $132.38 | 6.2% | $208.90 | 188 | 5.3% |
| 2018 | 11 | $15.7M | 5.0% | $3,196,875 | $182.86 | 5.7% | $193.59 | 174 | 5.4% |
| 2017 | 15 | $4M | 6.3% | $742,667 | $142.81 | - | $173.91 | 157 | 5.5% |
| 2016 | 16 | $23.7M | 14.7% | $2,185,505 | $106.28 | 6.3% | $155.32 | 140 | 5.7% |
| 2015 | 9 | $2.9M | 2.8% | $865,000 | $134.15 | - | $136.77 | 123 | 6.0% |
| 2014 | 8 | $14.3M | 8.4% | $3,302,141 | $99.37 | 9.5% | $120.26 | 108 | 6.4% |
| 2013 | 16 | $9.1M | 9.2% | $1,226,484 | $96.01 | 5.2% | $107.70 | 97 | 6.7% |
| 2012 | 15 | $5.1M | 9.7% | $1,128,554 | $80.59 | - | $100.53 | 91 | 7.0% |
| 2011 | 14 | $4.4M | 6.6% | $691,250 | $57.39 | - | $96.77 | 87 | 7.1% |
| 2010 | 16 | $6.8M | 5.7% | $709,244 | $74.72 | - | $95.19 | 86 | 7.3% |

(1) Completed transaction data is based on actual arms-length sales transactions and levels are dependent on the mix of what happened to sell in the period.
(2) Market price trends data is based on the estimated price movement of all properties in the market, informed by actual transactions that have occurred.

Copyrighted report licensed to Connolly Commercial - 330500

 CoStar

1/25/2021
Page 21

EXHIBIT "5"
PAGE 66

**Primary Data Analysis – Industrial Sector**

*Industrial Price Trends / Time Adjustment Support – 4th Quarter 2018 vs 4th Quarter 2020*

The following is our survey generated from CoStar data of the majority of *improved* industrial property sales to measure price changes relative to prior periods, and indicate changing market patterns. The data in the table, and especially the measured changes over each annual quarter, were considered to indicate the subject property type price trends and estimate any time adjustments. The most recent trends are given most weight, unless strongly inconsistent with other recent periods. A comparison of the industrial building sale prices per foot follows:

| 4Q2018 - 4Q2020 So Cal INDUSTRIAL Property Sales 5,000 SF to 100,000 SF | | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | # of Transactions | Average Bldg SF | Average Price Per Bldg SF | Change Over 4 Qtrs | Median Price Per Bldg SF | Change Over 4 Qtrs | Average Cap Rate | Median Cap Rate |
| 2020 Q4 | 65 | 26,578 | $223.05 | 24.3% | $194.44 | 17.3% | 5.33 | 5.49 |
| 2020 Q3 | 43 | 28,667 | $185.93 | -10.0% | $171.54 | -16.3% | 5.47 | 5.15 |
| 2020 Q2 | 28 | 22,155 | $184.59 | 8.1% | $193.58 | 5.7% | 5.66 | 5.45 |
| 2020 Q1 | 76 | 28,382 | $189.99 | -15.0% | $165.36 | -7.8% | 5.25 | 5.00 |
| 2019 Q4 | 99 | 25,481 | $179.39 | 15.8% | $165.80 | 9.0% | 5.38 | 5.18 |
| 2019 Q3 | 68 | 28,247 | $206.50 | | $204.94 | | 5.65 | 5.55 |
| 2019 Q2 | 71 | 27,788 | $170.68 | | $183.21 | | 5.56 | 5.46 |
| 2019 Q1 | 54 | 26,012 | $223.50 | | $179.34 | | 5.42 | 5.42 |
| 2018 Q4 | 53 | 27,641 | $154.90 | | $152.11 | | 5.58 | 5.25 |

Compiled by WESTATES from CoStar

**State of California COVID-19 Status**

In August 2020, the State of California introduced new guidelines for reopening businesses which the state had ordered shuttered in response to COVID-19. These include a new four-tier color code with designated thresholds that must be passed to move to the next tier.

Under these guidelines every county in California is assigned to a tier based on its test positivity and adjusted case rate. At a minimum, counties must remain in a tier for at least 3 weeks before moving forward. Data is reviewed weekly and tiers are updated on Tuesdays. To move forward, a county must meet the next tier's criteria for two consecutive weeks. If a county's metrics worsen for two consecutive weeks, it will be assigned a more restrictive tier.

The four tiers are described as follows:

**Widespread/Purple Tier**: Many non-essential indoor business operations are closed. Most counties including Riverside County remain in this category.

**Substantial/Red Tier**: Some non-essential indoor business operations are closed.

**Moderate/Orange Tier**: Some indoor business operations are open with modifications.

**Minimal/Yellow Tier**: Most indoor business operations are open with modifications.

The subject is located in Riverside County. Please refer to the chart and map on the following page.

| | | |
|---|---|---|
| **WIDESPREAD** <br> Many non-essential indoor business operations are closed | **More than 7** <br> Daily new cases (per 100k) | **More than 8%** <br> Positive tests |
| **SUBSTANTIAL** <br> Some non-essential indoor business operations are closed | **4-7** <br> Daily new cases (per 100k) | **5 – 8% and 5.3 – 8% health equity metric** <br> Positive tests |
| **MODERATE** <br> Some indoor business operations are open with modifications | **1 – 3.9** <br> Daily new cases (per 100k) | **2 – 4.9% and 2.2 – 5.2% health equity metric** <br> Positive tests |
| **MINIMAL** <br> Most indoor business operations are open with modifications | **Less than 1** <br> Daily new cases (per 100k) | **Less than 2% and Less than 2.2% health equity metric** <br> Positive tests |



**Current tier assignments as of December 8, 2020**

Tier assignments may occur any day of the week and may occur more than once a week.

**Broker Interview Responses**

Numerous brokers familiar with the subject property type and area were interviewed during the course of this and other recent similar property appraisals. Specifically, pertinent recent or current broker interviews and responses include:

We spoke with several sale and leasing brokers during the course of this and other appraisal assignments including Bill Faulkner of Allied Commercial Real Estate, Noah Samarin of DAUM Commercial, John Mulrooney, Greg Diab, Paul Whitehouse, and Aleksey Zabolotsky of Lee & Associates, Maria Babakitis of Keller Williams Realty, Brad Yates of Colliers International, Mia Pham of Lee & Associates, Jennifer Esser of CamelotWest Commercial, Mike Adams of Stream Realty Partners, Eric Darnell of Lee & Associates, and John Bosko of NAI Capital.

All brokers interviewed stated there has been some impact on current lease transactions related to Covid-19. Brokers stated landlords are allowing for more concessions such as free rent along with an additional month added to the lease term. Additionally, all brokers stated new lease transactions and inquiries have slowed significantly, with the greatest impact on local "mom and pop" retailers and manufacturers that have virtually disappeared from the market.

Current escrows / sale transactions have shown some impact thus far, including cancelled transactions and buyers attempting to take advantage of the current economic market to renegotiate already agreed-upon purchase prices; however, sellers are not necessarily agreeing. Additionally, with lending requirements changing almost daily, all brokers interviewed stated they expect "some" impact from the Covid-19 pandemic though there is no general consensus at this time.

Brokers also stated the subject has far too much office build-out for any current users in the market.  Since demand for office space has significantly decreased due to Covid-19 and movement restrictions causing more people to work remotely, the subject's office build-out far exceeds demand in the current market.  Most opinions revolved around giving credit to the ground floor office space only, with minimal to no credit for the "stacked" upper floor office build-out.

Additionally, brokers interviewed stated the subject's "clean room" space is overbuilt for the current market, and no future user would benefit from the current configuration.  Most brokers agreed that the "clean room" space should be removed, and the space made available for typical warehouse storage area.

Finally, the subject's relatively low coverage area indicates surplus land.  The subject is not within the current path of development and the surplus land area will likely not be developed in the near term.  Local brokers indicated a surplus land value of $4/SF to $5/SF, compared to full site values near $10/SF and higher for land area within the path of development and within superior locations in the city.

**Conclusion**

Depending on the location and property type, the subject wider market area has, since the 2009 end of the Great Recession, have generally experienced: 1) strong occupancy and increasing prices value increases in apartment properties, and; 2) sale price and rental rate increases in most industrial property values and occupancy in specific size single-user buildings and most multi-tenant properties, including new speculative and build-to-suit development intentions increasing, and; 3) some newer anchored or well-located retail properties showing demand, though many older or secondary commercial properties have seen selective interest, and 4) office properties, that were considered the most over-built sectors, have shown vacancy and rent stabilization and trends, while the strongest office markets and properties, especially medical space, has seen stable to strong absorption and some rent increases.  To date, the varied pace of absorption, rent increases, and sales volume, and generalized price and/or capitalization rate trends varies. However, the conclusions in this report reflect analysis of the most pertinent data as it applies to the subject.

EXHIBIT "5"
PAGE 70

# PROPERTY DESCRIPTION

**Site Data and Description**

The subject site details are derived from public records, discussions with the owner representative, and personal inspection.  Also, a colored aerial photo illustrating the site, surroundings, and any improvements follow within this report.  Please refer to the assumptions and limiting conditions for reliability assumed.

| | |
|---|---|
| Address/Location: | The subject site is located at 30590 Cochise Circle in the incorporated City of Murrieta.  The location is generally at the eastern terminus of Cochise Circle, east of Briggs Road and Winchester Road/Highway 79. |
| Assessor's Parcel Number: | 963-070-017 |
| Site Area: | The subject site is 760,993 SF or 17.47-acres, estimated as both the gross and net usable areas.  The sale comparable properties used in the Sales Comparison Approach had coverage ratios ranging from 21% to 47% with a 35% average.  Based on the average, the subject is estimated to have approximately 10.91-acres/475,279 SF of surplus land area.  This is considered and analyzed later in this report. |
| Frontage & Depth: | The subject parcel is an interior parcel accessed via two small roads that connect to Cochise Circle on the west and Magdas Colorado Street on the north.  Refer to parcel map in this report. |
| Accessibility: | Fair to Average due to the subject's interior location.  Based on physical inspection, there is one curb cut for vehicle access on Cochise Circle and one on Magdas Colorado Street. |
| Visibility: | Fair to Average due to the site's interior location. |
| Shape: | Irregular; please refer to the Parcel Map. |
| Topography and Drainage: | Sloping generally from north to south.  Drainage appears adequate, though the site was not inspected during inclement weather and any adverse drainage flow was not apparent. |
| Soil Conditions: | No unusual conditions appear to exist or were disclosed.  The soil appears stable but a soils report was not provided.  See the Assumptions and Limiting Conditions. |

| Easements: | A title report was provided to consult for easements affecting the site.  The reported easements appear to be for road and utility purposes as are typical for neighboring sites. |
|---|---|
| | There are a number of Exceptions noted in the addenda title report, including three liens for unsecured property taxes filed by Riverside County in 2018/2019, 2019/2020, and 2020/2021.  Additionally, there are two notices of default by First American Title Insurance Company from 2018 and 2019, an "Environmental Constraint" noted (#12 with no supporting documentation), and an Avigation Easement (#5) that allows for airplanes to fly above the subject property on their approach to French Valley Airport. |
| Surrounding Properties: | North – Industrial Properties, Retail Properties along Benton Road |
| | South – Vacant Land |
| | East – Vacant Land, Industrial Properties |
| | West – Self-Storage Facility with a separate RV Storage Lot |

| Utilities: | Servicing Agency | Availability |
|---|---|---|
| Electricity | Edison | At site |
| Gas | So. Calif. Gas Co. | At site |
| Water | City Agency | At site |
| Sewer | City Agency | At site |
| Telephone | Verizon or ATT | At site |

**Environmental Observations**

No evidence of hazardous waste and/or toxic materials was visible; the appraiser has no knowledge of the existence of these substances.  However, the appraiser is not qualified to detect hazardous waste and/or toxic materials.  See paragraph number 12 of the Assumptions and Limiting Conditions.

**Subject Parcel Map**



**Subject Overhead View**



**Flood Zone**

The subject property is located in Flood Zone D, Community Panel Number 060245.  Zone D is an unstudied area where base flood elevations (BFEs) are unknown.  The subject location and its area flood hazards are shown in the following FEMA Flood Map:

**Subject Flood Map**



**Earthquake Zone**

Current "Alquist – Priolo Earthquake Fault Zone" and "Seismic Hazard Zone" maps from the California Department of Conservation were reviewed by the appraiser.  Based on official maps of Alquist-Priolo earthquake fault zones, the subject property is not located within an Earthquake Fault Zone or within the boundaries of a Special Studies zone.  Of note, most of California is considered to be subject to some level of seismic activity; please refer to the Assumptions and Limiting Conditions.

EXHIBIT "5"
PAGE 74

**Zoning**

According to the Murrieta City Planning Department, the subject is zoned I-P – Industrial Park. The general plan and zoning show industrial is the primary use in this zone, with the full range of uses from the zoning ordinance retained in the work file.   The subject zoning and that of the surrounding properties are illustrated in the following map:

### Subject Zoning Map



| PARCEL | | | |
|---|---|---|---|
| APN | 963-070-017-1 | | |

PLANNING more... (http://planning.rctlma.org/)

| | | | |
|---|---|---|---|
| Specific Plans | NOT IN A SPECIFIC PLAN | Historic Preservation Districts | NOT IN A HISTORIC PRESERVATION DISTRICT |
| Land Use Designations | BP PF | Agricultural Preserve | NOT IN AN AGRICULTRAL PRESERVE |
| General Plan Policy Overlays | N/A | | |
| Area Plan (RCIP) | Southwest Area | Airport Influence Areas | FRENCH VALLEY |
| General Plan Policy Areas | HIGHWAY 79 POLICY AREA | Airport Compatibility Zones | FRENCH VALLEY, ZONE A |
| Zoning Classifications (ORD. 348) (https://planning.rctlma.org/General-Plan-Zoning/Zone-Descriptions-Requirements) | I-P | Zoning Districts and Zoning Areas | RANCHO CALIFORNIA AREA |
| Zoning Overlays | NOT IN A ZONING OVERLAY | Community Advisory Councils | NOT IN A COMMUNITY ADVISORY COUNCIL |
| Residential Permit Stats | | | |
| N/A | | | |

The minimum site size for the subject property in the I-P – Industrial Park zone is 20,000 SF. The setback requirements are 25 feet in the front, 10 feet on the sides, and 15 feet in the rear. The maximum building height in this zone is 35 feet.

The parking requirements are 1 space per 250 SF of gross floor area for office area, plus 1 space per 1,000 SF of gross floor area of storage area.  Based on the subject's current building square footage and configuration, and highest and best use as warehouse space, the subject site would be required to have 253 parking spaces.  The subject has 327 striped asphalt parking spaces. This equates to 2.68 spaces per 1,000 SF of building area, or a 2.7:1 ratio.  This parking ratio conforms to zoning and is superior for the area and adequate for the subject use.  The parking ratio and utility are considered in the comparable analysis.

Based on the legal requirements and the actual development description, the subject is estimated to be a legal conforming use of the site with regard to improvements and parking.

No Covenants, Conditions, and Restrictions (CC&R's) were supplied to review.  This analysis assumes that any CC&R's affecting the property are typical, without onerous terms or an above-market fee.  Any fee would assumedly provide services commensurate with the level of maintenance included in the subject value projection.

**Assessed Values and Taxes**

The subject site is identified as Assessor Parcel Number (APN) 963-070-017.  The current local tax rate area (TRA) and corresponding property tax assessment rate is **1.04059%.**  The most recent available total assessed value shown in public records, assessor records or the subject tax bill is $8,701,905, and the total annual tax premium is $92,239.18.  The special assessments portion of the annual total taxes is **$1,688.02**.  The breakdown and details from either the tax bill or assessors records are copied in the addenda.  The rate and rounded special assessments estimate are incorporated into the upcoming Income Approach value assumptions.

California's Proposition 13 limited the maximum ad valorem tax on real property to 1.0% of the full cash value of a property as of March 1, 1975.  Property created or sold subsequent to that date will bear full cash value as of the time sold or created, plus a 2.0% maximum annual increase.  Taxes levied to cover bonded indebtedness for county, city, school, or other taxing agencies are added to the basic 1.0% rate.  The subject would be re-assessed if sold.

The definition of market value implies a property sale will occur.  Correspondingly, any tax estimate forecasted for valuation purposes assumes a sale occurs, the property is re-assessed, and the anticipated taxes (including special assessments) are all based on the value estimated in this appraisal.

**Fixed / Special Assessments / Bonds**

The fixed / special assessments that encumber the subject are typical for similar properties in the neighborhood and area.  They do not have a negative impact on the subject property value.

**Improvement Description**

The property inspection and review of available information and the lease agreement (discussed in the Income Approach section of this report) indicate the subject improvements are described as follows:

The appraised subject is the leased fee interest in a 100% leased/occupied multi-user industrial building property. The property is currently 70% owner-occupied and 30% leased to four tenants. The 1995-built concrete tilt-up, 2-story, stairwell (2) and elevator (1) served building has estimated 122,388 SF net rentable and gross building areas (NRA and GBA). The building interior is demised with 43,456 SF / 36% of NRA of 2-story office improvement build-out, approximately 8,000 SF / 6% of NRA of warehouse area having a 20' clear height and 2 roll-up loading doors, and the remaining 70,932 SF / 58% of NRA is currently built out as "clean room" space with vinyl flooring, dropped ceiling tiles, air conditioning, and multiple power and compressed air attachments throughout the building. The I-P – Industrial Park-zoned level, irregular shaped site is 17.47-acres / 760,993 SF, partly paved and landscaped surrounding the building. The property has a 13% site coverage ratio and 327 parking spaces for a 2.7:1 parking ratio. The low coverage ratio indicates surplus land area discussed in the report. The property condition overall is estimated as average.

| Interior Space Distribution | | |
|---|---|---|
| | Office Area Build-Out -     Ground Floor: | 21,728 SF |
| | Upper Floor: | 21,728 SF |
| 36% | **Total Office Area:** | **43,456 SF** |
| 58% | "Clean Room" Build-Out (super-adequate) | 70,932 SF |
| 6% | Warehouse / Storage | 8,000 SF |
| 100% | TOTAL NRA / GBA | 122,388 SF |

*The sizes noted above were confirmed via the provided lease agreement and reasonably verified upon inspection.

It should be noted that only the ground floor office space is currently occupied; it is leased to an arms-length tenant for the next 19 months. The upper floor office space is not currently used. Also, the majority of the "clean room" space is currently not used. A small portion of this space, +/-12,000 SF, is leased to three tenants. However, the lease agreements and other terms of occupancy were not provided to the appraiser.

During the on-site inspection, it appeared that the majority of the subject building was not being used. The appraisers were not granted access to the leased ground floor office space since the tenant is a secure government contractor. However, the on-site facilities manager stated the build-out was very similar to the upper floor office build-out that was inspected.

## CONSTRUCTION COMPONENTS:

| | |
|---|---|
| Improvement Type: | Currently one multi-user demised, 2-story industrial building.  See illustrations in this report. |
| Foundation: | Poured reinforced concrete slab. |
| Structural System: | Concrete tilt-up panels. |
| Roof: | Wood Truss System & built-up composition cover. |
| Exterior Walls: | Concrete tilt-up panels. |
| Interior Walls: | Painted or wallpapered drywall in office and clean room areas, concrete panels in the warehouse area. |
| Floor Finish: | Carpet and vinyl tile in office area, vinyl flooring in the clean room area, concrete in warehouse area. |
| Ceilings: | Gypboard and dropped acoustic panels in the office and clean room areas, open in warehouse area. |
| Heating & Air Conditioning: | Roof and ground-mounted central HVAC provided to the entire building. |
| Restrooms: | Multiple restrooms throughout the building. |
| Fire Safety: | Fully sprinklered. |
| Energy Conservation: | Typical |
| ADA Compliance: | See paragraph 13 of Assumptions and Limiting Conditions. |
| Clear / Truss Height: | 20' |
| Loading Doors: | 2 Ground-level metal roll-up loading doors. |

**Estimated Remaining Economic Life**

The subject improvements were built in 1995.  Their actual age as of the appraisal date is 26-years.  The effective age is estimated at 15 years.  Correspondingly, the subject improvements are estimated to have a 40-year remaining economic life based on a 55-year total economic life shown in the Marshall Valuation Service.

EXHIBIT "5"
PAGE 79

**Personal Property/Trade Fixtures - FF&E**

Though the subject building interior finish is designed specifically for industrial users, removable specialty trade fixtures, personal property or other FF&E (furniture, fixtures and equipment) are not part of the real estate or included in this report.

A floor plan illustration of the subject building follows on the next page.

**Subject Building Floorplan**

**Ground Floor**



**Upper Floor Office**



Photographs of the subject property are shown in the following pages:

**Subject Property Photos**

Subject Overview



Subject Overview



**Subject Property Photos**

Subject Overview



Subject Overview



21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank

36

## Subject Property Photos

Typical Interior View – Office Area



Typical Interior View – Office Area



**Subject Property Photos**

Typical Interior View – Clean Room Area



Typical Interior View – Clean Room Area



21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank

38

EXHIBIT "5"
PAGE 85

**Subject Property Photos**

Typical Interior View – Clean Room Area



Typical Interior View – Warehouse Area



21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank

39

**Subject Property Photos**

Surplus Land Area



Surplus Land Area



**Subject Property Photos**

Street Scene Looking East on
Cochise Circle, Subject in Front of Camera



Street Scene Looking West on
Cochise Circle, Subject Behind Camera



**Insurable Value**

For the subject property industrial type, a Marshal Valuation Service (MVS) cost multiplier was selected based on the subject's quality and physical characteristics.  This multiplier was then adjusted for sprinklers, floor area, other pertinent property traits, and applicable local area cost multipliers.  The building improvement **Insurable Value** calculation is estimated as $10,630,000. Please refer to the following Insurable Value worksheet.

*A* **Replacement Cost** *New calculation does not change the intended user or the intended purpose of the appraisal.  The appraiser assumes no liability for providing an* **Insurable Replacement Cost** *calculation, which is not an appraised value, and does not guarantee that any estimate or opinion results in the subject property being fully insured for any possible loss sustained.  The appraiser recommends an insurance professional be consulted.  The* **Insurable Replacement Cost** *estimate may not be a reliable replacement or reproduction cost for any date other than the appraisal date of report due to changing labor and materials costs, as well as changing building codes and governmental regulations and requirements.*

EXHIBIT "5"
PAGE 89

# INSURABLE REPLACEMENT COST ESTIMATE

**PROPERTY:**                    Owner-User Idustrial Prop.

**LOCATION:**                    30590 Cochise Circle

                                 Murrieta

**PROPERTY DESCRIPTION:**        Flex/R&D As Is

## INSURABLE REPLACEMENT COST CALCULATIONS:

| | | | | | |
|---|---|---|---|---|---|
| **Building #:** | A | | | | |
| **Building Size (SF):** | 122,388 | | | | |
| **Structure Class:** | C | | | | |
| **Marshall Valuation Service Reference:** (or source referenced) | Sec 14; Pg 16 | | | | |
| **Base Cost PSF:** | $ 68.02 | | | | |
| **Plus (PSF)** | | | | | |
| Sprinklers > | $ 2.00 | | | | |
| > | | | | | |
| > | | | | | |
| > | | | | | |
| **Subtotal:** | $ 70.02 | $ - | $ - | $ - | $ - |
| **Multipliers** | | | | | |
| **Number of Stories:** | 1.00 | | | | |
| **Height Per Story:** | 1.00 | | | | |
| **Perimeter:** | 1.00 | | | | |
| **Calculator Cost:** | 1.06 | | | | |
| **Local:** | 1.17 | | | | |
| **Adjusted Cost PSF:** | $ 86.84 | $ - | $ - | $ - | $ - |
| **Insurable Replacement Cost of Structures:** | $10,628,028 | $0 | $0 | $0 | $0 |
| **Personal Property** | $0 | $0 | $0 | $0 | $0 |
| **Total:** | $10,630,000 | $0 | $0 | $0 | $0 |

# ANALYSIS AND VALUATION

**INTRODUCTION**

As required by USPAP, this section includes a summary of the information analyzed, the appraisal methods and techniques employed, and reasoning that supports the analyses, opinions, and conclusions. There are also explanations of any Sales Comparison Approach, Cost Approach, or Income Approach Exclusions.

Analysis and valuation of the subject property involves determining its highest and best use and estimating the subject property value in accordance with current appraisal theory and standards. Highest and best use analysis is critical to the appraisal problem. In the highest and best use analysis, the appraiser defines the composition of the subject property, and this in turn determines the appropriate valuation methodology. The highest and best use analysis links the "Descriptions" sections of the appraisal report with the valuation sections.

According to current appraisal theory, there are three approaches to valuing improved properties. These are the Cost Approach, the Sales Comparison Approach, and the Income Approach. The type and age of the property and the quantity and quality of data affect the applicability of each approach for a specific appraisal problem.

The Cost Approach is based upon the principle that an informed purchaser would pay no more than the cost to produce a substitute property with the same utility as the subject property. The Cost Approach components are considered to reflect a potential typical buyer's replacement thought process, which would also be in general market terms. The cost estimate may also show or measure the feasibility in comparison to other approaches. It is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land or when relatively unique or specialized improvements are on the site and for which there exists no comparable properties on the market.

The Income Approach is widely applied in appraising income-producing properties. The Income Approach is based on the principle of anticipation, that value is the present worth of anticipated future benefits or income forecast to be derived from ownership of the property rights being appraised. The Income Approach also relies upon market data to establish current market rents and expense levels to arrive at an expected net operating income. Anticipated present and future net operating income, as well as any future reversions, are discounted to a present worth figure through the capitalization process.

The Sales Comparison Approach applies the principle of substitution, based on the premise that an informed, prudent and rational purchaser would pay no more for a property than the cost to acquire a similar, competitive property with the same utility as of the date of valuation.   The Sales Comparison Approach is applicable to valuating all types of real property interests when sufficient recent transactions indicate value patterns in the market.   It is the most direct and straightforward approach when data are available.   This appraisal technique is dependent upon analyzing truly comparable sales data that occurred recently enough to reflect market conditions relative to the time period of the subject appraisal.   When transaction data on comparable properties are not available, however, the applicability of the Sales Comparison Approach may be limited.

Resulting indications from the three approaches are correlated into a final value estimate for the subject property.   It is not always possible or practicable to use all three approaches to value.   The nature of the property being appraised, and the amount, quality, and type of data available dictates the use of each of the three approaches.

**Highest and Best Use Analysis**

The Highest and Best Use in this appraisal is generally defined according to information in the Appraisal Institute, The Appraisal of Real Estate, 14th Edition, page 333, as:  The reasonably probable use that produces the most benefits and highest land value at any given time.

Highest and best use was defined in the 6th edition of The Dictionary of Real Estate Appraisal as:

*The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and that results in the highest value.  The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.  Alternatively, the probable use of land or improved property - specific with respect to the user and timing of the use - that is adequately supported and results in the highest present value.*

A property's highest and best use is determined by competitive forces in the market where the property is located.  It may or may not reflect the current or proposed use.  Indirectly, highest and best use analysis addresses who would be the most probable buyer of the subject property (owner/user vs. investor, for example) and what would be the most probable marketing scenario (for example, would the property sell in its entirety to one buyer or would it most likely be sold off in portions to a number of buyers).

An appraisal involving **existing** improvements must properly develop highest and best use conclusions from two perspectives: as if the site were vacant, and as currently improved.  The test of financial feasibility of the property **as improved** addresses the market demand for the subject ***only in its current state***.

**Highest and Best Use of the Site As Vacant**

This analysis answers:  If the site is or were vacant, what use should be made of it?  What type of building or other improvements, if any, should be constructed on the site, and when?  Highest and best use as if vacant tests: of those uses that are physically possible, legally permissible, and financially feasible, which use is maximally productive?

**Physically Possible**

Development constraints imposed on a site include its configuration, size, topography, location and access.

The subject consists of a parcel that is much larger in size based on the comparable market use sales.  The parcel could physically accommodate a variety of uses.  It is also larger in size compared to other industrial sites that have been developed in the neighborhood and immediate area.

All necessary utilities are available at the site and street improvements are in place.  Access and visibility to the site are fair to average, since it is an interior parcel.  Consequently, the site's physical attributes are fair to average.

**Legally Permissible**

The I-P – Industrial Park zoning designates industrial use on this site, according to Riverside County zoning officials.  Another use would require a variance, which would be unlikely.

**Financially Feasible**

A detailed operating analysis on every possible feasible use was not performed, but it is reasonable to assume that allowed uses are typically most feasible for the site.  Based on indications from other developments and broker opinions, certain uses of the site are estimated to be more likely than others.  Additionally, the value of most developed properties exceeds the industrial land values in the area.

The site is not zoned for retail, office, commercial, or residential uses, and the site's frontage and surrounding properties are not conducive to any use but industrial.  Therefore, an atypical use would likely not be financially feasible from a lease or sale perspective.

**Maximally Productive**

Of the legally allowed, physically possible, and estimated financially feasible uses, the maximally productive use of the parcel is estimated to be for development of an industrial use, similar to the uses of competing sites.

**Highest and Best Use as Improved**

The subject property has building improvements existing in its current state.  In determining highest and best use as improved, questions must be addressed using the four criteria (physically possible, legally permissible, financially feasible, and maximally productive) as tools.  This "improved" scenario is typically applied to construction above ground but can also be applicable to site improvements necessary to make the site ready for construction of buildings.

**Physically Possible**

The subject's existing industrial building and site improvements on the site are physically possible, as evidenced by its existence.

**Legally Permissible**

The I-P – Industrial Park use legally allows the existing development according to available zoning and planning information.

**Financial Feasibility**

The subject property's improved value as estimated in this appraisal exceeds a market-based estimate of vacant land value.  Operated as an industrial use property, the subject is currently financially feasible.  The subject building is currently partially owner-occupied and partially leased.  The Sale Comparable properties considered and analyzed in this report indicate this is a common occupancy type for industrial properties in the subject's size range.

**Maximally Productive**

As discussed, the subject's existing use and improvements are super adequate at this time.  The 43,456 SF / 36% of NRA office build-out is far more than any other industrial property in the current market.  Additionally, only the ground floor office space is leased for the next 19 months, while the upper floor "stacked" office space is currently unused.

Also as discussed, the subject's "clean room" build-out is functionally obsolete as it was originally developed for a specific user (Abbot Laboratories) and would not be used by any future user for the foreseeable future.  Market demand, with support from local brokers, indicate the clean room space should be renovated to typical warehouse storage space in order to achieve the subject's highest and best use.

### Conclusion - Highest and Best Use

The highest and best use *as vacant* is to be for development of an industrial use similar to the uses of competing sites.

The *As Improved* analysis of the subject is developed as an industrial property.  Based on discussions with the county planning department, personal inspection, market comparisons, and income analysis, it was determined that the subject as developed is legally allowed, physically possible, and financially feasible.  The property value as developed exceeds a general value estimate of the site.  However, as it exists, the building improvements warrant renovation to more typical industrial warehouse space as discussed.  Therefore, the Highest and Best Use of the site as improved is to renovate the subject building interior to typical industrial warehouse space and operate as a partially owner-occupied, partially leased industrial property.

### Most Probable Buyer

The most probable buyer of the subject property is a partial owner/user with the ability to lease a portion of the property to tenants.  This purchaser profile is reflective of a highest and best use owner and conforms to the majority of competitive property ownership interests in the market.

### Pertinent Subject Analysis and Valuation Methods

Two approaches to value, Income and Sales Comparison, were considered relevant to estimate the subject value.  The Income Approach is warranted because the improved property can be leased to tenants.  The Sales Comparison Approach to estimate the market value was warranted since the subject is mostly owned in fee, and similar properties actively transfer.

Area property owners, buyers, and industrial property brokers state they generally do not consider cost when estimating the value or price of an existing property such as the subject.  Additionally, there are very few sources to derive a reliable estimate of the subject building's developable land value and physical building depreciation without an arbitrary economic obsolescence estimate. Correspondingly, a Cost Approach was not performed, which is not a USPAP violation and the resulting valuation corresponds to the client's request.  The exclusion of a Cost Approach did not affect the credibility or reliability of the overall value estimate based on the Income and Sales Comparison Approach indicators.

**MARKET VALUE AS IS**

## INCOME CAPITALIZATION APPROACH

### Methodology

The Income Approach involves capitalizing net operating income to produce a value indication. The property's potential income is calculated and deductions are made for vacancy and collection loss and expenses, and calculated to derive an estimated prospective net operating income (NOI). There are two NOI capitalization methods, Direct Capitalization and yield or DCF capitalization.

Direct Capitalization analysis involves converting the stabilized net operating income into a value indication by dividing it by an appropriate overall capitalization rate (Ro) also referred to as the OAR. These rates are typically derived from comparable sales and pertinent market survey data and opinions.

Yield capitalization or DCF analysis converts future benefits to present value by discounting the future benefits (cash flow) at an appropriate yield rate (Yo.) The appropriate rate is selected by analyzing market evidence pertaining to the yield anticipated by typical investors over a projected holding period for which all cash flows and their patterns and relationships have been identified. In the DCF analysis, the procedure generally takes specified quantity, variability, timing, and duration of periodic income (including the reversion) and discounts it to a present value at a specified yield rate. These rates are less readily available (than OARs) and often derived from published source data and market investor opinions.

Stabilized operating terms for the subject property type are relatively uncomplicated and adequately equated to value via Direct Capitalization analysis. Consistent with market participant opinions, only a Direct Capitalization analysis was performed. A DCF would introduce too many assumptions to be a reliable valuation method.

### Subject Existing Contract Revenue

The first step in the Income Approach is analysis of any existing revenue. The owner's current rent roll was provided for review. The rent roll provided only tenant names, space sizes, and current rents; only one lease agreement was provided for review. Though requested, no historic operating data was provided for review. The property was 100% leased/occupied as of the appraisal date; 70% owner-occupied and 30% leased to four tenants. The appraiser's reconstructed rent roll based on the one provided lease and the owner-provided rent roll, as well as an abstract of the only provided lease agreement follow.

### Appraiser's Reconstructed Rent Roll

| TENANT | SUITE SIZE SF | START DATE | CURRENT RENT/MO. | EFFECTIVE RENT/SF | # | EXPIRATION |
|---|---|---|---|---|---|---|
| Owner-Occupied Space | 80,388 | | | | | |
| Pharmaxx (owner-related space) | 2,400 | | | | | |
| ExxelUSA Inc. (owner-related space) | 1,100 | | | | | |
| Ampharco (owner-related space) | 2,000 | | | | | |
| **Total Owner-Related Space** | **85,888** | | | | | |
| II-VI Optical | 24,500 | 9/1/2017 | $25,292 | $1.03 | 60 | 8/31/2022 |
| Mask Company N95 | 4,000 | | | | | |
| Pharmaxx Medical | 4,000 | | Information Not Provided | | | |
| MedLab Pharma Inc. | 4,000 | | | | | |
| **TOTAL** | **122,388** SF | | **$25,292** | | | |
| **OCCUPIED** | **122,388** SF | | **100%** | | | |
| **VACANT** | **0** SF | | **0%** | | | |

The subject property owner, along with three businesses related to subject property ownership occupy approximately 85,888 SF or 70% of NRA. The remaining 30% of NRA or 36,500 SF is leased to four reported arms-length tenants. Only one lease agreement was provided for review. An abstract of the lease terms follows:

**Lease Abstract**
**II-IV Optical Systems**

| | |
|---|---|
| Lease/Commencement Date: | April 19, 2017 / September 1, 2017 |
| Lessor : | Bioxxel, LLC |
| Lessee : | II-VI Optical Systems, Inc. |

Property Description :    "…approximately 21,728 rentable SF of first floor office space." *(It should be noted the provided rent roll shows the leased space is 24,500 SF, though no amendment or other documentation was provided showing the increase in leased space.)*

Term :    5 years, ending August 31, 2022 *(19 months remaining)*

Renewal Options :    One 5-year option to renew the lease.

Rent Schedule :
**CURRENT (per rent roll)**

| | Years | Monthly Rent | |
|---|---|---|---|
| | 4 | $25,292.04/mo. | *(=$1.03/SF/Mo.)* |

Expenses :    Effectively Gross terms per lease that in summary shows Landlord pays all operating expenses except interior space electricity and janitorial services.

As stated, no other documentation was provided regarding the tenant's expanded space or amended rent including any increase in the 5th year of the lease.  This leased space is nearly 100% office build-out; the expanded 2,772 SF is "clean room" space.

**Market Rental Data**

The subject currently consists of 36% office build-out, 58% clean room space, and 6% warehouse space. The subject's highest and best use was estimated to be for partial owner-use and partially leased to tenants. Additionally, the "clean room" space would need to be renovated to more typical industrial warehouse space to meet current market demand.

The majority of lease data reviewed, in addition to broker opinions indicate leased spaces between 47,000 SF and 116,000 SF, and one lease was found for 133,993 SF. This is the space range used for analysis purposes.

A search was made for recent leases of comparable spaces in the market, in order to estimate a market rental rate for the subject. An average number of recent leases of competitive industrial properties were found and considered for this analysis. Numerous other rental listings were also considered and analyzed as support. A prospective lessee or subject property buyer would likely only have available the same or similar data set to consider when estimating subject rent (or supporting its existing rent).

Rental listing sources, including other buildings, leasing brokers, a variety of subscription services, and proprietary data, were searched for available space for lease with characteristics similar to the subject property. Data found included spaces in a 40,000 SF to 100,000 SF range, listed for $0.73/SF to $0.85/SF gross or equivalent monthly rents. The most pertinent listing to the subject was included in the Lease Comparable adjustment grid as Comparable No. 5.

The best, most recent and local available comparable market data within the same or competitive areas were used to estimate subject market rent. A concerted effort was made to use leases with terms common to the market and similar overall or at least bracketing the subject characteristics. When certain aspects of the comparables differed from the subject, it was necessary to adjust the rentals to compare to the subject characteristics. The following discussions compare the data to the subject and explain the adjustments derived and applied. The adjustment grid reflects comparable lease details such as locations, lease terms, and required adjustments as well as the resulting adjusted indicated rent ranges and estimate of subject market rent. Photographs of each property follow the comparable rent presentation grid.

**Effective Rent**

Effective rent indications were the standard for comparison. The effective rent is derived by adjusting for influences of non-market concessions, differing tenant improvement (TI) cost allowances, rental abatements (free rent), and shorter or longer-than-normal lease periods.

Recent leases of similar industrial property spaces are leased on a variety of rental terms. The rent survey found the majority of leases were signed based on gross terms similar to the subject. This is the basis that will be utilized in the income analysis. In a gross lease the tenant is only responsible for their rent and their own utilities, with the landlord paying all other expenses. Lease No. 2 was based on gross terms and did not require adjusting. However, Lease Nos. 1, 3, and 5 were based on NNN terms warranting the adjustments shown in the grid. Additionally, Lease No. 4 was based on Industrial Gross (IG) terms warranting the adjustment shown in the grid

None of the lease comparables included abated rent. The leases reviewed also had no TI allowances. Therefore, none are included in market lease rates. Typically, any TI allowance exceeding the market amount is amortized as additional rent above the market base.

The most common lease periods in the market ranged from three to five years with a 5-year majority. Lease terms of all the comparables were for similar periods and did not require adjusting.

**Market Conditions**

Differences in market conditions usually relate to changes over time. Economic indicators have declined and real property trends have varied. The lease comparables and listings used were very current. Overall, there has been no measurable trend between the current date and when the comparable leases were executed. Therefore, no time adjustments were applied.

Lease No. 5 was a current listing and not an executed lease transaction. Area brokers report that suites typically do not have executed leases at full listed rents. Accordingly Lease No. 5 was adjusted downward as shown in the grid.

**Location /Access / Exposure / Visibility Adjustments**

The rental comparables were adjusted in comparison to the subject for location, and related or specific access / exposure / visibility considerations if pertinent. The quantified adjustment amounts were derived by either pairing of similar properties or general land value differences in opposing areas. The resulting location adjustment results are shown on the following grid.

**Physical Difference Adjustments**

The rentals were also adjusted to the subject for physical differences.  The building quality, condition, age, and other adjustments quantify rent differentials a tenant might pay for different building or property characteristics.  These include percentage or quality of interior office build-out in a building, or functional design, or permanent condition estimates.  A subject having curable below-average condition impact may be compared as if in typical market condition, and warrant a deduction after the final valuation estimate.  Rents were adjusted for only *measurable* usable land area differences, derived by either data pairings or estimating the amortized rent for the land percentage differential.

**Individual Lease Comparable Analysis**

The rentals were compared to the subject property in the following discussions, with the concluded quantified adjustments shown in the subsequent grid:

Lease Comparable Adjustment Grid

## LEASE COMPARABLE ADJUSTMENT GRID

| Item | Subject | Comparable #1 | Comparable #2 | Comparable #3 | Comparable #4 | Comparable #5 |
|---|---|---|---|---|---|---|
| Property Address | 30590 Cochise Circle | 1160 W Rincon Street | 27731 Diaz Road | 7345 Sycamore Canyon | 43085 Business Park Dr. | 40750 County Center Dr. |
| City, CA | Murrieta | Corona | Temecula | Riverside | Temecula | Temecula |
| Tenant Name | | Mascot Int'l Logistics | Industrial User | Industrial User | Cali-Wine and Vine | Listing |
| Lease Rate/SF | | $0.69 | $0.75 | $0.55 | $0.75 | Asking $0.63 |
| Expense Basis | Gross | NNN  $0.10 | Gross | NNN  $0.10 | IG  $0.06 | NNN  $0.10 |
| Start Date | | Oct-20 | Oct-20 | May-20 | Jan-20 | Listing  -$0.07 |
| Lease Term | | 60 Months | 36 Months | 60 Months | 36 Months | Months |
| Rent Adjustments | | CPI | CPI | CPI | CPI | CPI |
| Free Rent (Mos.) | | 0 Months | 0 Months | 0 Months | 0 Months | 0 Months |
| TI Allowance/SF | | | | | | |
| Eff. Lease Rate/Mo. | | As Is  $0.79 | As Is  $0.75 | As Is  $0.65 | As Is  $0.81 | As Is  $0.66 |
| Location | Average | Superior  -10% | Sl Superior  -5% | Similar | Sl Superior  -5% | Similar |
| Exposure | Fair-Average | Similar | Similar | Similar | Superior  -10% | Similar |
| Quality | CTU | Similar | Similar | Similar | Similar | Similar |
| Condition | Average | Similar | Similar | Similar | Similar | Similar |
| Year Built | 1995 | 2019  -10% | 1980 | 2006  -10% | 1990 | 1990 |
| Office % | 18% | 2%  5% | 6%  5% | 4%  5% | 5%  5% | 8%  5% |
| Clear Height | 20' | 32'  -2.5% | 30'  -2.5% | 30'  -2.5% | 24'  -2.5% | 26'  -2.5% |
| Coverage Ratio | 13% | 23%  5% | 15%  5% | 44%  10% | 39%  10% | 39%  10% |
| Unit Size (SF) | 122,388 | 133,993 | 65,625 | 67,100 | 47,808  -10% | 116,763 |
| Other | None | None | None | None | None | None |
| Net Adjustment | | -13% | -3% | 3% | -13% | 13% |
| Indicated Monthly Rent /Square Foot | | $0.69 | $0.73 | $0.67 | $0.71 | $0.74 |

| Indicated Range Statistics | |
|---|---|
| Mean | $0.71 |
| Maximum | $0.74 |
| Minimum | $0.67 |
| % Difference | 10% |

Estimated Subject Market Lease Rate  :  $0.70  /SF Gross

**Lease Comparable Photographs**

Lease Comparable No. 1
1160 W. Rincon Street, Corona



Lease Comparable No. 2
27731 Diaz Road, Temecula



**Lease Comparable Photographs**

Lease Comparable No. 3
7345 Sycamore Canyon Road, Riverside



Lease Comparable No. 4
43085 Business Park Drive, Temecula



**Lease Comparable Photographs**

Lease (Listing) Comparable No. 5
40750 County Center Drive, Temecula



## Lease Comparable Location Map



**Market Rental Conclusion**

The comparable rentals adjusted to the range formed by the minimum and maximum adjusted rents in the *Indicated Range Statistics* summary on the prior page Lease Rate Adjustment Grid; the adjusted "Mean" rent and "% Difference" or standard deviation from the mean are also shown. The most recent data, predominance in the adjusted range, and mean all tend to weight a range bracketed around a $0.70/SF gross rental indication.

Lease Nos. 2 and 3 required the least net adjusting and generally represented the whole range of adjusted indicators. Therefore, the estimated market rental rate was rounded near the mean.

Based on the range of the adjusted indicators and the mean, a **$0.70/SF Gross** market rent is supported for the subject. This rental conclusion assumes standard build-out condition but no above-market TI condition or allowance, an approximate 5-year lease term, and CPI or similar fixed rent increases.

Of note, the subject's sole provided lease agreement has the tenant paying $1.03/SF gross. As previously stated, this space is 100% office build-out and is reasonable compared to local office market rents. As a result, no leased fee market equivalency adjustment is warranted.

**Reimbursements**

The subject rent is estimated on a Gross basis which does not require reimbursement to the landlord. Therefore, none are included in this analysis.

**Vacancy and Collection Loss**

The subject is currently 100% leased/owner-occupied, however the majority of the building is not currently being used. Published sources indicate a variety of vacancy rates for the Inland Empire, both east and west sub-markets. As of the 4th Quarter 2020 (the latest reported), the vacancy range was generally from 1.1% to 8.7%. The subject's South Riverside submarket had a 4th Quarter 2020 vacancy rate of 6.3%. The area immediately surrounding the subject appears to have average occupancy. The subject property vacancy likelihood would generally be considered at the market average.

The selected stabilized vacancy rate is a forecast that corresponds to the estimated market-supported rent projection.  The average "stabilized" vacancy rate is a projection over a typical investment holding period, such as 10-years.  The historical rate incorporates a generally improving time period, after the recession that occurred prior to 10 years ago.  However, there are assumedly pending risks associated with the current Covid-19/Coronavirus impacting the world, including the U.S. and subject locations.

As of this report data, no current data on the virus' impact on vacancy and collection was available.  It is reasonable to assume the current forecasted vacancy rate will not be lower than the historical average; conversely, most sources project the market may stabilize by the last quarter of 2020 or earlier this year.  Additionally, the risk of collection loss will likely be a component in the local and wider industrial real estate market.  Consequently, the subject's stabilized vacancy and collection loss combined estimate is **7%** of potential gross income.


**Operating Expenses**

Expense histories for the subject property were not provided.  As a result, the following expense conclusions were based on market-supported indicators.  These included comparable property expense histories (confidential, on-file), broker opinions, and the most recent published expense surveys published by widely recognized sources such as IREM or BOMA.  Additionally, results of this firm's recent in-house, primary data survey are summarized below:

| INDUSTRIAL PROPERTY EXPENSES | | | |
|---|---|---|---|
| **Category** | **Low** | **High** | **Average** |
| Property Taxes | $0.64 | $2.67 | $1.11 |
| Property Insurance | $0.04 | $0.25 | $0.13 |
| Prof. Management as % of EGI | 0% | 5.6% | 3.7% |
| **CAM Only:** | | | |
| CAM Utilities | $0.00 | $0.09 | $0.02 |
| CAM Repairs & Maintenance | $0.00 | $0.39 | $0.14 |
| CAM Services (Trash, Landscaping, etc.) | $0.00 | $0.68 | $0.24 |
| **Subtotal CAM Only:** | **$0.00** | **$1.16** | **$0.40** |
| **TOTAL ALL EXPENSES:** | **$0.68** | **$4.08** | **$1.64** |

Source: Penner & Associates

The expense categories and their estimates follow:

### *Fixed Expenses*

### Property Taxes

The real estate tax expense is based upon the assumption that the property has been sold, typically at the estimated market value. Therefore, the projected tax estimate is based on the market value developed within the Income Approach times the property's current tax rate reported in the "Taxes and Assessment" section of this report.

The special assessments reported earlier were added as an additional separate line item. These payments are typically stable, regardless of a sale, the price, or change in assessed value, according to the assessor.

### Property Insurance

The majority of comparable properties, broker and owner proformas, and surveys indicated property insurance expenses in a wide range from $0.04/SF to $0.25/SF. The pertinent areas of the range varied typically with regard to total building NRA.

Considering the subject's location, and the building replacement cost, size, and construction materials, the majority of indicators or pertinent portion of the range is near $0.15/SF to $0.25/SF of rentable area. Based on trend indications and competitive project expenses, the stabilized insurance expense is projected at **$0.20/SF**.

### *Variable*

### Exterior Common Area Expenses / Property R & M

Expenses for the subject property type generally include contracted maintenance, repair, grounds, administration, and trash collection.

The majority of data from similar buildings showed common area utilities and repairs in the range of $0.05/SF to $1.16/SF. Based on broker and comparable property indicators, as well as the appropriate survey ranges, the common area expense considering the subject building size, age, quality and condition is concluded at **$0.50/SF** annually.

**Professional Property Management Expense**

The subject property is owner-used and not professionally managed. The widely accepted market range for professional (non-owner) property management stabilized expense is 3% to 6% of collected rental income (total contract rent minus a vacancy allowance). Most sale and listing operating proformas of similar properties reviewed used fees within this range. The rate is dependent on the level of income such as a low-end percentage for larger, high rent properties and vice versa. Typically, management companies may also have a base or monthly minimum.

The common market range is also supported by discussions with personnel at a variety of realty management service companies and actual lease terms, all collectively managers of millions of square feet of industrial properties throughout Southern California. Management fees vary dependent on income but are generally within the stated range.

The subject's large size, multiple tenancy, and design should not be management intensive. Based on the comparable property expense indicators and the expected effective gross income of the subject property, **3.0%** of all rental income less vacancy is the projected professional management expense.

**Reserve for Replacements**

A reserve for replacement of capital expenditure items is not an actual expense as much as an allowance. It is appropriate in a DCF projection, usually in conjunction with leasing commission and tenant improvement allowances. The investors and brokers surveyed, as well as the overall rate indicators, did not include a reserve for replacement expense in the direct capitalization operating projection. Therefore, to be consistent with the market, no reserve is included as an expense line item in this direct capitalization analysis.

**Total Expenses**

Market indicators support the subject's annual projected expense total that falls in the $0.68/SF to $4.08/SF range. More indicatively, almost all brokers agreed with the total monthly expense estimate to operate the property, as typically quoted to potential owners or tenants. The concluded expense components are utilized in a following Direct Capitalization Approach to value analysis.

An overall capitalization rate concluded in the following analysis is also predicated on comparables having a similar to bracketing level of expenses.

**Overall Capitalization Rate (OAR) Derivation**

The OAR data presented may include either Sales Comparison Approach investor sales, or other leased fee properties that sold, depending on the subject interest appraised.  The most current pertinent sales and listings, both included in the following table and others in the workfile, were considered and selected to bracket and estimate an OAR for the subject.  These Overall Capitalization Rate (OAR's) indicators were derived from a wide range of the most recent listed and sold industrial properties as reported by parties to the transaction.  The most recent and similar indicators, especially those having the most similar size, age, and operating considerations for comparison purposes were considered strongly.  None of the OAR / Sale verification sales reported any extraordinary above or below market rent included in the capitalization rates of the comparables.  Published national surveys and market participant opinions were also considered.

A summary of some of the most appropriate OAR indicators are presented in the following table:

| SALE OAR INDICATORS & ANALYSIS | | | | | |
|---|---|---|---|---|---|
| Property | Size NRA SF<br>Year Built<br>Other | Net Income<br>Net Inc. /SF<br>Occ. @ Sale | Cash Eq. Sale Price<br>Sales Date<br>Condition of Sale | Price/SF | OAR<br>$/SF Value Indic.<br>Adj. to Subject NOI |
| S  Subject<br>30590 Cochise Circle<br>Murrieta | 122,388<br>1995 | $701,137<br>$0.48<br>Assumed Stabilized | | | |
| 1  Leased Industrial Prop.<br>5821 Wilderness Ave<br>Riverside | 133,825<br>1992 | $802,100<br>$0.50<br>Stabilized | $15,425,000<br>11/17/2020<br>Subj $/SF based on NOI diff: | $115 | **5.20%**<br><br>**$110** |
| 2  Leased Industrial Prop.<br>28410 Vincent Moraga Dr<br>Temecula | 64,678<br>1985 | $625,500<br>$0.81<br>Stabilized | $10,425,000<br>5/22/2020<br>Subj $/SF based on NOI diff: | $161 | **6.00%**<br><br>**$95** |
| 3  Leased Industrial Prop.<br>7275 Sycamore Canyon Blvd<br>Riverside | 75,286<br>2006 | $428,498<br>$0.47<br>Stabilized | $8,890,000<br>5/10/2019<br>Subj $/SF based on NOI diff: | $118 | **4.82%**<br><br>**$119** |
| 4  Leased Industrial Prop.<br>1651 S Archibald Ave<br>Ontario | 199,951<br>1992 | $1,368,613<br>$0.57<br>Stabilized | $26,575,000<br>2/5/2019<br>Subj $/SF based on NOI diff: | $133 | **5.15%**<br><br>**$111** |
| 5  Leased Industrial Prop.<br>230 N Sherman Ave<br>Corona | 62,000<br>1984 | $325,000<br>$0.44<br>Stabilized | $6,500,000<br>Listing<br>Subj $/SF based on NOI diff: | $105 | **5.00%**<br><br>**$115** |

The OAR's reflect the ratio of stabilized net income to sale price.  Pertinent analysis of the risk represented by the OAR's and their comparison to the subject follows:

*OAR Indicator Analysis*

**OAR No. 1** is a very recent sale and OAR indicator.  The building is of similar age and in a slightly superior overall location.  It generates similar NOI on a square foot basis, supported by its location and / or other attributes.  The subject NOI risk and associated capitalization rate is estimated to be similar to this OAR sale indicator.

**OAR No. 2** is another recent sale and OAR indicator.  The building is older and in a competitive overall location.  It generates higher NOI on a square foot basis, supported by its location and / or other attributes.  The subject NOI risk and associated capitalization rate is estimated to be lower than this OAR sale indicator.

**OAR No. 3** is another recent sale and OAR indicator.  The building is newer and in a slightly superior overall location.  It generates similar NOI on a square foot basis, supported by its location and / or other attributes.  The subject NOI risk and associated capitalization rate is estimated to be higher than this OAR sale indicator.

**OAR No. 4** is another recent sale and OAR indicator.  The building is of similar age and in a slightly superior overall location.  It generates higher NOI on a square foot basis, supported by its location and / or other attributes.  The subject NOI risk and associated capitalization rate is estimated to be higher than this OAR sale indicator.

**OAR No. 5** is a current listing of a leased industrial property in the Inland Empire.  The building is older and in a slightly superior overall location.  It generates lower NOI on a square foot basis, supported by its location and / or other attributes.  The subject NOI risk and associated capitalization rate is estimated to be higher than this OAR sale indicator.

**Published Sources**

Published source indicators were for the most part generalized and had selected relevance to specific properties.  The most recent PwC (PriceWaterhouseCoopers, formerly Korpacz) Investor Survey publication was as of the 1st Quarter 2020.  This survey reported a 3.6% to 6% OAR range with an average of 4.8% for industrial properties.  The survey is national and the subject is within the relatively desirable Southern California investment market; however, the subject's specific and relative appeal, location, and overall comparisons to investment grade properties were considered.

**Direct Capitalization Rate Conclusion**

The most pertinent indicators were in the most similar sales having rates supporting a conclusion.  The published survey indicators and knowledgeable broker opinions were generally also supportive of the sales range.

The sale OAR's were as reported by and verified through available sources privy to the transactions.  Components such as collected versus gross income, actual or stabilized vacancy rates included in the OAR, and the exact property operating expenses and basis (actual or proforma) were typically not disclosed or available when requested.  Oftentimes, the total expense ratios used to estimate the sale OAR's were lower or less inclusive than those used in the subject forecast.  The subject NOI was estimated using market derived rent and vacancy estimates, combined with stabilized expenses, which tends to understate the comparative NOI/SF compared to the sales.

However, the NOI/SF comparisons of truly comparable properties are considered to reflect the risk relative to market norms; ie: above market rent, little or no vacancy inclusion, or below or above-market expenses within the operating information, will be reflected in the higher or lower than typical NOI/SF.  Though some brokers are of the opinion that buyer's desire 6% OARs or higher, they admit this return is based on either absolute net rental income, or less comprehensive expense estimates and higher NOI's/SF than are projected for the stabilized subject forecast.

All OAR's from sales ranged from 4.8% to 6% and were relatively consistent.  The subject's size is solidly within the comparable range, and its age is competitive with the sale properties; the competitive age indicates a similar remaining economic property life to recoup the investment that typically results in a rate within this range.  Also, on a per square foot basis, the subject's projected NOI with all the market supported components used in the forecast was bracketed by the reported NOI's for generally competitive properties.  As a result, the subject's competitive age, size, multi-versus single tenancy appeal, and forecasted NOI/SF would likely make a capitalization rate from the middle portion of the market indicated range most pertinent.  After all considerations, the projected stabilized subject property NOI using market rents, supported vacancy and sufficient expense projections warrant a capitalization rate supported at **5.25%**.

Applications of the prior conclusions are in the Direct Capitalization Summary that follows.

**DIRECT CAPITALIZATION SUMMARY**

| SUBJECT PROPERTY DIRECT CAPITALIZATION SUMMARY | | | | | | |
|---|---|---|---|---|---|---|
| **30590 Cochise Circle** | | | | | **Murrieta** | |
| **SPACE DESCRIPTION** | **SIZE** | | **RENT SF/MO.** | **TOTAL RENT/MO.** | **TOTAL INC. %** | **ANNUAL TOTALS** |
| Multi-User Industrial Prop. | 122,388 SF | @ | $ 0.70 | $85,672 | 100.0% = | $1,028,059 |
| **Rent Totals:** | 122,388 SF | Avg: | **$ 0.70** | **$85,672** | **100.0%** | **$1,028,059** |
| **POTENTIAL GROSS INCOME (PGI) all sources** | | | $ 0.70 | 13.0 GIM | | **$1,028,059** |
| **MINUS STABILIZED VACANCY & COLL. LOSS:** | | | | 0% actual; Stablzd@: | **7.0%** | ($71,964) |
| **EFFECTIVE GROSS INCOME (EGI) all sources** | | | $0.65 /SF | | | **$956,095** |
| Estimated Stabilized Expenses (rnd) | | | | | ANNUALLY | |
| *Fixed Expenses:* | | | | | **(Rounded)** | |
| Taxes - est. based on Mkt.Value: | $1.14 /SF | | | 1.04059% | $138,920 | |
| Special Asmnts | $0.01 /SF | | | Actual: | $1,688 | |
| Insurance | $0.20 /SF | | | | $24,480 | |
| *Variable Expenses:* | | | | % of EGI | | |
| Exter. Common Area Utils/Bldg R&M: | $0.50 /SF | | | 6.4% | $61,190 | |
| | $1.85 /SF | | $0.15 /SF/Mo. | | | $226,278 |
| Professional Mgmt  3.0% of Rent-Vac | $0.23 /SF | | | | $28,680 = | $28,680 |
| **TOTAL EXPENSES   27% of EGI** | $2.08 /SF/Yr | | $0.17 /SF/Mo. | | Rounded: | **$254,958** |
| **NET OPERATING INCOME (NOI)** | $5.73 /SF&Mo: | | $0.48 | 73.3% of EGI | | **$701,137** |
| Capitalized @ | | | (Rounded to nearest .25%, suppported by market data) | | | **5.25%** |
| Direct Capitalization Value Estimate: | | | | $109 /SF (rnd) | | $13,354,991 |
| **INDICATED VALUE VIA THE INCOME APPROACH:** | | | | $109 /SF (rnd) | | **$13,350,000** |

As a result of the analysis, a subject property **Market Value As Is** indication via the Income Approach based on data as of January 21, 2021 was:

**$13,350,000**

## SALES COMPARISON APPROACH

### Methodology

In the Sales Comparison Approach, properties similar to the subject property that have been sold recently or for which listing prices or offers are known are compared to the subject. Prices paid and data in actual market transactions from generally comparable properties are used and comparisons are made, to demonstrate a probable price at which the subject property would sell if offered on the market.

To apply the sales comparison approach, the following steps are taken:

(1)    Research the market to obtain information on sales transactions, listings, and offerings to purchase properties that are similar to the subject property in terms of utility and highest and best use.

(2)    Verify the information by confirming that the data obtained are factually accurate and that the transactions reflect arm's length market considerations.

(3)    Select relevant units of comparison and develop a comparative analysis for each unit.

(4)    Identify the elements of comparison and compare the subject property and comparable sale properties; adjust the sale price of each comparable appropriately or eliminate the property as a comparable.

(5)    Reconcile the values indicated by the adjusted sales prices of the comparable to conclude to a value estimate for the subject property.

### Improved Sale Data Search

An extensive search was performed to find the most recent closed sales, escrows and available for sale listings of comparable leased fee industrial properties in the subject size range and competitive market. The search was of public and subscription listing services, broker queries, and other sources. The intent was to find prices for properties with characteristics equal or similar to, or bracketing as best as possible, the specific subject characteristics.

In wide and narrowed area surveys, a sufficient amount of recently closed, similar size multi-user leased fee industrial property data was found. The best, most comparable sale indications were selected for direct comparison and discussion within the appraisal. Brokers state that buyer purchase criteria in investment properties, especially those in limited supply, are more typically based on property type, tenant profiles, or overall price and return rates rather than limits on specific locations. Most location considerations can be quantified by land value comparisons, though rents throughout most generally competitive markets (i.e.: primary or secondary) are relatively similar.

If the number of closed sales occurring in recent months was limited, sale comparable properties not necessarily proximate to the subject location may have been selected in order to reflect the most current investment buyer motivations and data. Brokers state that buyer purchase criteria in larger commercial investment properties are more typically based on property type, tenant profiles, or overall risk rates rather than limits on specific locations. Most location considerations can be quantified by land value comparisons, though rents throughout most generally competitive markets (i.e.: primary or secondary) are relatively similar.

A thorough data search was performed for competitive properties located in the subject's neighborhood and surrounding area. Numerous sales were analyzed. The unadjusted price range of the most competitive data reviewed was generally from $91/SF to $138/SF and the subject property is most similar to those in the lower end of the range. The most recent sales having similar sizes, locational characteristics, and allowable uses were given most weight.

In addition to the closed sales used, other slightly less similar closed sales appeared to support the selected sale price range. Unsold / listed property sale prices were also considered in order to establish a maximum range bracket indicator that a reasonable purchaser would pay as a competitive alternative to the subject. The unsold properties ranges were from 50,000 SF to 250,000 SF in size and with $100/SF to $180/SF prices, and nearly all sales close at lower than asking prices. The best most pertinent listing that a subject price would likely not exceed is included in the following adjustment grid.

Data in the following adjustment grid represents the very best available competitive sales, presented in date order. Though the Sale Comparable properties selected may not all be in the subject city, their more recent sale dates were in what buyers would consider a reasonable time frame and more pertinent than using older, closer proximity sales. Also the most recent sales were competitive with regard to buyer considerations of similar size buildings and rent levels, etc. The grid summarizes the comparable property descriptions, sale transaction information, adjustments to the data to compare to the subject, and resulting value indications. Comparable Sale Property Photos, a Location Map, and adjustment explanation discussions follow the adjustment grid.

## Comparable Sale Adjustment Grid

### IMPROVED INDUSTRIAL SALES ADJUSTMENT GRID

| Description Item | Subject | Improved Sale Comp #1 | Improved Sale Comp #2 | Improved Sale Comp #3 | Improved Sale Comp #4 | Improved Sale Comp #5 |
|---|---|---|---|---|---|---|
| Property Name/Type | Owner-User Idustrial Prop. | Partially Leased Inadust. Prop. | Leased Industrial Prop. | Leased Industrial Prop. | Leased Industrial Prop. | Currently Vacant Industrial Prop. |
| Street Address | 30590 Cochise Circle | 43350-43352 Business Park Dr | 27719 Diaz Rd | 40761 County Center Dr | 28410 Vincent Moraga Dr | 2285 Rutherford Road |
| City, CA | Murrieta | Temecula | Temecula | Temecula | Temecula | Carlsbad |
| **Sale Transaction Details:** | | | | | | |
| Buyer Name | | Garmon Family Trust | Greeshav Partners | Kwi II Construction Inc. | Stos Partners | Current Listing |
| Seller Name | | Temecula BP LLC | MCA Realty, Inc. | Hill Properties | Calavo Growers, Inc | BPP Pacific Industrial |
| Marketing Time | | 0.9 Months | Not reported | 7.8 Months | Not reported | 22.9 Months |
| Sales Price & Doc# | | # 0663125 — $12,600,000 | # 0479288 — $14,000,000 | # 0496204 — $9,350,000 | # 0143088 — $7,100,000 | # Listing — $23,045,355 |
| Unadj.$/SF of Bldg Area | | 137.97 | 106.40 | 91.38 | 109.77 | 179.00 |
| Interest Transferred | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Fee Simple |
| Adjusted Price | | $12,600,000 | $14,600,000 | $9,350,000 | $7,100,000 | $23,045,355 |
| Financing Terms | Cash Equivalent | $ - | $ - | $ - | $ - | $ - |
| Adjusted Price | | $12,600,000 | $14,000,000 | $9,350,000 | $7,100,000 | $23,045,355 |
| Condition of Sale | None | None | None | None | None | None |
| Adjusted Price | | $12,600,000 | $14,000,000 | $9,350,000 | $7,100,000 | $23,045,355 |
| Escrow/COE Date:& Time Adj | DOV: 1/21/2021 | 12/29/2020 | 10/6/2020 | 12/3/2019 | 4/26/2019 | Listing |
| Adjusted Price | | $12,600,000 | $14,000,000 | $9,350,000 | $7,100,000 | $(2,304,536) → $20,740,820 |
| Adj. Price / Bldg SF | | $137.97 | $106.40 | $91.38 | $109.77 | $161.10 |
| **Physical Features/Comparisons/Adjustments:** | | | | | | |
| Location | Average | Superior ($6.90) | Superior ($5.32) | Superior ($4.57) | Superior ($5.49) | Superior ($35.64) |
| Access/Exposure | Fair-Average | Corner-Superior ($20.70) | Similar | Similar | Similar | Similar |
| Condi. (typ. curable) | Average | Similar | Similar | Similar | Similar | Similar ($16.11) |
| Bldg Qual/Mat/Class | CTU | CTU | CTU | CTU | CTU | CTU/Superior |
| Yr Built ~ Eff Age Adj | 1995 | 1987 ($3.45) | 1972/1985 | 1998 | 1985 $5.00 | 1990 |
| Bldg Size/Area (SF) | 122,388 | 91,326 $12.48 | 131,577 $10.82 | 102,320 $13.94 | 64,678 ($10.98) | 128,745 $9.41 |
| Zoning / Use | I-P – Industrial Park | MSC | PI | LI | LI | Industrial |
| Occupancy @ Sale | Assumed Stabilized | Stabilized | Stabilized | Stabilized | Stabilized | Stabilized |
| Site Size (Acres) | 17.47 | 4.87 | 10.16 $1.50 | 4.97 $4.00 | 7.05 $7.36 | 6.55 |
| Bldg/Site Coverage | 13% | 41% ($3.00) | 30% | 47% | 21% $2.81 | 35% ($5.00) |
| Office/% Build-Out | 18% | 30% ($4.00) | 12% | 2% ($4.00) | 7% | 38% |
| Loading Doors | 2 | 6 | 14 | 16 | 8 | 8 |
| Truss/Clear Ht | 20' | 28' | 18' ($1.00) | 28' | 24' ($2.00) | 26' ($3.00) |
| Other/NOI Disparity | $0.48 | $0.50 | $0.81 | $0.47 | $0.57 | $0.44 |
| Net Adjustment % & $ Equivalents: | | -19% ($25.57) | 6% $6.00 | 10% $9.37 | -3% ($3.30) | -31% ($50.34) |
| Indicated Subject Value/SF (per Square Foot) | | $112 | $112 | $101 | $106 | $111 |

**Indicated Range Statistics**

| | |
|---|---|
| Mean | $109 |
| Maximum | $112 |
| Minimum | $101 |
| % Difference | 10.9% |

**ADJUSTMENTS:**

| | |
|---|---|
| Annual % Time Adj. from Comp Sale Dates to DOV : | 0% |
| Est Surplus Land Value Adjustment (typ. 25% to 75% of full use value): | $2.50 |
| Est Depreciated Office Build-Out Value/SF Adjustment : | $25 |
| Estimated Subject Bldg. SF Value : | $110 |

**VALUE INDICATIONS:**   1/21/2021

Est. Subject Property Value Indication (Rnd) : **$13,460,000**

## Improved Sale Comparable Photographs

Improved Sale Comparable No. 1
43350-43352 Business Park Drive, Temecula



Improved Sale Comparable No. 2
27719 Diaz Road, Temecula



**Improved Sale Comparable Photographs**

Improved Sale Comparable No. 3
40761 County Center Drive, Temecula



Improved Sale Comparable No. 4
28410 Vincent Moraga Drive, Temecula



**Improved Sale Comparable Photographs**

Improved Sale Comparable (Listing) No. 5
2285 Rutherford Road, Carlsbad



**Improved Sale Comparable Location Map**



**Improved Sale Comparable Adjustment Analysis**

Price per square foot of building area is the common market measure used to compare and evaluate the subject property type for Sales Comparison Approach analysis.  For value indication purposes, similarities between the properties were identified and measurable differences recognized by the market were adjusted.  The adjustments required average degrees of subjectivity on the part of the appraiser.  Pairings to derive adjustments were performed when data allowed.  Comparison elements not discussed were estimated to be reasonably comparable to the subject and did not require adjusting.  Other components requiring consideration or adjustments were as follows:

**Property Rights/Interest Transferred**

All of the closed sales were transfers of the leased fee interests.  Therefore, no property right interest adjustments were warranted.

**Condition of Sale**

The general conditions of the closed sales were similar overall.  Therefore, no condition of sale adjustments were required.

**Time / Market Conditions**

The sale data were not identical in all aspects and deriving a single applicable time adjustment was somewhat subjective.  Prices of most property types continually increased since the last "great recession" (generally 2008-2009) at varying trend rates depending on use, demand, and availability. Starting in March 2020, the Corona/Covid-19 virus caused a significant economic downturn that as of this report's date, had an unknown effect on the real estate market.

The subject's industrial property type does not have sufficient activity to indicate any exact measurable price changes (24 months and less) related to the time period when the sales closed. Also, the sales were sufficiently recent that no time adjustments were considered necessary. However, the most recent sales and trends carry strongest weight.

Sale No. 5 was a current listing and not a closed sale.  Area brokers report an average to increasing amount of recent sale activity, though closed prices are typically 5% to 20% or more lower than current list prices.  The listing was adjusted based on data pairings, time on market, broker opinions of likely offer prices, and other considerations.   The resulting adjustment for the listing status considers all factors.

**Location**

Sale Nos. 1 through 5 were located in areas superior to the subject city or specific location.  These sales were located in areas where land prices differed from the subject's.  The adjustments are calculated by the respective estimated land value disparities divided by the coverage ratios of each sale property, which adjusts the price/SF based on building size.  The adjustments to the building prices resulting from the calculations are shown on the grid.

**Exposure / Access / Frontage**

The subject is effectively an interior lot with fair to average street frontage, access and exposure. The exposure and access considerations comparing the comparables to the subject were estimated and shown on the grid, where warranted.

**Building/Property Condition**

The condition of the structures and property of the sales were compared to the subject.  The adjustments reflect an estimate of cost to cure deferred condition differences or any disparity value estimate not quantified in the age adjustment.  The estimated adjustment differences are shown and applied on the grid.

**Building Construction Quality / Appeal**

The building construction materials and associated quality, sometimes including appeal, of the sale properties in comparison to the subject, based on details in the Improvement Description, were estimated.  Adjustments derived based on MVS or typical cost factors, broker opinions, lease rate differences, or matched pairing, were estimated and applied.

**Effective Age**

The subject was constructed in 1995 and has an effective age of 15 years. Depreciation estimates and MVS cost indications show that buildings age by an estimate of approximately $0.50/SF to $1/SF per effective year. However, this is applied only to effective age differences because buildings have longer actual lives than the typical forecasted economic life. Correspondingly, the effective age disparities of the sale buildings are estimated at near half their actual ages. Each resulting effective age difference times the estimated depreciation factor are shown on the grid.

**Building Improvement Size**

Size adjustments are somewhat speculative. Typically, smaller size buildings sell for higher prices on a square foot basis as compared to larger buildings, and vice versa. Supported by pairing and broker opinions, Sale Nos. 1 and 4 were adjusted for size considerations to compare to the subject.

**Site Size / Coverage Ratio / Parking Consideration Comparisons**

Sale Comparable site sizes are compared to the subject based on respective building size, since price adjustments are on building square foot basis. Correspondingly, site sizes necessary to legally accommodate larger or smaller buildings will, by comparison, be larger or smaller than the subject size, but still be comparable based on market coverage ratios. Also, differing ratios may indicate the presence of surplus land, or inadequate coverage, and also typically adjust for parking ratio disparities.

The sale comparable properties were adjusted to the subject by differences in coverage ratios. For each property, the subject coverage ratio was applied to the building size to estimate the respective land area needed to be directly comparable. This common ratio land area was subtracted from the comparable property's actual site size to derive the positive or negative difference in land area present. Each land square footage difference was multiplied by the estimated "Subject Land Value Adjustment" factor shown in the prior adjustment grid. The land adjustment factor is commonly based on 25% to 100% of a site's full value, reflecting local land prices, market recognition percentage of additional land, and a sensitivity analysis yielding the smallest disparity or "% Difference" also shown in the adjustment grid. Each resulting total estimated land value required to equate the sale comparable property to a ratio identical to the subject was then divided by its building size to yield the building $/SF adjustment.

**Interior Office Portion Build-out**

The subject's actual interior build-out percentage was much higher than typical.   Local brokers surveyed indicate the office space is super-adequate for the subject market.   This is supported by Listing #5 that has a similar level of build-out but has been sitting on the market for nearly two years.   As a result, only the subject's ground floor office space was given credit.   Adjustments to the comparables were estimated based on the percentage disparities between the subject and comparable buildings.   These disparities were multiplied by the market-supported depreciated build-out value factor shown near the bottom of the adjustment grid.   This amount was supported by reported new costs ranging from $45/SF to $65/SF for relatively small areas of interior office build-out in industrial buildings.   The resulting adjustments in the grid automatically calculated in comparison to the subject build-out percentage.

**Clear Height**

Those sale buildings having significant or measurable interior warehouse clear height differences as compared to the subject were adjusted.   Clear height difference adjustments were based on price pairing and cost considerations, to compare to the subject.

**Sales Comparison Approach Analysis and Conclusion**

The comparable improved property sales adjusted to the range formed by the minimum and maximum adjusted prices in the *Indicated Range Statistics* summary on the prior page Improved Sale Adjustment Grid; the adjusted "Mean" rent and "% Difference" or standard deviation from the mean are also shown.  The most recent sales and predominance in the adjusted range all tend to weight a range resulting from both upward and downward adjustments bracketed around the $110/SF mean value indication.

Sale Nos. 2 and 4 required the least net adjusting and bracketed the overall mean.  Therefore, the final value was rounded near the mean.

Based on the data and analysis, the subject property value is concluded at the middle of the range. Therefore, the subject property value estimate is rounded to $110/SF of building area, which calculates to an overall property value of:

$110/SF  x  122,388 SF =                                              $13,460,000

As a result of the analysis, a subject property **Market Value As Is** indication via the Sales Comparison Approach based on data as of January 21, 2021 was:

**$13,460,000**

**RECONCILIATION OF THE MARKET VALUE AS IS**

| Cost Approach | N/A |
|---|---|
| Income Approach | $13,350,000 |
| Sales Comparison Approach | $13,460,000 |

**Income Approach**

The Income Approach assumptions were based on currently strong market data. The market rents supported the subject's projected income with a reasonable level of net adjusting. The vacancy, expense and OAR projections were also forecasted based on relatively strong comparable data. The assumptions used were verified against market norms, absorbed and available inventory, and broker opinions.

The subject property is a leased investment, warranting most weight on the Income Approach as a value indicator.

**Sales Comparison Approach**

The validity and credibility of the Sales Comparison Approach depends on the quantity and quality of recent market sales. This approach is desirable when analyzing comparable properties to establish a direct correlation between the subject property and its real estate market.

The best available market data and opinions of participants were collected in an attempt to confidently estimate value by this approach. The data that was found was considered strongly comparable to the subject at market terms.

The sales utilized were all relatively recent, similar size properties, and from within the immediate or competing areas. This is the sale data available to market participants in the past two years. Therefore, the available data represented alternative properties. The Sales Comparison indicator was supportive of the Income Approach.

**Market Value "As Is" Conclusion**

The two previous approach indicators suggest a value of $13,400,000.  This value represents the subject property as a renovated industrial property with the clean room build-out removed and loading doors installed to meet market demand.  As a result, an estimated cost deduction to achieve this condition is warranted.

Local brokers and one contractor stated demolition costs would be between $7.50/SF and $10/SF of building area to remove the current clean room build-out, including all of the electrical and compressed air equipment in the ceiling.  Additionally, a building of the subject's size would require at least approximately 12 dock-hi loading docks in addition to at least two more ground level loading docks.  Since the subject building is located at ground level, it would be necessary to dig out and concrete areas for the dock-hi loading doors/truck parking, in addition to creating space in the current parking area for truck maneuverability.  Cost estimates for this ranged from $5/SF to $10/SF, indicating a total renovation cost in a $12.50 to $20/SF range, inclusive of plans and permits/engineering.  A rounded $15/SF is utilized for purposes of valuation, and is applied only to the 70,932 SF clean room square footage.

A typical buyer would also require a profit motivation to take on the time and cost to renovate the subject building versus buying a competitive building already in this condition.  Typically, the market projects 10% to 20% of renovation costs for profit.

The following deductions are made to the previously concluded value that reflects the subject building already in typical industrial warehouse condition.

| | |
|---|---|
| Hypothetical Value: | $13,400,000 |
| Less Renovation Costs at $15/SF x 70,932 SF: | ($1,063,980) |
| Less Entrepreneurial Profit at 15% of Costs: | ($   159,597) |
| **Estimated Market Value As Is:** | **$12,176,423** |

Based on the analysis, it is my opinion that on January 21, 2021, the **Market Value As Is** of leased fee interest in the subject property, conditioned on the Assumptions and Limiting Conditions within the report, was:

**$12,180,000**

**Estimated Marketing Time and Exposure Time**

Any marketing times reported for sales data considered for and used / presented in the Sales Comparison Approach were considered, along with property listing periods, and from broker opinions.  Some reported marketing times were presented in the adjustment grid.  There was not a reasonable amount of alternative properties for sale in the subject city and surrounding areas. Though not all sales and listings reported exposure or marketing times, a reasonably predominant range was found from all of the data reviewed.  The subject is characteristically most similar to properties with predominant marketing times nearest the middle portion of the range.

It is concluded that if the subject property were offered for sale on the appraisal date at the estimated "as is" market value, it would sell in an estimated nine to twelve months.  If it had been offered for sale prior to the appraisal date (assumed sale date), the exposure time would also have been nine to twelve months.

# ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general assumptions:

1.      No responsibility is assumed for the legal description provided of for matters pertaining to legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated in this report.

2.      The property is appraised free and clear of any or all liens and encumbrances unless otherwise stated in this report.  The Appraiser cannot guarantee that property is free of encroachments or easements, and recommends further investigation and survey.

3.      Responsible ownership and competent property management are assumed unless otherwise stated in this report.

4.      The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

5.      All engineering is assumed to be correct.  The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.      It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

7.      It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated in this report.

8.      It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been described / stated / defined and considered in this appraisal report.

9.      It is assumed that all required licenses, certificates of occupancy consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report are based.

10.     It is assumed that the use of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless otherwise stated in this report.

EXHIBIT "5"
PAGE 133

11.    Any sketch in this report may show approximate dimensions and is included to assist the reader in visualizing the property.  Maps and exhibits found in this report are provided for reader reference purposes only.  No guarantee as to accuracy is expressed or implied unless otherwise stated in this report.  No survey has been made for the purpose of this report.

12.    The Appraiser is not qualified to detect hazardous waste and/or toxic materials.  Any comment by the appraiser that might suggest the possibility that such substances were apparent are the result of routine observations made during the appraisal process and should not be taken as confirmation of the presence of hazardous waste and/or toxic materials.  Such determination would require investigation by an environmental assessment field expert and the intended user is urged to retain an expert in this field, if desired.  The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property.  The Appraiser's value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value unless otherwise stated in this report.  No responsibility is assumed for such conditions, or for any expertise or engineering knowledge or studies required to discover them.

13.    Unless otherwise stated in this report, the subject property is appraised without a specific compliance survey having been conducted to determine if the property is or is not in conformance with the requirements of the Americans with Disabilities act.  The presence of architectural and communications barriers that are structural in nature that would restrict access by disabled individuals may adversely affect the property's value, marketability, or utility.

14.    Any proposed improvements are assumed to be completed in a good workmanlike manner in accordance with the submitted plans and specifications.

15.    The Appraiser's conclusion of either current or prospective market value is based upon the assumption that there are no hidden or unapparent conditions of the land/property that might impact upon buildability.  The Appraiser recommends due diligence be conducted through the local building department or municipality to investigate buildability and whether the site is suitable for the intended use if proposed.  Appraiser makes no representations, guarantees or warranties.

16.    The Appraiser is not required to give further consultation, testimony, or to be in attendance in court with reference to the property in question unless arrangements have been previously made.  The client is notified that any such further consultation, testimony, or attendance in court will be at my discretion and will be predicated upon the payment of an additional fee.

17    The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy.  These forecasts are, therefore, subject to changes with future conditions.

21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank                    87

18      Appraiser and Client agree that the following mutual limitation of liability is agreed to in consideration of the fees to be charged and the nature of Appraiser's services under this Agreement.  Appraiser and Client agree that to the fullest extent permitted by applicable law, each part's and its Personnel's maximum aggregate and joint liability to the other party for claims and causes of action relating to this Agreement or to appraisals or other services under this Agreement shall be limited to the higher of $5,000 or the total fees and costs charged by Appraiser for the services that are the subject of the claim(s) or cause(s) of action.  This limitation of liability extends to all types of claims or causes of action, whether in breach of contract or tort, including without limitation claims/causes of action for negligence, professional negligence or negligent misrepresentation on the part of either party or its Personnel, but excluding claims/causes of action for intentionally fraudulent conduct, criminal conduct or intentionally caused injury.  The Personnel of each party are intended third-party beneficiaries of this limitation of liability. "Personnel", as used in this paragraph, means the respective party's staff, employees, contractors, members, partners and shareholders.  Appraiser and Client agree that they each have been free to negotiate different terms that stated above or contract with other parties.

19      There were assumed to be no conditions influencing the subject or sale and/or comparable data that were not readily apparent, not reported, or could not be ascertained from confirmation and could therefore not be considered; this appraiser reserves the right to reconsider comparisons or amend the appraisal and valuation should any other value-influencing information besides what was readily apparent or available during the appraisal or confirmation process becomes available.

This appraisal report has been made with the following ***general limiting conditions***:

1.      Any allocation of the total value estimated in this report between the land and improvements applies only under the stated program of utilization.  The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2.      Possession of this report, or a copy thereof, does not carry with it the right of publication.  It may not be used for any purpose by any person other than the party whom it is addressed without the written consent of Terence M. Connolly, MAI, ASA, AI-GRS, and in any event, only with proper written qualification and only in its entirety.

3.      Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news sales, or other media without prior written consent and approval of Terence M. Connolly, MAI, ASA, AI-GRS.

21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank                    88

The **Market Value As Is** is based on the following reasonable but *Extraordinary Assumptions* that may have affected the assignment results:

• **national, regional and local economies have very recently been, and are reportedly being, negatively impacted by the current Covid-19/Corona Virus, but there are no definitive indicators relating to real estate.  Generally, the majority of current indicators and expectations are for a one to two annual quarter severe decline before a rebound; in the absence of measurable real estate evidence in available data, this appraisal assumes the market expectations explained in the pertinent valuation conclusions in this report.  And as disclosed in our typical Assumptions and Limiting Conditions (#17) "The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy.  These forecasts are, therefore, subject to changes with future conditions", and;**

• **only one lease agreement of the four leased spaces was provided for review.  The provided lease agreement did not include any addendums that reflect the actual current leased space size noted in the owner-provided rent roll; the owner-provided rent roll was used for analysis purposes.  Market rent was applied to the three remaining spaces since leases were not provided resulting in no leased fee market equivalency adjustment assumptions for these spaces, and;**

• **the subject's 70,932 SF / 58% of NRA "clean room" space was originally developed for a prior specific user (Abbott Laboratories).  The majority of this space is not currently in use and, according to market participants we spoke to during the course of this appraisal, would likely not be used by a typical future owner or tenant.  It was determined that the Highest and Best Use of this space would be to remove the equipment, the ductwork, and ceiling and revert the space to typical industrial warehouse area to satisfy market demand at this time, and;**

• **the subject's 43,456 SF / 36% of NRA of two-story office build-out is super-adequate for the market at this time.  Though roughly half of the office space (24,500 SF on the ground floor) is currently leased to a tenant for another 19 months, there are no other potential users in the current market for such large office space inclusive of the subject's currently unused upper floor office space.  Additionally, the subject building location, configuration, access, and surrounding properties are not conducive to multi-tenant office users.  It would likely take a significant time period and cost to demise the space further and lease/absorb the space.  As a result, the subject's office space is considered in the analysis, but not all square foot contributes full value or is comparable to typically built-out industrial building properties.**

EXHIBIT "5"
PAGE 136

# CERTIFICATION

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, and unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- We have not performed services, as an appraiser or in any other capacity, regarding the subject property in the 3-year period immediately preceding the agreement to perform this assignment.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement with the client in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal. **This appraisal was not based on a requested minimum or specific valuation, or the approval of a loan.**

- Our analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Code of Professional Ethics and with the *Uniform Standards of Professional Appraisal Practice*.

- Terence M. Connolly inspected the exterior and Jeffrey W. LaDue personally inspected both the interior and exteriors of the subject property of this report.

- No one provided significant real property appraisal assistance to the persons signing this Certification.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute. Also, requirements of the USPAP competency provision were met for purposes of this appraisal assignment.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, Terence M. Connolly, MAI, AI-GRS has completed the continuing education program for Designated Members of the Appraisal Institute.

- As of the date of this report, Jeffrey W. LaDue has completed the continuing education program for Practicing Affiliates of the Appraisal Institute.

- The appraisers did not base, either partially or completely, analysis and/or the value estimate on the race, color, religion, sex, handicap, familial status, health or national origin of the present or prospective owners, occupants or users of the subject or properties in the vicinity.

Terence M. Connolly, MAI, ASA, AI-GRS
CGREA #AG009708, Exp. 11/2/22

Jeffrey W. LaDue
CGREA #AG033573, Exp. 4/1/22

21-1-8-I – Industrial Property with Surplus Land, Cochise Circle, Murrieta, First Choice Bank

90

EXHIBIT "5"
PAGE 137



**ADDENDA**

**SUBJECT PUBLIC RECORDS**

# Property Detail Report

**For Property Located At :**
**30590 COCHISE CIR, MURRIETA, CA 92563-2501**



## Owner Information

| | |
|---|---|
| Owner Name: | **BIOXXEL** |
| Mailing Address: | **30590 COCHISE CIR, MURRIETA CA 92563-2501 R009** |
| Vesting Codes: | **/ /** |

## Location Information

| | | | |
|---|---|---|---|
| Legal Description: | **17.47 ACRES NET IN PAR 12 PM 170/073 PM 23199** | | |
| County: | **RIVERSIDE, CA** | APN: | **963-070-017** |
| Census Tract / Block: | **432.42 / 1** | Alternate APN: | **963-070-017** |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | **/** |
| Legal Lot: | **12** | Tract #: | |
| Legal Block: | | School District: | **TEMECULA VLY** |
| Market Area: | **208** | School District Name: | **TEMECULA VLY** |
| Neighbor Code: | | Munic/Township: | **TEMECULA SCHOOL DIST** |

## Owner Transfer Information

| | | | |
|---|---|---|---|
| Recording/Sale Date: | **/** | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

## Last Market Sale Information

| | | | |
|---|---|---|---|
| Recording/Sale Date: | **10/17/2016 / 10/06/2016** | 1st Mtg Amount/Type: | **$5,820,000 / CONV** |
| Sale Price: | **$8,200,000** | 1st Mtg Int. Rate/Type: | **/** |
| Sale Type: | **FULL** | 1st Mtg Document #: | **454541** |
| Document #: | **454540** | 2nd Mtg Amount/Type: | **/** |
| Deed Type: | **GRANT DEED** | 2nd Mtg Int. Rate/Type: | **/** |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | **CHICAGO TITLE CO** | | |
| Lender: | **KEYSTONE R/E LNDG FUND LP** | | |
| Seller Name: | **ABBOTT CARDIOVASCULAR SYSTEMS** | | |

## Prior Sale Information

| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | **/** | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | **/** |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | **/** |
| Prior Deed Type: | | | |

## Property Characteristics

| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | **/** | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | | Total Restrooms: | | Garage Capacity: | |
| Building Area: | | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | | Air Cond: | |
| # of Stories: | | Foundation: | | Pool: | |
| Other Improvements: | **Building Permit** | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | |

## Site Information

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | **I-P** | Acres: | **17.47** | County Use: | **CT-LIGHT INDUSTRIAL (AL2)** |
| Lot Area: | **760,993** | Lot Width/Depth: | **x** | State Use: | **C08** |
| Land Use: | **LIGHT INDUSTRIAL** | Commercial Units: | | Water Type: | |
| Site Influence: | | Sewer Type: | | Building Class: | |

## Tax Information

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | **$8,701,905** | Assessed Year: | **2020** | Property Tax: | **$92,117.94** |
| Land Value: | **$4,032,590** | Improved %: | **54%** | Tax Area: | **094215** |
| Improvement Value: | **$4,669,315** | Tax Year: | **2020** | Tax Exemption: | |
| Total Taxable Value: | **$8,701,905** | | | | |

# Transaction History Report

For Property Located At



## 30590 COCHISE CIR, MURRIETA, CA 92563-2501

**TRANSACTION HISTORY**

**History Record #:** 1

Finance:

| | | | |
|---|---|---|---|
| **Mtg Recording Date:** | 07/25/2017 | **Mtg Loan Type:** | CONV |
| **Mtg Document #:** | 302467 | **Mtg Rate Type:** | |
| **Document Type:** | DEED OF TRUST | **Mtg Term:** | |
| **Lender:** | US METRO BK | **Mtg Rate:** | |
| **Loan Amount:** | $5,000,000 | **Borrower Vesting:** | // CO |
| **ARM Rider Indicator:** | | **Pre-payment Penalty Indicator:** | |
| **Initial Rate Reset Cap:** | | **Interest Only Indicator:** | |
| **Payment Option Indicator:** | | **Negative Amortization Indicator:** | |
| **ARM Rate Change Frequency:** | | **ARM Index Type:** | |
| **ARM Maximum % Rate:** | | **ARM Initial Rate Change Date:** | |
| **ARM Rate Change Margin:** | | **ARM Rate Change Limit:** | |
| **ARM Rate Change Interval:** | | **ARM Payment Change Date:** | |
| **Borrower 1:** | BIOXXEL LLC | | |
| **Borrower 2:** | | | |
| **Borrower 3:** | | | |
| **Borrower 4:** | | | |

**History Record #:** 2

**Sale:**

| | | | |
|---|---|---|---|
| **Sale Recording Date:** | 10/17/2016 | **Sale Price:** | $8,200,000 |
| **Sale Date:** | 10/06/2016 | **Sale Price Type:** | FULL |
| **Rec. Document #:** | 454540 | **Multi/Split Sale:** | |
| **Document Type:** | GRANT DEED | **Other Document #:** | |
| **Title Company:** | CHICAGO TITLE CO | | |
| **Buyer:** | BIOXXEL LLC | | |
| **Seller:** | ABBOTT CARDIOVASCULAR SYSTEMS | | |

**Finance:**

| | | | |
|---|---|---|---|
| **Mtg Recording Date:** | 10/17/2016 | **Mtg Loan Type:** | CONV |
| **Mtg Document #:** | 454541 | **Mtg Rate Type:** | |
| **Document Type:** | DEED OF TRUST | **Mtg Term:** | |
| **Lender:** | KEYSTONE R/E LNDG FUND LP | **Mtg Rate:** | |
| **Loan Amount:** | $5,820,000 | **Borrower Vesting:** | / / CO |
| **ARM Rider Indicator:** | | **Pre-payment Penalty Indicator:** | |
| **Initial Rate Reset Cap:** | | **Interest Only Indicator:** | |
| **Payment Option Indicator:** | | **Negative Amortization Indicator:** | |
| **ARM Rate Change Frequency:** | | **ARM Index Type:** | |
| **ARM Maximum % Rate:** | | **ARM Initial Rate Change Date:** | |
| **ARM Rate Change Margin:** | | **ARM Rate Change Limit:** | |
| **ARM Rate Change Interval:** | | **ARM Payment Change Date:** | |
| **Borrower 1:** | BIOXXEL LLC | | |
| **Borrower 2:** | | | |
| **Borrower 3:** | | | |
| **Borrower 4:** | | | |

**History Record #:**   3

Sale:

| | | | |
|---|---|---|---|
| **Sale Recording Date:** | 04/07/2006 | **Sale Price:** | |
| **Sale Date:** | 03/29/2006 | **Sale Price Type:** | UNKNOWN |
| **Rec. Document #:** | 249371 | **Multi/Split Sale:** | |
| **Document Type:** | GRANT DEED | **Other Document #:** | |
| **Title Company:** | CHICAGO TITLE CO | | |
| **Buyer:** | ADVANCED CARDIOVASCULAR SYSTEM | | |
| **Seller:** | BOSTON SCIENTIFIC CORP | | |

Finance:

| | | | |
|---|---|---|---|
| **Mtg Recording Date:** | 04/07/2006 | **Mtg Loan Type:** | PRIVATE PARTY |
| **Mtg Document #:** | 249372 | **Mtg Rate Type:** | |
| **Document Type:** | DEED OF TRUST | **Mtg Term:** | |
| **Lender:** | PRIVATE INDIVIDUAL | **Mtg Rate:** | |
| **Loan Amount:** | $12,850,000 | **Borrower Vesting:** | / / CO |
| **ARM Rider Indicator:** | | **Pre-payment Penalty Indicator:** | |
| **Initial Rate Reset Cap:** | | **Interest Only Indicator:** | |
| **Payment Option Indicator:** | | **Negative Amortization Indicator:** | |
| **ARM Rate Change Frequency:** | | **ARM Index Type:** | |
| **ARM Maximum % Rate:** | | **ARM Initial Rate Change Date:** | |
| **ARM Rate Change Margin:** | | **ARM Rate Change Limit:** | |
| **ARM Rate Change Interval:** | | **ARM Payment Change Date:** | |
| **Borrower 1:** | ADVANCED CARDIOVASCULAR SYSTEM | | |
| **Borrower 2:** | | | |
| **Borrower 3:** | | | |
| **Borrower 4:** | | | |

---

**History Record #:**  4

Finance:

| | | | |
|---|---|---|---|
| **Mtg Recording Date:** | 03/19/1996 | **Mtg Loan Type:** | CONV |
| **Mtg Document #:** | 96873 | **Mtg Rate Type:** | |
| **Document Type:** | DEED OF TRUST | **Mtg Term:** | |
| **Lender:** | CITY NAT'L BK | **Mtg Rate:** | |
| **Loan Amount:** | $2,207,017 | **Borrower Vesting:** | / / CO |
| **ARM Rider Indicator:** | | **Pre-payment Penalty Indicator:** | |
| **Initial Rate Reset Cap:** | | **Interest Only Indicator:** | |
| **Payment Option Indicator:** | | **Negative Amortization Indicator:** | |
| **ARM Rate Change Frequency:** | | **ARM Index Type:** | |
| **ARM Maximum % Rate:** | | **ARM Initial Rate Change Date:** | |
| **ARM Rate Change Margin:** | | **ARM Rate Change Limit:** | |
| **ARM Rate Change Interval:** | | **ARM Payment Change Date:** | |
| **Borrower 1:** | REISUNG ENTS INC | | |
| **Borrower 2:** | | | |
| **Borrower 3:** | | | |
| **Borrower 4:** | | | |



**OFFICE OF THE TREASURER-TAX COLLECTOR**
RIVERSIDE COUNTY, CALIFORNIA

HOME      ACCOUNT SEARCH      CHECK OUT      COUNTY HOME      CONTACT US

← BACK    ▤ ACCOUNT SUMMARY

## Tax Year 2020

| PARCEL NUMBER | GEO PARCEL # | LAST UPDATE |
|---|---|---|
| 963070017 | 963070017 | 1/18/2021 1:06:03 PM |

### Assessment Data

| Description | Value |
|---|---|
| Net Taxable Value | $8,701,905.00 |

### Exemptions

No Tax Exemptions Records Found

### Taxing Agencies

> **Tax Payment Distribution**
> For information regarding these charges please contact the Taxing Agency directly at the numbers listed here.

**General Purpose**

| Taxing Authority | Phone | Net Rate | Net Tax |
|---|---|---|---|
| 01-0000-GP GENERAL PURPOSE | See Phone List | 1.0000000000 % | $87,019.05 |
| Fund Type Total | | **1.0000000000 %** | **$87,019.05** |

**Debt**

| Taxing Authority | Phone | Net Rate | Net Tax |
|---|---|---|---|
| 04-5301-D MWD EAST 1301999 | See Phone List | 0.0035000000 % | $304.57 |
| 03-6520-D TEMECULA UNIFIED B&I | See Phone List | 0.0238900000 % | $2,078.89 |
| 03-9201-D MT SAN JACINTO JR COLLEGE | See Phone List | 0.0132000000 % | $1,148.65 |
| Fund Type Total | | **0.0405900000 %** | **$3,532.11** |

**Special Assessment**

| Taxing Authority | Phone | Net Rate | Net Tax |
|---|---|---|---|
| 68-1379-FC FLD CNTL STORMWATER/CLEANWATER | See Phone List | NA | $838.56 |
| 68-1815-FC CSA #103 | See Phone List | NA | $29.44 |
| 68-5305-FC MWD STANDBY EAST | See Phone List | NA | $121.24 |
| 68-5402-FC EMWD STDBY-COMBINED CHARGE | See Phone List | NA | $698.78 |
| Fund Type Total | | | **$1,688.02** |
| **Total** | | **1.04059 %** | **$92,239.18** |

NOTE: Tax Authority Districts 28-5251, 28-5275 and 28-5291 are applied to the land value only.

### Payments

| TAX YEAR | BILL NUMBER | PMT TYPE | RECEIPT NUMBER | AMOUNT PAID | LAST PAID |
|---|---|---|---|---|---|
| 2020 | 2020002466605 | Payment | B20.314154 | $46,119.59 | 11/26/2020 |

EXHIBIT "5"
PAGE 145

**TITLE REPORT**

EXHIBIT "5"
PAGE 146



**TICOR TITLE**™

1500 Quail Street, 3rd Floor
Newport Beach, CA 92660
Phone: (714) 289-3300

Issuing Policies of Chicago Title Insurance Company

---

ORDER NO.: **00780978-001-BOC**          Escrow/Customer Phone: **(714) 289-3300**

Ticor Title Company of California          Title Officer: **Bob Taylor - OC**
1500 Quail Street, 3rd Floor               Title Officer Phone: **(714) 289-6402**
Newport Beach, CA 92660                    Title Officer Fax: **(714) 289-7105**
ATTN: Shu Hoang                            Title Officer Email: **taylor@ticortitle.com**
Email: Shu.Hoang@ticortitle.com

PROPERTY:   **30590 Cochise Circle, Murrieta, CA  92563**

---

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Ticor Title Company of California** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a Florida Corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

Countersigned:

By: _____
      Authorized Signature

By: _____

ATTEST          President

Secretary

---

EXHIBIT "5"
PAGE 147



1500 Quail Street, 3rd Floor
Newport Beach, CA 92660
Phone:  (714) 289-3300

## PRELIMINARY REPORT

---

**EFFECTIVE DATE:**              **January 6, 2021 at 7:30 a.m.**

**ORDER NO.:  00780978-001-BOC**

The form of policy or policies of title insurance contemplated by this report is:

    **CLTA Standard Coverage Policy**
    **ALTA Extended Loan Policy (6-17-06)**

1.    THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

    **A FEE**

2.    TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS <u>VESTED IN:</u>

    **BIOXXEL LLC, a California limited liability company**

3.    THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

    **See Exhibit A attached hereto and made a part hereof.**

# EXHIBIT "A"

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 12 OF PARCEL MAP NO. 23199, IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, ON FILE IN BOOK 170 PAGES 73 THROUGH 76 INCLUSIVE, OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, A CERTIFICATE OF CORRECTION BEING RECORDED MAY 15, 1992 AS INSTRUMENT NO. 177301 OF OFFICIAL RECORDS.

APN:  963-070-017

Ticor Title Company of California

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A.   Property taxes, including any personal property taxes and any assessments collected with taxes, are as follows:

| | |
|---|---|
| Tax Identification No.: | 963-070-017 |
| Fiscal Year: | 2020-2021 |
| 1st Installment: | $46,119.59, paid. |
| 2nd Installment: | $46,119.59, open (Delinquent after April 10) |
| Penalty and Cost: | $4,650.02 |
| Homeowners Exemption: | $ |
| Code Area: | 094-215 |

B.   The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

1.   Water rights, claims or title to water, whether or not disclosed by the public records.

2.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Gas pipeline |
| Recording Date: | June 24, 1949 |
| Recording No: | in Book 1087, Page 124, Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

| | |
|---|---|
| and Recording Date: | May 16, 1991 |
| and Recording No: | as Instrument No. 164132, Official Records |

3.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Gas pipelines |
| Recording Date: | July 25, 1958 |
| Recording No: | in Book 2307, Page 118, Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

| | |
|---|---|
| and Recording Date: | May 16, 1991 |
| and Recording No: | as Instrument No. 164132, Official Records |

4.   Matters contained in that certain document

| | |
|---|---|
| Entitled: | Traffic Signalization Mitigation Schedule "E" Agreement |
| Recording Date: | May 15, 1991 |
| Recording No: | as Instrument No. 162532, Official Records |

Reference is hereby made to said document for full particulars.

PRELIMINARY REPORT
YOUR REFERENCE:                                                          Ticor Title Company of California

# EXCEPTIONS
## (Continued)

5.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                Avigation
      Recording Date:         May 16, 1991
      Recording No:           as Instrument No. 163973, Official Records
      Affects:                A portion of said land as more particularly described in said document.

6.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                Water and sewer
      Recording Date:         February 10, 1995
      Recording No:           as Instrument No. 44724, Official Records
      Affects:                A portion of said land as more particularly described in said document.

7.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                Pipelines and other facilities
      Recording Date:         April 17, 1995
      Recording No:           as Instrument No. 118475, Official Records
      Affects:                A portion of said land as more particularly described in said document.

8.      Matters contained in that certain document

      Entitled:               Hold Harmless Agreement for Sewer
      Recording Date:         December 7, 2006
      Recording No:           as Instrument No. 2006-901332, Official Records

      Reference is hereby made to said document for full particulars.

9.      Matters contained in that certain document

      Entitled:               Hold Harmless Agreement for Water
      Recording Date:         December 7, 2006
      Recording No:           as Instrument No. 2006-901337, Official Records

      Reference is hereby made to said document for full particulars.

10.     Matters contained in that certain document

      Entitled:               Hold Harmless Agreement
      Recording Date:         July 17, 2009
      Recording No:           as Instrument No. 2009-371188, Official Records

      Reference is hereby made to said document for full particulars.

11.     Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

      Purpose:                Pipeline
      Recording Date:         November 23, 2010
      Recording No:           as Instrument No. 2010-563480, Official Records
      Affects:                A portion of said land as more particularly described in said document.

# EXCEPTIONS
## (Continued)

12.     Environmental Constraint Note:  Environmental Constraint Sheet affecting this map is on file in the office of the County Surveyor, in E.C.S. in Book 22, Page 73 this affects all parcels.

13.     A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $5,820,000.00 |
| Dated: | October 5, 2016 |
| Trustor/Grantor | Bioxxel, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | Keystone Real Estate Lending Fund, L.P., a Delaware limited partnership |
| Recording Date: | October 17, 2016 |
| Recording No: | as Instrument No. 2016-0454541, Official Records |

A notice of default under the terms of said trust deed

| | |
|---|---|
| Executed by: | First American Title Insurance Company |
| Recording Date: | September 13, 2018 |
| Recording No: | as Instrument No. 2018-0367329, Official Records |

A notice of default under the terms of said trust deed

| | |
|---|---|
| Executed by: | First American Title Insurance Company |
| Recording Date: | October 5, 2018 |
| Recording No: | as Instrument No. 2018-0396621, Official Records |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | BREFI 30590 Chochise LLC, a California limited liability company |
| Recording Date: | October 23, 2018 |
| Recording No: | as Instrument No. 2018-0417199, Official Records |

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

| | |
|---|---|
| Trustee: | Tullius Law Group, a professional corporation |
| Recording Date: | June 11, 2020 |
| Recording No: | as Instrument No. 2020-0250477, Official Records |

A notice of trustee's sale under said deed of trust

| | |
|---|---|
| Executed by: | Tullius Law Group, a professional corporation |
| Date, Time and Place of Sale: | July 6, 2020 at 9:00 a.m. at the area in the front of 847 W. Sixth Street, Corona, CA |
| Recording Date: | June 11, 2020 |
| Recording No: | as Instrument No. 2020-0250478, Official Records |

14.     An assignment of all the moneys due, or to become due as rental, as additional security for the obligations secured by deed of trust shown as item no. 13

| | |
|---|---|
| Assigned to: | Keystone Real Estate Lending Fund, L.P., a Delaware limited partnership |
| Recording Date: | October 17, 2016 |
| Recording No: | as Instrument No. 2016-0454542, Official Records |

EXHIBIT "5"
PAGE 152

PRELIMINARY REPORT
YOUR REFERENCE:

Ticor Title Company of California

# EXCEPTIONS
## (Continued)

15. A financing statement as follows:

| | |
|---|---|
| Debtor: | Bioxxel, LLC |
| Secured Party: | Keystone Real Estate Lending Fund, L.P. |
| Recording Date: | October 17, 2016 |
| Recording No: | as Instrument No. 2016-0454543, Official Records |

16. A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

| | |
|---|---|
| County: | Riverside |
| Fiscal Year: | 2018-2019 |
| Taxpayer: | Bioxxel Investment Holding Inc |
| County Identification Number: | 0476815 |
| Amount: | $57,726.35 |
| Recording Date: | November 14, 2018 |
| Recording No: | as Instrument No. 2018-0448908, Official Records |

17. A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

| | |
|---|---|
| County: | Riverside |
| Fiscal Year: | 2019-2020 |
| Taxpayer: | Bioxxel Investment Holding Inc |
| County Identification Number: | 0605107 |
| Amount: | $63,362.26 |
| Recording Date: | November 6, 2019 |
| Recording No: | as Instrument No. 2019-0456991, Official Records |

18. A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

| | |
|---|---|
| County: | Riverside |
| Fiscal Year: | 2020-2021 |
| Taxpayer: | Bioxxel Investment Holdings Inc. |
| County Identification Number: | 0614535 |
| Amount: | $63,287.84 |
| Recording Date: | November 05, 2020 |
| Recording No: | as Instrument No. 2020-0548475 of Official Records |

19. Any easements not disclosed by the public records as to matters affecting title to real property, whether or not said easements are visible and apparent.

20. Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

PRELIMINARY REPORT
YOUR REFERENCE:

Ticor Title Company of California

# EXCEPTIONS
## (Continued)

21.   Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

The Company will require, for review, a full and complete copy of any unrecorded agreement, contract, license and/or lease, together with all supplements, assignments and amendments thereto, before issuing any policy of title insurance without excepting this item from coverage.

The Company reserves the right to except additional items and/or make additional requirements after reviewing said documents.

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

**END OF EXCEPTIONS**

# REQUIREMENTS SECTION

1.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        Bioxxel LLC, a California limited liability company

a)    A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)    If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)    A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)    If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)    Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

2.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        Pharmagold Investment LLC (Buyer)

a)    A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)    If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)    A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)    If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)    Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

PRELIMINARY REPORT                                                                                    Ticor Title Company of California
YOUR REFERENCE:                                                                                       ORDER NO.:  00780978-001-BOC

## REQUIREMENTS
### (Continued)

3.      Prior to the close of escrow, the Company requires a Statement of Information to be completed by the
        following party(s),

        Party(s):                    All Parties

        The Company reserves the right to add additional items or make further requirements after review of the
        requested Statement of Information.

4.      Furnish for review a full and complete copy of any unrecorded agreement, contract, license and/or lease
        together with all supplements, assignments and amendments thereto, prior to the close of this
        transaction.

        The Company reserves the right to add additional items or make further requirements after review of the
        requested documentation.

5.      Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the
        Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This
        Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to
        the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the
        closing of this transaction. Thank you.

        The Company reserves the right to add additional items or make further requirements after review of the
        requested Affidavit/Declaration.

---

## END OF REQUIREMENTS

---

# INFORMATIONAL NOTES SECTION

1.     None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement Form 9 to an Extended Coverage Loan Policy, when issued.

2.     The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Commercial properties, known as 30590 Cochise Circle, located within the area of Murrieta, California, 92563, to an Extended Coverage Loan Policy.

3.     Note:  The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

4.     Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

5.     Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax. If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

6.     Note:  There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

---

### END OF INFORMATIONAL NOTES

---

Bob Taylor - OC/ry0

WIRE SAFE™ | Inquire before you wire!

# Wire Fraud Alert

*This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.*

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

EXHIBIT "5"
PAGE 158



1500 Quail Street, 3rd Floor
Newport Beach, CA 92660
Phone: (714) 289-3300

## Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Company**
CTC – Chicago Title company
CLTC – Commonwealth Land Title Company
FNTC – Fidelity National Title Company of California
FNTCCA - Fidelity National Title Company of California
TICOR – Ticor Title Company of California
LTC – Lawyer's Title Company
SLTC – ServiceLink Title Company

**Underwritten by FNF Underwriters**
CTIC – Chicago Title Insurance Company
CLTIC - Commonwealth Land Title Insurance Company
FNTIC – Fidelity National Title Insurance Company
FNTIC - Fidelity National Title Insurance Company
CTIC – Chicago Title Insurance Company
CLTIC – Commonwealth Land Title Insurance Company
CTIC – Chicago Title Insurance Company

## Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

Notice of Available Discounts (Rev. 01-15-20)
MISC0343 (DSI Rev. 03/12/20)

Last Saved:  January 15, 2021 by RY0
Escrow No.: 00780978-001-SH0-BOC

EXHIBIT "5"
PAGE 159

## FIDELITY NATIONAL FINANCIAL, INC.
### PRIVACY NOTICE

Effective April 9, 2020

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:
• contact information (*e.g.*, name, address, phone number, email address);
• demographic information (*e.g.*, date of birth, gender, marital status);
• identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
• financial account information (*e.g.* loan or bank account information); and
• other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
• information we receive from you or your agent;
• information about your transactions with FNF, our affiliates, or others; and
• information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
• Internet Protocol (IP) address and operating system;
• browser version, language, and type;
• domain name system requests; and
• browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

### Use of Personal Information
FNF uses Personal Information for three main purposes:
• To provide products and services to you or in connection with a transaction involving you.
• To improve our products and services.
• To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

### When Information Is Disclosed
We may disclose your Personal Information and Browsing Information in the following circumstances:
• to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
• to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2020. Fidelity National Financial, Inc. All Rights Reserved
Order No. 00780978-001-SH0-BOC

EXHIBIT "5"

PAGE 160

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request by email, phone, or physical mail as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.
For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice. We may use comments or feedback that you submit to us in any manner without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, send your requests to privacy@fnf.com, by phone to (888) 934-3354, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

## ATTACHMENT ONE (Revised 05-06-16)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.   (a)   Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

     (b)   Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.   Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.   Defects, liens, encumbrances, adverse claims or other matters:
     (a)   whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
     (b)   not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
     (c)   resulting in no loss or damage to the insured claimant;
     (d)   attaching or created subsequent to Date of Policy; or
     (e)   resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.   Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.   Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.   Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.   Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
     Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.   Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.   Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4.   Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.   (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.   Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.   Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
     a.   building;
     b.   zoning;
     c.   land use;
     d.   improvements on the Land;
     e.   land division; and
     f.   environmental protection.
     This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.   The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.   The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.

4.   Risks:
     a.   that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
     b.   that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

---

Attachment One – CA (Rev. 05-06-16)                                                                                                          Page 1

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "5"

c.   that result in no loss to You; or
d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5.   Failure to pay value for Your Title.
6.   Lack of a right:
a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
b.   in streets, alleys, or waterways that touch the Land.
This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.   The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.   Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.   Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
•   For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1.   (a)   Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
(i)    the occupancy, use, or enjoyment of the Land;
(ii)   the character, dimensions, or location of any improvement erected on the Land;
(iii)  the subdivision of land; or
(iv)   environmental protection;
or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b)   Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.   Defects, liens, encumbrances, adverse claims, or other matters
(a)   created, suffered, assumed, or agreed to by the Insured Claimant;
(b)   not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c)   resulting in no loss or damage to the Insured Claimant;
(d)   attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
(e)   resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a)   a fraudulent conveyance or fraudulent transfer, or
(b)   a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

---

Attachment One – CA (Rev. 05-06-16)                                                                                                          Page 2

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "5"
PAGE 164

## {PART I

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.}

## PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

## 2006 ALTA OWNER'S POLICY (06-17-06)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7. {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

Attachment One – CA (Rev. 05-06-16)                                                                                          Page 3

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "5"
PAGE 166



This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

# OWNER'S DECLARATION

Escrow No.:        00780978-001-SH0-BOC
Property Address:  30590 Cochise Circle
                   Murrieta, CA 92563

The undersigned hereby declares as follows:

1.    (Fill in the applicable paragraph and strike the other)

    a.    Declarant ("Owner") is the owner or lessee, as the case may be, of certain premises located at 30590 Cochise Circle, Murrieta, CA 92563, further described as follows:  See Preliminary Report/Commitment No.  for full legal description (the "Land").

    b.    Declarant is the _____ of _____ ("Owner"), which is the owner or lessee, as the case may be, of certain premises located at 30590 Cochise Circle, Murrieta, CA 92563, further described as follows:  See Preliminary Report/Commitment No.  for full legal description (the "Land").

2.    (Fill in the applicable paragraph and strike the other)

    a.    During the period of six months immediately preceding the date of this declaration no work has been done, no surveys or architectural or engineering plans have been prepared, and no materials have been furnished in connection with the erection, equipment, repair, protection or removal of any building or other structure on the Land or in connection with the improvement of the Land in any manner whatsoever.

    b.    During the period of six months immediately preceding the date of this declaration certain work has been done and materials furnished in connection with _____ upon the Land in the approximate total sum of $_____, but no work whatever remains to be done and no materials remain to be furnished to complete the construction in full compliance with the plans and specifications, nor are there any unpaid bills incurred for labor and materials used in making such improvements or repairs upon the Land, or for the services of architects, surveyors or engineers, except as follows: _____. Owner, by the undersigned Declarant, agrees to and does hereby indemnify and hold harmless Ticor Title Company of California against any and all claims arising therefrom.

3.    Owner has not previously conveyed the Land;  is not a debtor in bankruptcy (and if a partnership, the general partner thereof is not a debtor in bankruptcy); and has not received notice of any pending court action affecting the title to the Land.

4.    Except as shown in the above-referenced Preliminary Report/Commitment, there are no unpaid or unsatisfied mortgages, deeds of trust, Uniform Commercial Code financing statements, regular assessments, special assessments, periodic assessments or any assessment from any source, claims of lien, special assessments, or taxes that constitute a lien against the Land or that affect the Land but have not been recorded in the public records. There are no violations of the covenants, conditions and restrictions as shown in the above-referenced Preliminary Report/Commitment.

5.    The Land is currently in use as _____; _____ occupy/occupies the Land; and the following are all of the leases or other occupancy rights affecting the Land:

    _____

6.    There are no other persons or entities that assert an ownership interest in the Land, nor are there unrecorded easements, claims of easement, or boundary disputes that affect the Land.

7.    There are no outstanding options to purchase or rights of first refusal affecting the Land.

8.    Between the most recent Effective Date of the above-referenced Preliminary Report/Commitment and the date of recording of the Insured Instrument(s), Owner has not taken or allowed, and will not take or allow, any action or inaction to encumber or otherwise affect title to the Land.

This declaration is made with the intention that Ticor Title Company of California (the "Company") and its policy issuing agents will rely upon it in issuing their title insurance policies and endorsements. Owner, by the undersigned Declarant, agrees to indemnify the Company against loss or damage (including attorneys fees, expenses, and costs) incurred by the Company as a result of any untrue statement made herein.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _____ at _____.

Signature:    _____

EXHIBIT "5"

**MARKETING BROCHURE**



FOR LEASE: 30590 Cochise Circle | Murrieta, CA

+/- 21,728 Square Feet of Professional Office Space

Only One Suite Remaining!!

31805 Temecula Parkway • Suite 210 • Temecula, CA 92592

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sales or lease agreement has been fully executed by all parties.



FOR LEASE: 30590 Cochise Circle | Murrieta, CA

MASINO COMMERCIAL
REAL ESTATE SERVICES
.com

Just Leased!!

First Floor +/- 21,728 Square Feet

31805 Temecula Parkway • Suite 210 • Temecula, CA 92592

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sales or lease agreement has been fully executed by all parties.

EXHIBIT "5"
PAGE 171



# FOR LEASE: 30590 Cochise Circle | Murrieta, CA

| Suite | Rentable Square Feet | *Monthly Lease Rate | Improvements and Features |
|---|---|---|---|
| **Suite** | | | |
| 1st Floor | | | |
| 101 | 21,728 | $23,466.24 | multiple private offices, executive offices, multiple small conference rooms, large conference room, large training room, break room, outdoor patio, ...shed with cubicles/desks/conference tables, ...and much more. available Immediately all or in part |

*Just Leased!!*

All suites include access to the Common Area, Elevator, and a Lobby Directory Signage Position
*Full Service Gross Lease. Monthly Lease Rate includes electricity estimated to be $0.18/SF per month

## Unique Real Estate Opportunity:

- Unique uses possible, such as educational and/or vocational facilities
- Customizable square footage based on market demand; available all or in part
- Fully furnished, available immediately, and true value offered at a competitive lease rate

**31805 Temecula Parkway • Suite 210 • Temecula, CA 92592**

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sales or lease agreement has been fully executed by all parties.

EXHIBIT "5"
PAGE 172





# FOR LEASE: 30590 Cochise Circle | Murrieta, CA

| Suite | | Rentable Square Feet | *Monthly Lease Rate | Improvements and Features |
|---|---|---|---|---|
| **Suite** | | | | |
| 2nd Floor | 201 | 21,728 | $23,466.24 | 5 private offices, 1 executive office, 5 small conference rooms, |
| | | | | 1 large conference room, large training room, break room, outdoor patio, |
| | | | | fully furnished with cublices/desks/conference tables, |
| | | | | elevator served, available immediately all or in part |

All suites include access to the Common Area, Elevator, and a Lobby Directory Signage Position

*Full Service Gross Lease: Monthly Lease Rate includes electricity estimated to be $0.18/SF per month



## Unique Real Estate Opportunity:

- Unique uses possible, such as educational and/or vocational facilities
- Customizable square footage based on market demand; available all or in part
- Fully furnished, available immediately, and true value offered at a competitive lease rate

**31805 Temecula Parkway • Suite 210 • Temecula, CA 92592**

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sales or lease agreement has been fully executed by all parties.

# FOR LEASE: 30590 Cochise Circle | Murrieta, CA







30590 Cochise Circle, Murrieta, CA 92563

- Easy access to I-215 freeway and I-15 via Murrieta Hot Spring Road
- Close to business amenities including, restaurants, banking, business services, and more
- Minutes from the cities of Murrieta, Menifee, and Temecula
- Regional location midway between Riverside and Escondido
- Excellent office location in Southern California

31805 Temecula Parkway • Suite 210 • Temecula, CA 92592

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sales or lease agreement has been fully executed by all parties.



EXHIBIT "5"
PAGE 176



**PROJECT FEATURES:**

- Opportunity to Lease within the French Valley area
- Two Story Building with Beautiful Architectural Accents and Finishes
- Part of a larger bio-medical manufacturing facility
- Generous Parking Areas
- Outdoor Lunch Area

+/- 43,456 Square Feet
30590 Cochise Circle
Murrieta, CA 92563

31805 Temecula Parkway • Suite 210 • Temecula, CA 92592

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sales or lease agreement has been fully executed by all parties.



# Are You Ready to Take the Next Step?

**Christopher J. Masino, SIOR**
BRE License #: 01352110
951-795-4556
cmasino@masinoindustrial.com

31805 Temecula Parkway • Suite 210 • Temecula, CA 92592

The information contained herein has been obtained from a variety of sources and Masino Industrial Consulting, Inc., its agents, representatives and property owner make no warranty or representation regarding its accuracy or completeness. The delivery of this information does not constitute an offer and no transaction shall be considered binding until sale or lease agreement has been fully executed by all parties.

SIOR

EXHIBIT "5"
PAGE 178

**LEASE AGREEMENT**

  **ORIGINAL**

# AIRCRE

## STANDARD MULTI-TENANT OFFICE LEASE - GROSS

**1. Basic Provisions ("Basic Provisions").**

**1.1 Parties.** This Lease ("**Lease**"), dated for reference purposes only <u>April 19, 2017</u>, is made by and between <u>Bioxxel, LLC, a California Limited Liability Company</u> ("**Lessor**") and <u>II-VI Optical Systems, Inc., a California corporation</u> ("**Lessee**"), (collectively the "**Parties**", or individually a "**Party**").

**1.2(a) Premises.** That certain Portion of the Project (as defined below), commonly known as (street address, suite, city, state): <u>30590 Cochise Circle</u> <u>Murrieta, CA 92563</u> ("**Premises**"). The Premises are located in the County of <u>Riverside</u>, and consist of approximately <u>21,728</u> rentable square feet of 1st floor office space. ~~and approximately _____ useable square feet.~~ In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas (as defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, the exterior walls, the area above the dropped ceilings, or the utility raceways of the building containing the Premises ("**Building**") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "**Project**." The Project consists of approximately <u>122,388</u> rentable square feet. (See also Paragraph 2)

**1.2(b) Parking:** <u>76</u> unreserved ~~and _____ reserved vehicle parking spaces at a monthly cost of $_____ per unreserved space and $_____ per reserved space.~~ (See Paragraph 2.6)

**1.3 Term:** <u>five (5)</u> years and <u>zero (0)</u> months ("**Original Term**") commencing <u>September 1, 2017</u> ("**Commencement Date**") and ending <u>August 31, 2022</u>. (See also Paragraph 3)

**1.4 Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing <u>upon execution of Lease, delivery of Monies Due Upon Execution of this Lease, and delivery of commercial general liability insurance in form acceptable to Lessor</u> ("**Early Possession Date**"). (See also Paragraphs 3.2 and 3.3)

**1.5 Base Rent:** <u>$15,555.00</u> per month ("**Base Rent**"), payable on the <u>first (1st)</u> day of each month commencing <u>September 1, 2017</u>. (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph <u>50</u>.

**1.6 Lessee's Share of Operating Expense Increase:** <u>seventeen point eight</u> percent ( <u>17.8</u> %) ("**Lessee's Share**"). In the event that that size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

**1.7 Base Rent and Other Monies Paid Upon Execution:**

    (a) **Base Rent:** <u>$15,555.00</u> for the period <u>September 1, 2017 to August 31, 2017</u>.

    (b) **Security Deposit:** <u>$21,888.00</u> ("**Security Deposit**"). (See also Paragraph 5)

    ~~(c) Parking: $_____ for the period _____.~~

    (d) **Other:** <u>$3,911.04</u> for <u>estimated electricity for the period September 1, 2017 to August 31, 2017</u>.

    (e) **Total Due Upon Execution of this Lease:** <u>$41,354.04</u>.

**1.8 Agreed Use:** <u>professional office, business administration and engineering labs</u>. (See also Paragraph 6)

**1.9 Base Year; Insuring Party.** The Base Year is <u>2017</u>. Lessor is the "**Insuring Party**". (See also Paragraphs 4.2 and 8)

**1.10 Real Estate Brokers.** (See also Paragraphs 15 and 25)

    (a) **Representation:** The following real estate brokers (the "**Brokers**") and brokerage relationships exist in this transaction (check applicable boxes):

    ☑ <u>Masino Industrial Consulting, Inc.</u> represents Lessor exclusively ("**Lessor's Broker**");

    ☐ _____ ~~represents Lessee exclusively ("**Lessee's Broker**"); or~~

    ☐ _____ ~~represents both Lessor and Lessee ("**Dual Agency**").~~

    (b) **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of <u>$49,204.04</u> or _____% of the total Base Rent) for the brokerage services rendered by the Brokers.

~~**1.11 Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____ ("**Guarantor**"). (See also Paragraph 37)~~

**1.12 Business Hours for the Building:** <u>6:00</u> a.m. to <u>6:00</u> p.m., Mondays through Fridays (except Building Holidays) and <u>6:00</u> a.m. to <u>6:00</u> p.m. on Saturdays (except Building Holidays). "**Building Holidays**" shall mean the dates of observation of New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day, ~~and _____~~. Notwithstanding anything to the contrary contained in this Lease, Lessee shall have unfettered access to the Premises 24 hours per day, 7 days per week, and 365 days per year.

**1.13 Lessor Supplied Services.** Notwithstanding the provisions of Paragraph 11.1, Lessor is NOT obligated to provide the following within the Premises:

☑ Janitorial services

☐ ~~Electricity~~

☑ Other (specify): <u>telephone service, internet data services and cabling, security systems</u>

**1.14 Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs <u>50</u> through <u>61</u>;

☑ a plot plan depicting the Premises; (see attached 'Exhibit A: Floor Plan' and 'Exhibit B: Site Plan')

☑ a current set of the Rules and Regulations;

☐ ~~a Work Letter;~~

☐ ~~a Janitorial schedule;~~

☑ other (specify): <u>'Exhibit C: Lessee's Proposed Improvements'; 'Exhibit D: Lessor's Work'; 'Exhibit E: Proposed Route of Trench'; 'Exhibit F: Signage and Building Paint Stripe'; BRE Real Estate Agency Relationship Disclosure</u>.

**2. Premises.**

**2.1 Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

**2.2 Condition.** Lessor shall deliver the Premises to Lessee in a clean condition on the Commencement Date or the Early Possession Date, whichever first occurs ("**Start Date**"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("**HVAC**"), and all other items which the Lessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Premises do not

INITIALS ✍

Page 1 of 13
Last Edited: 8/7/2017 2:51 PM

INITIALS ✍

© 2017 AIR CRE. All Rights Reserved.

OFG-21.00, Revised 01-03-2017

contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3   **Compliance.**  Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Applicable Requirements**") that were in effect at the time that each improvement, or portion thereof, was constructed.  Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.  **NOTE: Lessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.**  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Premises ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)   Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent.  If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter.  Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)   If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises.  Lessee shall pay interest on the balance but may prepay its obligation at any time.  If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure.  If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid.  If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)   Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements.  If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense.  Lessee shall not have any right to terminate this Lease.

2.4   **Acknowledgements.**  Lessee acknowledges that:  (a) it has been given an opportunity to inspect and measure the Premises, (b) Lessee has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental  aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relative to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease.  In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5   **Lessee as Prior Owner/Occupant.**  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date, Lessee was the owner or occupant of the Premises.  In such event, Lessee shall be responsible for any necessary corrective work.

2.6   **Vehicle Parking.**  So long as Lessee is not in default, and subject to the Rules and Regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use the number of parking spaces specified in Paragraph 1.2(b) at the rental rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

(a)   If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

(b)   The monthly rent per parking space specified in Paragraph 1.2(b) is subject to change upon 30 days prior written notice to Lessee.  The rent for the parking is payable one month in advance prior to the first day of each calendar month.

2.7   **Common Areas - Definition.**  The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the  Premises that are provided and designated by the Lessor from time to time for the general nonexclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including, but not limited to, common entrances, lobbies, corridors, stairwells, public restrooms, elevators, parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8   **Common Areas - Lessee's Rights.**  Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project.  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store property, temporarily or permanently, in the Common Areas.  Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9   **Common Areas - Rules and Regulations.**  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to adopt, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees.  The Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessor shall not be responsible to Lessee for the noncompliance with said Rules and Regulations by other tenants of the Project.

2.10   **Common Areas - Changes.**  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)   To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)   To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)   To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)   To add additional buildings and improvements to the Common Areas;

(e)   To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)   To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

**3.   Term.**

3.1   **Term.**  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   **Early Possession.**  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of the Operating Expense Increase) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3   **Delay In Possession.**  Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.                    OFG-21.00, Revised 01-03-2017

Date. If, despite such efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4   **Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessee's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.   Rent.**

4.1   **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2   **Operating Expense Increase.** Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share of the amount by which all Operating Expenses for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year, such excess being hereinafter referred to as the "**Operating Expense Increase**", in accordance with the following provisions:

(a)   "**Base Year**" is specified in Paragraph 1.9.

(b)   "**Comparison Year**" is defined as each calendar year during the term of this Lease subsequent to the Base Year; provided, however, Lessee shall have no obligation to pay a share of the Operating Expense Increase applicable to the first 12 months of the Lease Term (other than such as are mandated by a governmental authority, as to which government mandated expenses Lessee shall pay Lessee's Share, notwithstanding they occur during the first twelve (12) months). Lessee's Share of the Operating Expense Increase for the first and last Comparison Years of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase.

(c)   The following costs relating to the ownership and operation of the Project, calculated as if the Project was at least 95% occupied, are defined as "**Operating Expenses**":

(i)   Costs relating to the operation, repair, and maintenance in neat, clean, safe, good order and condition, but not the replacement (see subparagraph (g)), of the following:

(aa)   The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

(bb)   All heating, air conditioning, plumbing, electrical systems, life safety equipment, communication systems and other equipment used in common by, or for the benefit of, tenants or occupants of the Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

(cc)   All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(ii)   The cost of trash disposal, janitorial and security services, pest control services, and the costs of any environmental inspections;

(iii)   The cost of any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

(iv)   The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 and any deductible portion of an insured loss concerning the Building or the Common Areas;

(v)   The amount of the Real Property Taxes payable by Lessor pursuant to paragraph 10;

(vi)   The cost of water, sewer, gas, electricity, and other publicly mandated services not separately metered;

(vii)   Labor, salaries, and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Project and accounting and management fees attributable to the operation of the Project;

(viii)   The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such Capital Expenditure in any given month;

(ix)   The cost to replace equipment or improvements that have a useful life for accounting purposes of 5 years or less;

(x)   Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(d)   Any item of Operating Expense that is specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building. However, any such item that is not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(e)   The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(c) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(f)   Lessee's Share of Operating Expense Increase is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the Operating Expense Increase. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year. In addition, within 60 days of written request (but not more than once each year), Lessor shall provide Lessee with legible copies of any and all bills or charges associated with the actual Operating Expenses of the Premises so as to confirm the accuracy of Lessee's Share of Operating Expense Increase (if any). If Lessee's payments during such year exceed Lessee's Share, Lessee shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of said statement. Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense Increases, notwithstanding that the Lease term may have terminated before the end of such Comparison Year.

(g)   Operating Expenses shall not include the costs of replacement for equipment or capital components such as the roof, foundations, exterior walls or a Common Area capital improvement, such as the parking lot paving, elevators, fences that have a useful life for accounting purposes of 5 years or more.

(h)   Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

(i) During the duration of the initial Lease Term, Lessee's Share of Operating Expense Increase shall not in any year increase by more than 5.0% over the prior Comparison Year.

4.3   **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States on or before the day on which it is due, without offset or deduction (except as specifically permitted in this Lease). All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.   Security Deposit.** Lessee shall deposit with Lessor upon  execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease.  If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of the Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof.  If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit

INITIALS

Page 3 of 13
Last Edited: 8/7/2017 2:51 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 182

shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.  Lessor shall not be required to keep the Security Deposit separate from its general accounts.  Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor.  Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied.  No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.  THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6.   Use.**

6.1   **Use.**  Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.  Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.  Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements of the Building, will not adversely affect the mechanical, electrical, HVAC, and other systems of the Building, and/or will not affect the exterior appearance of the Building.  If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2   **Hazardous Substances.**

(a)   **Reportable Uses Require Consent.**  The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, byproducts or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use such as ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor.  In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)   **Duty to Inform Lessor.**  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)   **Lessee Remediation.**  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)   **Lessee Indemnification.**  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)   **Lessor Indemnification.**  Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)   **Investigations and Remediations.**  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)   **Lessor Termination Option.**  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3   **Lessee's Compliance with Applicable Requirements.**  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4   **Inspection; Compliance.**  Lessor and Lessor's "**Lender**" (as defined in paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times, after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1e) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of written request therefor.  Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to allow such inspections

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 183

and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

**7.    Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

    7.1    **Lessee's Obligations.** Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to abuse or misuse. In addition, Lessee rather than the Lessor shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any similar improvements within the Premises. Lessee may, at its option, upon reasonable notice, elect to have Lessee perform any particular such maintenance or repairs the cost of which is otherwise Lessee's responsibility hereunder."

    7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, fire alarm and/or smoke detection systems, fire hydrants, and the Common Areas.

    7.3    **Utility Installations; Trade Fixtures; Alterations.**

        (a)    **Definitions.** The term "**Utility Installations**" refers to all floor and window coverings, air lines, vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, and plumbing in or on the Premises. The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

        (b)    **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof, ceilings, floors or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed $2000. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications.  For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

        (c)    **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

    7.4    **Ownership; Removal; Surrender; and Restoration.**

        (a)    **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations.  Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

        (b)    **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease.  Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.  However, Lessor shall not require Lessee to remove any of the proposed Lessee Owned Alterations or Utility Installations contained in Paragraph 59 of this Lease.

        (c)    **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted.  "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lease occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear.  Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee.  Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements.  Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee.  Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire.  The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.    Insurance; Indemnity.**

    8.1    **Insurance Premiums.** The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 are included as Operating Expenses (see paragraph 4.2 (c)(iv)). Said costs shall include increases in the premiums resulting from additional coverage related to requirements of the holder of a mortgage or deed of trust covering the Premises, Building and/or Project, increased valuation of the Premises, Building and/or Project, and/or a general premium rate increase. Said costs shall not, however, include any premium increases resulting from the nature of the occupancy of any other tenant of the Building.  If the Project was not insured for the entirety of the Base Year, then the base premium shall be the lowest annual premium reasonably obtainable for the required insurance as of the Start Date, assuming the most nominal use possible of the Building and/or Project.  In no event, however, shall Lessee be responsible for any portion of the premium cost attributable to liability insurance coverage in excess of $2,000,000 procured under Paragraph 8.2(b).

    8.2    **Liability Insurance.**

        (a)    **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000.  Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement and coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder.  Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

        (b)    **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

    8.3    **Property Insurance - Building, Improvements and Rental Value.**

        (a)    **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Building and/or Project.  The amount of such insurance shall be equal to the full insurable replacement cost of the Building and/or Project, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall

© 2017 AIR CRE.  All Rights Reserved.                          OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 184

be insured by Lessee not by Lessor.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss.  Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b)    **Rental Value.**  Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)    **Adjacent Premises.**  Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)    **Lessee's Improvements.**  Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4    **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

(a)    **Property Damage.**  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b)    **Worker's Compensation Insurance.**  Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.  Such policy shall include a 'Waiver of Subrogation' endorsement.  Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(c)    **Business Interruption.**  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(d)    **No Representation of Adequate Coverage.**  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    **Insurance Policies.**  Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 10 days prior written notice to Lessor.  Lessee shall, at least 30 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    **Waiver of Subrogation.**  Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto.  The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    **Indemnity.**  Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee.  If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8    **Exemption of Lessor and its Agents from Liability.**  Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom.  Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    **Failure to Provide Insurance.**  Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater.  The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.    Damage or Destruction.**

9.1    **Definitions.**

(a)    **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)    **"Premises Total Destruction"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)    **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)    **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)    **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in on, or under the Premises which requires restoration.

9.2    **Partial Damage - Insured Loss.**  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $5,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                                    OFG-21.00, Revised 01-03-2017

**EXHIBIT "5"
PAGE 185**

assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    **Partial Damage - Uninsured Loss.**  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.**  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.**  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Abatement of Rent; Lessee's Remedies.**

(a)    **Abatement.**  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)    **Remedies.**  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination; Advance Payments.**  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

**10.    Real Property Taxes.**

10.1    **Definitions.**  As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address.  **"Real Property Taxes"** shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2    **Payment of Taxes.**  Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3    **Additional Improvements.**  Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees.  Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4    **Joint Assessment.**  If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.  Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5    **Personal Property Taxes.**  Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11.    Utilities and Services.**

11.1    **Services Provided by Lessor.**  Lessor shall provide heating, ventilation, air conditioning, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use in connection with an office, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures.  Lessor shall also provide janitorial services to the ~~Premises and Common Areas~~ 5 times per week, excluding Building Holidays, or pursuant to the attached janitorial schedule, if any.  Lessor shall not, however, be required to provide janitorial services to kitchens or storage areas included within the Premises.

11.2    **Services Exclusive to Lessee.**  Notwithstanding the provisions of paragraph 11.1, Lessee shall pay for all ~~water, gas, light, power,~~ telephone and other utilities and services specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon.  Notwithstanding the provisions of Paragraph 4.2(vi), if a service is deleted by Paragraph 1.13 and such service is not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges for such jointly metered service.

11.3    **Hours of Service.**  Said services and utilities shall be provided during times set forth in Paragraph 1.12.  Utilities and services required at other times shall be subject to advance request and reimbursement by Lessee to Lessor of the cost thereof.

11.4    **Excess Usage by Lessee.**  Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security and trash services, over standard office usage for the Project.  Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a breach of this subparagraph by Lessee.  Lessor may, in its sole discretion, install at Lessee's expense supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

11.5    **Interruptions.**  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

**12.    Assignment and Subletting.**

12.1    **Lessor's Consent Required.**

(a)    Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

INITIALS

Page 7 of 13
Last Edited: 8/7/2017 2:51 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 186

(b)   Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent.  The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)   The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buyout or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)   An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)   Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)   Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)   Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

**12.2  Terms and Conditions Applicable to Assignment and Subletting.**

(a)   Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)   Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)   Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)   In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e)   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and anticipated modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.  (See also Paragraph 36)

(f)   Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)   Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing.  (See Paragraph 39.2)

**12.3  Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)   Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)   In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)   Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)   No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)   Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

**13.  Default; Breach; Remedies.**

**13.1  Default; Breach.**  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)   The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)   The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfil any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.  THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)   The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)   The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)   A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)   The occurrence of any of the following events:  (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "**debtor**" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)   The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)   If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.00, Revised 01-03-2017

**EXHIBIT "5"**
**PAGE 187**

with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2 **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3 **Inducement Recapture.** Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4 **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5 **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6 **Breach by Lessor.**

(a) **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14. Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the rentable floor area of the Premises, or more than 25% of Lessee's Reserved Parking Spaces, if any, are taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15. Brokerage Fees.**

15.1 **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.

15.2 **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3 **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any

INITIALS

© 2017 AIR CRE. All Rights Reserved.

INITIALS

OFG-21.00, Revised 01-03-2017

**EXHIBIT "5"**
**PAGE 188**

person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16. Estoppel Certificates.**

(a)    Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)    If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Responding Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)    If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17. Definition of Lessor.** The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18. Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19. Days.** Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

**20. Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Project, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21. Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22. No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23. Notices.**

23.1 **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed received on the actual receipt thereof. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

**24. Waivers.**

(a)    No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)    The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)    THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25. Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)    When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)    *Lessor's Agent.* A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: *To the Lessor:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. *To the Lessee and the Lessor:* (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)    *Lessee's Agent.* An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. *To the Lessee:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. *To the Lessee and the Lessor:* (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)    *Agent Representing Both Lessor and Lessee.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or

© 2017 AIR CRE. All Rights Reserved.    OFG-21.00, Revised 01-03-2017

Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)  Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)  Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26.  No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Holdover Base Rent shall be calculated on a monthly basis. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27.  Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.  Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29.  Binding Effect; Choice of Law.**  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

**30.  Subordination; Attornment; Non-Disturbance.**

30.1 **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2 **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new  owner.

30.3 **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4 **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31.  Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32.  Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

**33.  Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34.  Signs.**  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Lessor may not place any sign on the exterior of the Building that covers any of the windows of the Premises. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35.  Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36.  Consents.**  All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

**37.  Guarantor.**

37.1 **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published BY AIR CRE.

37.2 **Default.**  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its

INITIALS

Page 11 of 13
Last Edited: 8/7/2017 2:51 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 190

board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38. Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39. Options.** If Lessee is granted any option, as defined below, then the following provisions shall apply.

39.1 **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2 **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3 **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4 **Effect of Default on Options.**

(a)   Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured; (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee); (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

**40. Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties. In the event, however, that Lessor should elect to provide security services, then the cost thereof shall be an Operating Expense.

**41. Reservations.**

(a)   Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessor may also: change the name, address or title of the Building or Project upon at least 90 days prior written notice; provide and install, at Lessee's expense, Building standard graphics on the door of the Premises and such portions of the Common Areas as Lessor shall reasonably deem appropriate; grant to any lessee the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and to place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the Building or the Project or on signs in the Common Areas. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights. The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way affect this Lease or impose any liability upon Lessor.

(b)   Lessor also reserves the right to move Lessee to other space of comparable size in the Building or Project. Lessor must provide at least 45 days prior written notice of such move, and the new space must contain improvements of comparable quality to those contained within the Premises. Lessor shall pay the reasonable out of pocket costs that Lessee incurs with regard to such relocation, including the expenses of moving and necessary stationary revision costs. In no event, however, shall Lessee be required to pay an amount in excess of two months Base Rent. Lessee may not be relocated more than once during the term of this Lease.

(c)   Lessee shall not: (i) use a representation (photographic or otherwise) of the Building or Project or their name(s) in connection with Lessee's business; or (ii) suffer or permit anyone, except in emergency, to go upon the roof of the Building.

**42. Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**43. Authority; Multiple Parties; Execution.**

(a)   If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)   If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)   This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**44. Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**45. Offer.** Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**46. Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**47. Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

**48. Arbitration of Disputes.** An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

**49. Accessibility; Americans with Disabilities Act.**

(a)   The Premises:

☑ have not undergone an inspection by a Certified Access Specialist (CASp). Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

~~☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.~~

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 191

~~have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code 655.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction-related accessibility standards.~~

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

(b)    Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

**LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.**

**ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:**
**1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.**
**2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING AND SIZE OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.**

**WARNING: IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.**

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: MURRIETA          Executed at: Aul
On: 8/14/2017                  On: 10-Aug

**By LESSOR:**                 **By LESSEE:**
Bioxxel, LLC, a California Limited     II-VI Optical Systems, Inc., a California
Liability Company              corporation

By: _____                 By: _____
Name Printed: Phuong Nguyen     Name Printed: Andrew Riser
Title: Manager                 Title: General Manager
Phone: _____              Phone: _____
Fax: _____                Fax: _____
Email: _____              Email: _____

By: _____                 By: _____
Name Printed: _____       Name Printed: _____
Title: _____              Title: _____
Phone: _____              Phone: (951) 926-7644
Fax: _____                Fax: (951) 926-1984
Email: _____              Email: rebecca.mendoza@ii-vi.com
Address: 30590 Cochise Circle   Address: 36570 Briggs Road
Murrieta, CA 92563             Murrieta, CA 92563
Federal ID No.: _____      Federal ID No.: _____

**BROKER**                     **BROKER**
Masino Industrial Consulting, Inc., a
California corporation

Attn: Christopher J. Masino, SIOR     Attn: _____
Title: President               Title: _____
Address: 41707 Winchester Road, Suite 300     Address: _____
Phone: 951 795 4556            Phone: _____
Fax: 951 501 2990             Fax: _____
Email: cmasino@masinoindustrial.com     Email: _____
Federal ID No.: 37-1552607     Federal ID No.: _____
Broker/Agent BRE License #: 01909860 / 01352110     Broker/Agent BRE License #: _____

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS                       Page 13 of 13                    INITIALS
© 2017 AIR CRE. All Rights Reserved.     Last Edited: 8/7/2017 2:51 PM          OFG-21.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 192

# AIRCRE

## RENT ADJUSTMENT(S)
### STANDARD LEASE ADDENDUM

Dated: __April 19, 2017__

**By and Between**

Lessor: __Bioxxel, LLC, a California Limited Liability Company__

Lessee: __II-VI Optical Systems, Inc., a California corporation__

Property Address: __30590 Cochise Circle__
__Murrieta, CA 92563__
(street address, city, state, zip)

Paragraph: __50__

**A.  RENT ADJUSTMENTS:**

The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:
(Check Method(s) to be Used and Fill in Appropriately)

☐ I.  Cost of Living Adjustment (COLA)

a.  On (Fill in COLA Dates): _____ the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area): _____ All Items (1982-1984 = 100), herein referred to as "CPI".

b.  The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): the ☐ first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ _____ (Fill in Other "Base Month"). The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the Base Rent adjustment.

c.  In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐ II.  Market Rental Value Adjustment(s) (MRV)

a.  On (Fill in MRV Adjustment Date(s): _____ the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1)  Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then:

(a)  Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

(b)  Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

(i)  Within 15 days thereafter, Lessor and Lessee shall each select an independent third party ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease). The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii)  The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii)  If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv)  The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, i.e., the one that is NOT the closest to the actual MRV.

2)  When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which shall include, but not limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.

3)  Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.  Upon the establishment of each New Market Rental Value:

1)  the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

2)  the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☑ III.  **Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| September 1, 2018 | $16,955.00 plus electricity, currently estimated to be $3,911.04 per month |
| September 1, 2019 | $18,481.00 plus electricity, currently estimated to be $3,911.04 |
| September 1, 2020 | $20,144.00 plus electricity, currently estimated to be $3,911.04 |

INITIALS                                     INITIALS

© 2017 AIR CRE.  All Rights Reserved.                    RA-7.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 193

September 1, 2021

$21,888.00 plus electricity, currently
estimated to be $3,911.04

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Page 2 of 2
Last Edited: 8/7/2017 2:51 PM

INITIALS

RA-7.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 194

# AIR CRE

## OPTION(S) TO EXTEND
### STANDARD LEASE ADDENDUM

**Dated:**    April 19, 2017
**By and Between**
**Lessor:**    Bioxxel, LLC, a California Limited Liability Company
**Lessee:**    II-VI Optical Systems, Inc., a California corporation
**Property Address:**    30590 Cochise Circle
    Murrieta, CA 92563
    (street address, city, state, zip)

Paragraph:    51

**A. OPTION(S) TO EXTEND:**

Lessor hereby grants to Lessee the option to extend the term of this Lease for    one (1)    additional    sixty (60)    month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i)    In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least    3    but not more than    6    months prior to the date that the option period would commence, time being of the essence. If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire. Options (if there are more than one) may only be exercised consecutively.

(ii)    The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii)    Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv)    This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v)    The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☐    I.    Cost of Living Adjustment(s) (COLA)

a.    On (Fill in COLA Dates): _____ the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area): _____ All Items (1982-1984 = 100), herein referred to as "CPI".

b.    The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): _____ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or _____ (Fill in Other "Base Month"): _____. The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the rent adjustment.

c.    In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the Index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐    II.    Market Rental Value Adjustment(s) (MRV)

a.    On (Fill in MRV Adjustment Date(s)) _____ the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1)    Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached, within thirty days, then:

(a)    Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

(b)    Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing to arbitration in accordance with the following provisions:

(i)    Within 15 days thereafter, Lessor and Lessee shall each select an independent third party appraiser or broker ("Consultant") - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease). The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii)    The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii)    If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv)    The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

2)    When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which include, but not limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.

3)    Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.    Upon the establishment of each New Market Rental Value:

1)    the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

2)    the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☑    III.    Fixed Rental Adjustment(s) (FRA)

_____    Page 1 of 2    _____
INITIALS    Last Edited: 8/7/2017 2:51 PM    INITIALS

© 2017 AIR CRE.  All Rights Reserved.    OE-6.00, Revised 01-03-2017

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| September 1, 2022 | $21,888.00 plus electricity, currently estimated to be $3,911.04 |

☐ IV.   Initial Term Adjustments
The formula used to calculate adjustments to the Base Rate during the original Term of the Lease shall continue to be used during the extended term.

**B.   NOTICE:**
Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

**C.   BROKER'S FEE:**
The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease or if applicable, paragraph 9 of the Sublease.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS

Page 2 of 2
Last Edited: 8/7/2017 2:51 PM


INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OE-6.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 196



## RIGHT OF FIRST REFUSAL TO LEASE ADDITIONAL SPACE
### STANDARD LEASE ADDENDUM

**Date:**    April 19, 2017

**By and Between**

**Lessor:**    Bioxxel, LLC, a California Limited Liability Company

**Lessee:**    II-VI Optical Systems, Inc., a California corporation

**Property Address:**    30590 Cochise Circle

Murrieta, CA 92563

(street address, city, state, zip)

Paragraph:    52

(a)    Subject to the provisions of Paragraph 39 Lessee shall have a one-time right to lease (the "Right to Lease") the space described in subparagraph (b) if such space becomes available during the term of this Lease.

(b)    This Right to Lease shall only apply to the following space in the Project:    30590 Cochise Circle, Murrieta, CA 92563; 2nd floor office space consisting of approximately 21,728 square feet as depicted in the attached 'Exhibit A', and, as referenced in Paragraph 54 of this Lease as the "Expansion Premises"    (the "**Additional Space**").

(c)    Prior to offering the Additional Space to anyone else Lessor shall give Lessee written notice of the availability of the Additional Space and the date the existing tenant or occupant, if any, is expected to vacate such space.  For a period of three business days following delivery of such notice, time being of the essence, Lessee shall have the right to request from Lessor a written statement setting forth the basic economic terms, including, but not limited to, Lessor's determination of the monthly Base Rent, an improvement allowance, if any, and all other economic terms and conditions (collectively, the "Economic Terms"), upon which Lessor is willing to lease the Additional Space. Lessee must make such request in writing.  If Lessor has not received such a request from Lessee within such time period Lessee shall be conclusively presumed to have elected not to lease the Additional Space and Lessee's Right to Lease the Additional Space will thereafter be null and void and of no further force or effect.

(d)    In establishing the Economic Terms the Lessor will make a good faith determination of the fair market rental rate for the Additional Space.  The term "fair market rental rate" as used in this subparagraph shall mean the rental rate that a willing, comparable, renewal tenant (excluding sublease and assignment transactions) would pay, and a willing owner of a comparable quality building located in the same vicinity would accept, for comparable space taking into account (i) the age, quality and layout of the existing improvements in the Additional Space, and (ii) items that real estate brokers customarily consider, including, but not limited to, rental rates, space availability, length of lease term, Lessee size, Lessee improvement allowances, operating expenses and allowance, and any other economic matters then being charged by Lessor or owners of similar buildings.  In no event, however, shall the monthly Base Rent payable for the Additional Space be less, on a square foot basis, then the Base Rent payable with respect to the original Premises.

(e)    For a period of three business days after receipt of the Economic Terms from Lessor, time being of the essence, Lessee shall have the right to give written notice to Lessor of Lessee's exercise of its Right to Lease the Additional Space upon the Economic Terms and the same non-Economic Terms as set forth in this Lease with respect to the Premises.  If Lessee timely exercises its Right to Lease as provided herein, the parties will promptly thereafter execute an amendment to this Lease to include the Additional Space in the Premises and to document the lease terms thereof.  If Lessor has not received such notice from Lessee within such time period Lessee shall be conclusively presumed to have elected not to lease the Additional Space and Lessee's Right to Lease the Additional Space will thereafter be null and void and of no further force or effect.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com

NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Page 1 of 1
Last Edited: 8/7/2017 2:51 PM

INITIALS

RRLAS-1.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 197

# AIRCRE

## ADDENDUM

**Date:**      April 19, 2017
**By and Between**
**Lessor:**    Bioxxel, LLC, a California Limited Liability Company
**Lessee:**    II-VI Optical Systems, Inc., a California corporation
**Property Address:**    30590 Cochise Circle
                         Murrieta, CA 92563
                         (street address, city, state, zip)

Paragraphs: 53 through 61

**53.) OFFICE FURNISHINGS:**

Throughout the duration of the Term of the Lease, all furnishing currently located within the Premises (including office furniture, chairs, tables, cubicles, projectors, and other trade fixtures) shall be made available for the exclusive use of Lessee and included at no additional cost.

**54.) OPTION TO LEASE 2ND FLOOR OFFICE SPACE "EXPANSION PREMISES" (SEE ATTACHED 'EXHIBIT A'):**

Lessee shall, subject to the then current availability of the space, have one (1) Option to Lease the 2nd floor office space located at 30590 Cochise Circle, Murrieta, CA 92563 consisting of approximately 21,728 square feet ("Expansion Premises"). Lessee shall provide Lessor with written Notice of its intention to exercise its Option to Lease Expansion Premises not less than three (3) but not more than six (6) months prior to the Expiration Date of this Lease Agreement. Upon receipt of Lessee's written Notice, Lessor or Lessor's Agent shall prepare an amendment to this Lease Agreement recalculating the square footage of the Premises to include the square footage of the Expansion Premises.

Additionally, said amendment shall include the following monthly Schedule of Rents, which shall apply to the Expansion Premises commencing September 1, 2022:

For the Period September 1, 2022 to August 31, 2027: $15,209.60/month plus electricity, currently $3,911.04/month

Upon Lessee's execution of said amendment, Lessee shall immediately deposit the amount of $15,209.60 which shall be deemed additional Security Deposit under the Terms of the amended Lease Agreement for Premises

**55.) LESSEE'S ACCESS TO PROJECT UTILITY INSTALLATIONS:**

Lessor shall have exclusive access to following areas of the Project:

- Main telecommunications room located on the 2nd floor (computer networking, phone. and electrical sub-panels)
- Main building security room located in the attic (security camera server, Siemens magnetic lock server),
- Main building utility room located on the west side of the Project (main phone and electrical services points)

In order to maintain its equipment connected to the networking, security, and other utility systems of the Project, Lessee shall have 24/7 access to any of the aforementioned utility system areas throughout the duration of the Lease Term so long as Lessee provides advanced written notice to Lessor. To request access to any of the aforementioned areas, Lessee shall provide Lessor with written notice and, upon Lessor's receipt of said written notice, Lessor shall not unreasonably withhold Lessee's immediate access to said utility system areas.

**56.) LINE OF SIGHT / FIBER OPTIC ROUTING (SEE ATTACHED 'EXHIBIT E'):**

Lessee, at its sole cost and expense, shall have the option to install a line of sight/point to point node telecommunications system on the roof of 30590 Cochise Circle. Pursuant to the relevant conditions contained in this Lease, and prior to the installation of any system or the commencement of any work, Lessee shall obtain Lessor's written approval of the final design of the proposed improvements to be installed on the roof of Premises.

Lessee shall have the option, at its sole cost and expense, to install a utility trench across the parking lot of the Project (see attached 'Exhibit E').

Pursuant to the relevant conditions contained in this Lease, and prior to the installation of any trench or the commencement of any work, Lessee shall obtain Lessor's written approval for the final design of the proposed improvements to be installed in the parking lot. Additionally, the actual, final proposed location of said trench shall be in Lessor's sole and absolute discretion.

INITIALS

Page 1 of 3
Last Edited: 8/7/2017 2:51 PM

INITIALS

© 2017 AIR CRE. All Rights Reserved.

ADD-1.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 198

**57.) USE OF GOLF CARTS / ELECTRIC VEHICLE CHARGING STATION / STORAGE SHED (SEE ATTACHED 'EXHIBIT B'):**

Lessee requires a mode of short distance transportation between other nearby facilities it currently occupies and the Premises. Therefore, Lessee shall have permission to drive a limited number of electric golf carts on paved surfaces and to park said golf carts on and around Premises.

Lessee shall, at its sole cost and expense, have the option to install an electric vehicle charging station for said golf carts. Additional electric costs resulting from Lessee's electric vehicle charging station, as determined by Lessor, shall be paid monthly by Lessee directly to Lessor in addition to monthly Base Rent.

Also, Lessor may require that Lessee install an electric sub-meter so that Lessor is able to determine Lessee's actual electric use and calculate Lessee's costs associated with said electric vehicle charging station.

Lessee, at its sole cost and expense, shall have the option to install an approximately 20' X 20' enclosure for the purposes of secured outdoor storage for its golf carts (see attached 'Exhibit B'). Lessee shall ensure that the construction of said enclosure shall be of sufficient materials, quality, and aesthetics so as to not constitute a nuisance at the Project.

**58.) USE OF COMMON AREAS (SEE ATTACHED 'EXHIBIT A'):**

The location of Common Areas of the Project are shown on 'Exhibit A'. Lessee shall have non-exclusive access to Common Areas, including the hallways, staircase, elevator, restrooms, large conference room, private meeting rooms, and the security desk room. The Common Areas located within the Property are available for use by Lessee and/or Lessee's employee's only, between the hours of 8:00 a.m. and 6:00 p.m. Monday to Friday.

No food shall be permitted or consumed in the large conference room, private meeting rooms, and/or in the security desk room without the express prior written consent of Lessor. Use of the large conference room, private meeting rooms, and/or the security desk room is by reservation only unless otherwise agreed upon between the Parties to this Lease Agreement. Reservations can be requested via email to Lessor, and the exact email address to be utilized for making reservations shall be provided to Lessee by Lessor. Requests may not be made more than thirty days in advance, without the prior written consent of Lessor. After Lessee's use, the large conference room, private meeting rooms, and/or security desk room shall be left in a neat and orderly fashion or Lessee will be assessed a $25.00 cleaning charge per use. Lessor shall have the exclusive right, at Lessor's sole discretion, from time to time to amend any provision relating to the use of Common Areas.

**59.) LESSEE'S PROPOSED IMPROVEMENTS (SEE ATTACHED 'EXHIBIT C'):**

Pursuant to the provisions contained in this Lease Agreement, Lessee shall, at its sole cost and expense, install the following improvements to the Premises:

- Install computer networking infrastructure, communication system infrastructure, and security system infrastructure
- Install and administer its own access permission badge system throughout the Premises for its security purposes
- Install a new entryway door, concrete pathway, and lobby area as shown on 'Exhibit C'
- install a new office as shown on 'Exhibit C'. In addition, Lessee shall be permitted to remove two cubicles from the area in question and shall move said cubicles to a location at the Project to be determined by Lessor

Lessee shall have the option to convert several of the existing offices, as shown on 'Exhibit C', located within the Premises to lab and/or light manufacturing space.

Pursuant the relevant provisions contained in Paragraph 7.3 of this Lease, prior to any installation or commencement of work, Lessee shall obtain Lessor's written approval for the proposed installation of improvements.

**60.) LESSOR'S WORK (SEE ATTACHED 'EXHIBIT D'):**

Lessor shall, at its sole cost and expense, install the following improvements to the Premises:

- Provide labor, and materials including (frame, door, hardware, and magnetic lock) to match existing Building and Project equipment adjacent to the Common Areas, located as shown on 'Exhibit A' and 'Exhibit D'
- Rekey the exterior doors to Premises and provide Lessee with a set of four keys for Lessee's initial access
- General cleaning, vacuuming, restock and service both restrooms, break areas, and other areas of the Premises prior to the Occupancy Date
- Removal and/or capping of copper pipe fittings on walls and ceilings as shown in the attached 'Exhibit D'
- Trimming of all shrubbery and landscaping located adjacent to Lessee's main lobby entrance and adjacent parking areas
- Removal of beehive in tree (as shown in 'Exhibit D')
- Service and certify all fire extinguishers located in the Premises are in operable condition

Lessor reserves the right to install, at its sole cost and expense, an electrical sub-meter at anytime during the Term of this Lease in order to determine Lessee's actual electrical use associated with its occupancy of the Premises. Upon determining Lessee's actual electrical use, Lessor may elect to charge Lessee for the cost of Lessee's actual electrical usage in lieu of the estimated cost of electricity.

**61.) SIGNAGE AND BUILDING PAINT STRIPE (SEE ATTACHED 'EXHIBIT F'):**

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

ADD-1.00, Revised 01-03-2017

EXHIBIT "5"

Lessee shall, at its sole cost and expense, be permitted to install its corporate signage on Lessee's main entry lobby door and to the exterior of the Premises at the location as shown in the attached Exhibit F.  Further, Lessee shall be permitted to paint the exterior of the Premises with a 'red stripe' so as the match its existing corporate facilities located at 36570 Briggs Road, Murrieta, CA 92563.  However,  all signage installations must conform to applicable municipal requirements pursuant to the requirements of the County of Riverside.

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS

Page 3 of 3
Last Edited: 8/7/2017 2:51 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

ADD-1.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 200

'Exhibit A'

Floor Plan

30590 Cochise Circle, 1st and 2nd Floor Office Space

Murrieta, CA 92563

Premises: +/-21,728 square feet

**Building Floor Plan, showing 1st Floor Office Floor Plan ("Premises") :**



**2ND Floor Office Floor Plan ("Expansion Premises" see paragraph 54):**

Expansion Premises: +/-21,728 square feet

Initials:
Initials:

**'Exhibit B'**

**Site Plan**

**30590 Cochise Circle**

**Murrieta, CA 92563**



Proposed location of +/- 20' X 20' golf cart charging station (see Paragraph 57)

Lessee's Signage and Paint Striping (see Paragraph 61)

Lessee's Main Lobby Entrance (see Paragraph 59)

Initials:
Initials:

**"Exhibit C"**

Lessee's Proposed Improvements (see Paragraph 59)

*Proposed Location of New Reception Area:*

 

Proposed Location of New Office and Cubicle Removal:



Initials: ___
Initials: ___

EXHIBIT "5"
PAGE 203





Initials:
Initials:

EXHIBIT "5"
PAGE 204

**"Exhibit D"**

Lessor's Work (see Paragraph 60)

*Selected Images of Location of Copper Piper Removal from Office:*




Selected Images of Location of Removal of Beehive in Tree and Repair to Break Room Flooring:




Initials:
Initials:

Page **2** of **2**

Lessor to Frame in Door

Repair to Break Room Flooring

Lessor to install new
frame, door,
hardware, and
magnetic lock

Approximate Locations of Copper Piping in
Ceiling to be Capped Off (see Paragraph 60)

Initials: 
Initials:

EXHIBIT "5"
PAGE 206

**'Exhibit E'**

**Proposed Route of Trench (see Paragraph 56)**

**30590 Cochise Circle**

**Murrieta, CA 92563**



Initials: 
Initials:



Initials: 
Initials:

**'Exhibit F'**

**Signage and Building Paint Stripe (see Paragraph 61)**

**30590 Cochise Circle**

**Murrieta, CA 92563**



Proposed location, main lobby entry signage

Proposed location, Paint Striping

Initials: 
Initials:

# AIR CRE

## RULES AND REGULATIONS FOR
## STANDARD OFFICE LEASE

Date:    April 19, 2017

By and Between

Lessor:    Bioxxel, LLC, a California Limited Liability Company

Lessee:    II-VI Optical Systems, Inc., a California corporation

Property Address:    30590 Cochise Circle
Murrieta, CA 92563
(street address, city, state, zip)

### GENERAL RULES

1.  Lessee shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.
2.  Lessee reserves the right to refuse access to any persons Lessor in good faith judges to be a threat to the safety and reputation of the Project and its occupants.
3.  Lessee shall not make or permit any noise or odors that annoy or interfere with other lessees or persons having business within the Project.
4.  Lessee shall not keep animals or birds within the Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.
5.  Lessee shall not make, suffer or permit litter except in appropriate receptacles for that purpose.
6.  Lessee shall not alter any lock or install new or additional locks or bolts.
7.  Lessee shall be responsible for the inappropriate use of any toilet rooms, plumbing or other utilities.  No foreign substances of any kind are to be inserted therein.
8.  Lessee shall not deface the walls, partitions or other surfaces of the Premises or Project.
9.  Lessee shall not suffer or permit anything in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Project.
10.  Furniture, significant freight and equipment shall be moved into or out of the building only with the Lessor's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Lessor.  Lessee shall be responsible for any damage to the Office Building Project arising from any such activity.
11.  Lessee shall not employ any service or contractor for services or work to be performed in the Building, except as approved by Lessor.
12.  Lessor reserves the right to close and lock the Building on Saturdays, Sundays and Building Holidays, and on other days between the hours of    6:00
P.M. and    6:00    A.M. of the following day.  However, Lessee shall have unfettered access 24 hours, 7 days per week, and 365 days
per year.  If Lessee uses the Premises during such periods, Lessee shall be responsible for securely locking any doors it may have opened for entry.
13.  Lessee shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.
14.  No window coverings, shades or awnings shall be installed or used by Lessee.
15.  No Lessee, employee or invitee shall go upon the roof of the Building without the prior written consent of Lessor.
16.  Lessee shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas reasonably designated by Lessor or by applicable governmental agencies as non-smoking areas.
17.  Lessee shall not use any method of heating or air conditioning other than as provided by Lessor.
18.  Lessee shall not install, maintain or operate any vending machines upon the Premises without Lessor's written consent.
19.  The Premises shall not be used for lodging or manufacturing, cooking or food preparation.
20.  Lessee shall comply with all safety, fire protection and evacuation regulations established by Lessor or any applicable governmental agency.
21.  Lessor reserves the right to waive any one of these rules or regulations, and/or as to any particular Lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Lessee.
22.  Lessee assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.
23.  Lessor reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Project and its occupants.  Lessee agrees to abide by these and such rules and regulations.

### PARKING RULES

1.  Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."
2.  Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.
3.  Parking stickers or identification devices shall be the property of Lessor and be returned to Lessor by the holder thereof upon termination of the holder's parking privileges.  Lessee will pay such replacement charge as is reasonably established by Lessor for the loss of such devices.
4.  Lessor reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.
5.  Lessor reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent offsite location(s), and to reasonably allocate them between compact and standard size spaces, as long as the same complies with applicable laws, ordinances and regulations.
6.  Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.
7.  Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle.  Lessor will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.
8.  Validation, if established, will be permissible only by such method or methods as Lessor and/or its licensee may establish at rates generally applicable to visitor parking.
9.  The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.
10.  Lessee shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.
11.  Lessor reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.
12.  Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

**AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com**
**NOTICE:  No part of these works may be reproduced in any form without permission in writing.**

INITIALS



INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFGRR-2.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 210

# AIRCRE

## DISCLOSURE REGARDING
## REAL ESTATE AGENCY RELATIONSHIP
### (As required by the Civil Code)

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT ("Seller" includes both a vendor and a lessor)**
A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a)   Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)   A duty of honest and fair dealing and good faith.
    (c)   A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT ("Buyer" includes both a purchaser and a lessee)**
A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a)   Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)   A duty of honest and fair dealing and good faith.
    (c)   A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.
An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**
A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a)   A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b)   Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

☐ Buyer ☐ Seller ☒ Lessor ☐ Lessee _____ Date: _____

Bioxxel, LLC, a California limited Liability Company

By: _____

Name Printed: Phuong Nguyen

Title: Manager

Date: 8 11 2017

☐ Buyer ☐ Seller ☐ Lessor ☒ Lessee _____ Date: _____

II-VI Optical Systems Inc, a California corporation

By: _____

Name Printed: Andrew Riser

Title: General Manager

Date: 10 - Aug

Agent: Masino Industrial Consulting, Inc.    BRE Lic. #: 01909860
    Real Estate Broker (Firm)

By: Christopher J. Masino, SIOR    BRE Lic. #: 01352110    Date: April 19, 2017
    (Salesperson or Broker-Associate)

**NOTE:**
* When the listing brokerage company also represents Buyer/Lessee: The Listing Agent shall have one Agency Disclosure form signed by Seller/Lessor and a second Agency Disclosure form signed by Buyer/Lessee.
* When Seller/Lessor and Buyer/Lessee are represented by different brokerage companies: (i) the Listing Agent shall have one Agency Disclosure form signed by Seller/Lessor and (ii) the Buyer's/Lessee's Agent shall have one Agency Disclosure form signed by Buyer/Lessee and either that same or a different Agency Disclosure form presented to Seller/Lessor for signature prior to presentation of the offer. If the same form is used, Seller/Lessor may sign here:

_____  Date: _____

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.
AD-2.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 211

Seller/Lessor

THIS FORM HAS BEEN PREPARED BY AIR CRE.  NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF THIS FORM FOR ANY SPECIFIC
TRANSACTION.  PLEASE SEEK LEGAL COUNSEL AS TO THE APPROPRIATENESS OF THIS FORM.

INITIALS

Page 2 of 3
Last Edited: 8/7/2017 2:51 PM


INITIALS

© 2017 AIR CRE.  All Rights Reserved.

AD-2.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 212

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP
### CIVIL CODE SECTIONS 2079.13 THROUGH 2079.24 (2079.16 APPEARS ON THE FRONT)

**2079.13** As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings:
**(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. **(b)** "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and functions under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. **(c)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. **(d)** "Commercial real property" means all real property in the state, except single-family residential real property, dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, mobilehomes, as defined in Section 798.3, or recreational vehicles, as defined in Section 799.29. **(e)** "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. **(f)** "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. **(g)** "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(h)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. **(i)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(j)** "Offer to purchase" means a written contract executed by a buyer acting through a selling agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(k)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property that constitutes or is improved with one to four dwelling units, any commercial real property, any leasehold in these types of property exceeding one year's duration, and mobilehomes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(l)** "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. **(m)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(n)** "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. **(o)** "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. **(p)** "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

**2079.14** Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgement of receipt from that seller or buyer, except as provided in this section or subdivision (c) of this section. **(a)** The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). **(c)** Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgement of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgement of receipt is required. **(d)** The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.

**2079.15** In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this form.

**2079.17 (a)** As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.

**(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form.

| [DO NOT COMPLETE, SAMPLE ONLY] | is the agent of (check one): ☐ the seller exclusively; or ☐ both the buyer and seller. |
| [Name of Listing Agent] | |
| [DO NOT COMPLETE, SAMPLE ONLY] | is the agent of (check one): ☐ the buyer exclusively; or ☐ the seller exclusively; or ☐ both the buyer and seller. |
| [Name of Selling Agent if not the same as the Listing Agent] | |

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.
**2079.18** No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.
**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.
**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.
**2079.21** A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.
**2079.22** Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.
**2079.23 (a)** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.
**(b)** A lender or an auction company retained by a lender to control aspects of a transaction of real property subject to this part, including validating the sales price, shall not require, as a condition of receiving the lender's approval of the transaction, the homeowner or listing agent to defend or indemnify the lender or auction company from any liability alleged to result from the actions of the lender or auction company. Any clause, provision, covenant, or agreement purporting to impose an obligation to defend or indemnify a lender or an auction company in violation of this subdivision is against public policy, void, and unenforceable.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

**AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com**
**NOTICE: No part of these works may be reproduced in any form without permission in writing.**

INITIALS

Page 3 of 3
Last Edited: 8/7/2017 2:51 PM



INITIALS

© 2017 AIR CRE.  All Rights Reserved.

AD-2.00, Revised 01-03-2017

EXHIBIT "5"
PAGE 213

# ENGAGEMENT AGREEMENT LETTER
# AND CLIENT REQUIRED DATA



**Keith Dawson**
**Dawson Appraisal, Inc.**
State Certified General Real Estate Appraiser
Real Estate Appraisers & Consultants
CA #AG005802
229 Seal Beach Blvd.
Seal Beach, CA 90740
714-901-2222 phone
keithdawson@dawsonappraisal.com

**APPRAISAL ENGAGEMENT LETTER**

January 14, 2021

Terence Connolly                                                                Dawson File #10491
Westates/Connolly Commercial
32815 Temecula Parkway, Ste B
P.O box 890822
Temecula, CA 92589

Dear Terence,

As an agent for First Choice Bank ("FCB"), we request that you appraise the following property on behalf of the Bank in order to estimate the market value.  The purpose of this Engagement Letter is to secure an **Appraisal**, which will result in an estimated market value for the property and any improvements.  ***Please do not submit the report without reviewing the preliminary title report.  Request the prelim from the FCB officer noted below.***

| | |
|---|---|
| **Property Address:** | 30590 Cochise Cir., Murrieta, CA 92563 |
| **APN:** | 963-070-017 |
| **Property Type:** | Industrial |
| **FCB Account Officer:** | Khin Vong          **email:** kvong@firstchoicebankca.com |
| **Phone:** | 714-634-5150 |
| **Borrower:** | Pharmagold Investment LLC |
| **Property Contact:** | Phuong Nguyen – 951-446-5924 or bosamin@gmail.com |

Please request all property specific information needed to complete the assignment from Khin Vong.  No value related discussion is permitted.

| | | | |
|---|---|---|---|
| **Property Interest** | ☒ Fee Simple | ☐ Leased Fee | ☐ Leasehold Estate |
| **Report Type** | ☒ Appraisal Report | ☐ Restricted Appraisal Report | |
| **Inspection Required** | ☒ Yes | ☐ No | |
| **Report Format** | ☒ Narrative, or | ☐ Form w/narrative | ☐ Either (up to appraiser) |
| **Values Reported** | ☒ As Is | ☐ As Proposed | ☒ Insurable Value |
| | ☐ Going Concern w/components broken out: R/E, FF&E, Goodwill | | |
| **Stated users/Client** | ☒ First Choice Bank and its designees | | |
| | ☒ US Small Business Administration | | |
| **Other Requirements** | ☒ Remaining Economic Life | | |
| | ☒ Indicate conforming or legal non-conforming | | |
| **Scope of Work** | ☐ Cost | ☒ Income | ☒ Sales |
| **Purpose of Appraisal** | ☐ Special Assets | ☐ Loan Servicing | ☐ Refinance |
| | ☒ Purchase Financing | ☐ Other (additional collateral for SBA loan) | |

**Addt'l Comments**
The format of the appraisal shall strictly adhere to all generally accepted standards of professional appraisal practices (e.g., the Uniform Standards of Professional Appraisal Practice) as adopted by the Federal Deposit Insurance Corporation in addition to all applicable State and/or Federal laws and regulations (e.g., FIRREA).

EXHIBIT "5"
PAGE 215

If you have questions regarding this assignment, or the terms of this Engagement Letter, please call me immediately. Otherwise, we will expect that you will return a copy of this letter forthwith, duly executed without modifications, indicating your agreement to all of the terms of this letter.

Pursuant to our previous discussion regarding this assignment, you are to provide a PDF version of the report to us no later than 1-28-21. Your fee for this appraisal report shall not exceed $3,150.00 per report, subject to the timely performance as set forth above and compliance with the other terms of this Engagement Letter. It shall be payable directly to you by the Bank within 30 days of receiving (I) a completed report pursuant to the terms of this letter and (II) an invoice in the above stated amount. In no event shall your firm or any others involved in the preparation of the report bill or collect the above fee and/or any other consideration from the Bank client. For each day that this report is delayed past the "due date", the Bank may reduce the fee by $100.00 unless the delay is beyond your control. If a delayed delivery is anticipated, please inform us immediately.

## FORMAT / CONTENT REQUIREMENTS

The appraisal report should be:
    A.  Sufficiently detailed so as to enable the Bank to fully understand the basis upon which the appraiser has determined the market value of the property;
    B.  Presented in the form and order as set forth in Items 1 through 14 below. This section is intended to cause the appraiser to clearly and accurately set forth the analysis, opinions, and conclusions. Supporting schedules may either be attached to or incorporated within the body of the report or referenced within the body of the report and attached.

At a minimum, the appraisal report should contain:
1. The name, address, and telephone number of the firm or individual(s) engaged to provide the report and date of valuation.
2. The name, address and telephone number of each person who assisted in the appraisal process.
3. The purpose of the appraisal report.
4. The commonly used mailing address for the property.
5. The legal description for the property, or a preliminary title report provided by the Bank.
6. The Assessor's Parcel Number(s).
7. A brief description of the site, its improvements, its condition and its current and projected use.
8. Any special limited conditions.
9. Representative photographs of the subject property, including directional photographs taken from the entrance to the property which clearly shows the neighboring properties along the street, which the property fronts.
10. Appropriate locator maps.
11. Any other information that the appraiser feels is salient in order to arrive at the market value as defined in the Engagement Letter.
12. A written conclusion of the market value together with supporting data, including but not limited to assumptions and projections, and a logical explanation as to the conclusion of value determined by the evaluator.
    Supporting data should be included, or if desired, should be attached to the appendix section of the appraisal.
    All assumptions and projections must be identified as such so that the reader will be able to distinguish fact from opinion.
13. A fully executed Engagement Letter together with addenda, and/or other written forms of modification to said Letter, if any including all enclosures, attachments and exhibits thereto, shall be included as an exhibit to the appraisal report.
14. A Statement from the appraiser certifying that the appraisal:
        a.  Conforms to the Uniform Standards of Professional Appraisal Practice ("USPAP") adopted by the Appraisal Standards Board of the Appraisal Foundation.
        b.  Discloses any steps taken that were necessary or appropriate to comply with the Competency Provision of the USPAP.
        c.  Includes in the certification, required by the USPAP, an additional statement that the appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

## FIDUCIARY RELATIONSHIP

First Choice Bank is the client for the appraisal report and payment shall be made directly from First Choice Bank to the appraiser. All documents furnished to the appraiser from First Choice Bank and/or Dawson Appraisal, Inc. are to be considered confidential information to the appraiser pursuant to the disclosure requirements in the confidentiality section of the Ethics Provision and Statement on Appraisal Standards Number Five. Value estimates of the subject property must not be released to anyone except members of First Choice Bank's Lending Department and/or Dawson Appraisal, Inc.

## REPORT DELIVERY

| | |
|---|---|
| Addressee | Michael Martin |
| | First Choice Bank |
| | 17785 Center Court, Suite 750 |
| | Cerritos, CA., 90703 |

**NOTE**                    **Acceptance, Report and Invoice Routing Instructions**

- Signed Acceptance       Email to kerie@dawsonappraisal.com

- PDF Copy of Report      Email a full color, signed and final version of the report (PDF) to Keith Dawson
  (keithdawson@dawsonappraisal.com) and kerie@dawsonappraisal.com

- Invoice                 Email to kerie@dawsonappraisal.com.

Sincerely,
Dawson Appraisal, Inc. for First Choice Bank

Keith Dawson
Dawson Appraisal, Inc.

---

**Acceptance of Appraisal Engagement**

**I have read the attached Engagement Letter and Appraisal Requirements and certify that the written report that you will receive will be in accordance therewith and will comply with all generally accepted standards of professional appraisal practice (e.g., the USPAP) as well as all applicable State and/or Federal laws and regulations (e.g., FIRREA). I,** *Terence M. Connolly, MAI, ASA, AI-GRS* **, accept the terms and conditions contained in the preceding engagement letter and Appraisal Assignment Information and certify that I will personally appraise the subject property.**

*I agree to review the preliminary title report and report my findings in the appraisal report.*

**Signature / Date** *Terence M. Connolly*      1/22/2021

**State License #**    CA AG09708                    **Expiration Date** 11/02/2022

---

A copy of this engagement letter must be included in the appraisal report

# QUALIFICATIONS OF TERENCE M CONNOLLY, MAI, ASA, AI-GRS

Terence M. Connolly, MAI, ASA is a General Certified Commercial Real Estate Appraiser in CA and WA and an Appraisal Reviewer. Principal Appraiser of WESTATES Appraisals Corp and Connolly Commercial RE Valuation. Our office also includes 3 CA Certified General Real Estate Appraisers plus an experienced office staff. Extensive experience and expertise in valuing and reviewing all types of Commercial Real Estate including: commercial land; existing and proposed Retail, Office, and Industrial use properties; Manufactured Housing Communities / Mobile Home Parks and RV Parks; and special purpose properties such as Self-Storage Facilities and Hotels as well as for Eminent Domain purposes. Recognized as a Litigation Expert Witness.

### *Professional Experience*
Experience reviewing and producing commercial real estate appraisals as a staff and fee appraiser since 1986. Principal / owner of WESTATES / Connolly Commercial Real Estate Valuation and Consulting. Previously employed as Section Manager, Commercial Appraisal Consultant, and Small Business Property Appraisal Coordinator with Bank of America Real Estate Risk Assessment / Appraisal Section. Also Senior Commercial Appraiser with Imperial Bank, Far West Bank, and ITT Federal Savings Bank. Primary responsibilities at these institutions were production and review of narrative, form, and other commercial appraisal reports. Prior to appraisal experience, ordered and reviewed appraisals as Vice President, Commercial Loan Officer for loan origination and underwriting purposes with ITT Federal Savings Bank. Experience in all areas of banking as both a lending institution employee or consultant since 1977.

### *Education*
Obtained a Bachelor of Science degree from the University of San Francisco. Continuing education appraisal courses include: USPAP, Ethics, Federal and State Laws and Regulations, Appraiser as an Expert Witness: Preparation & Testimony, Partial Interest, Easements, Eminent Domain and Condemnation, and Complex Litigation Appraisal Case Studies. Also real estate license courses such as agency and fair housing. Also successfully completed Appraisal Institute sponsored courses: Feasibility/Highest and Best Use of Residential and Non-Residential Properties, Appraising Apartments, Expert Witness Litigation Testimony, Business Valuations, Small Hotel Valuation. Additional education includes graduate Real Estate Law and Marshall & Swift Cost Evaluation courses.

### *Professional Affiliations*
Member Appraisal Institute #11272 since May 1997
Member IRWA #7912594
Member American Society of Appraisers # 105370
Member NACVA - National Association of Certified Valuators and Analysts #61924
Completed Appraisal Institute Litigation Professional Development Program

### *Licenses:*
California Office of Real Estate Appraiser State Certified-General Appraiser #AG009708
Washington Department of Licensing Certified General Real Estate Appraiser #1101653



Business, Consumer Services & Housing Agency

## BUREAU OF REAL ESTATE APPRAISERS
## REAL ESTATE APPRAISER LICENSE

**Terence M. Connolly**

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AG 009708

3055344

Effective Date:    November 2, 2020
Date Expires:    November 1, 2022

Loretta Dillon, Deputy Bureau Chief, BREA

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"
COPY

## QUALIFICATIONS of JEFFREY W. LADUE

**Jeffrey W. LaDue is an independent appraiser with experience in assisting in the valuation of most types of commercial properties. Property type experience includes existing or proposed: office, retail, industrial, and other commercial properties; multi-family (apartment) projects; vacant land; and other special purpose properties. Property locations appraised and reviewed includes all of southern California.**

### *Professional Experience*

**Mr. LaDue has assisted in the preparation and production as a fee commercial trainee appraiser since 2004. He previously held the position of Researcher with Connolly Commercial Real Estate Valuation and Consulting. Primary responsibilities at this institution were property inspection, site and improvement description within the report, factual data gathering and assisting in the production of narrative, form, and other product types of commercial appraisal reports.**

### *Education*

**Bachelor of Arts – Psychology, University of California, Riverside – 1997, Clear CLAD Multiple Subject Teaching Credential, California State University, San Jose - 2000. Successfully completed Appraisal Institute courses 110, 120, 310, 320, 410, and currently holds California Certified General Real Estate Appraisal license.**

### *Professional Affiliations*

**Candidate in the Candidate for Designation Program of the Appraisal Institute California OREA State Certified General Real Estate Appraiser #AG033573**

### *Additional Activities*

**Mr. LaDue served as President and Founding Father of Lambda Chi Alpha Fraternity – Delta Nu Chapter – University of California, Riverside**



Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS
## REAL ESTATE APPRAISER LICENSE

**Jeffrey W. LaDue**

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AG 033573

Effective Date:    April 2, 2020
Date Expires:    April 1, 2022

Jim Martin, Bureau Chief, BREA

3051702

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"

**EXHIBIT "6"**



## STANDARD OFFER, AGREEMENT AND ESCROW INSTRUCTIONS
## FOR PURCHASE OF REAL ESTATE

### (Non-Residential)

Dated: __January 22, 2020__

**1.   Buyer.**

1.1    __Pharmagold Investment LLC__ , ("**Buyer**") hereby offers to purchase the real property, hereinafter described, from the owner thereof ("**Seller**") (collectively, the "**Parties**" or individually, a "**Party**"), through an escrow ("**Escrow**") to close 30 or _____ days after the waiver or satisfaction of the Buyer's Contingencies, ("**Expected Closing Date**") to be held by __Ticor Title - Orange County__ ("**Escrow Holder**") whose address is __1500 Quail Street, 3rd Fl, Newport Beach, CA 92660__ , Phone No. __(714) 289-3300__ , Facsimile No. __(714)704-1798__ upon the terms and conditions set forth in this agreement ("**Agreement**").  Buyer shall have the right to assign Buyer's rights hereunder, but any such assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.

1.2    The term "**Date of Agreement**" as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase, the Property upon terms accepted by both Parties.

**2.   Property.**

2.1    The real property ("**Property**") that is the subject of this offer consists of (insert a brief physical description) _____ is located in the County of __Riverside__ , is commonly known as (street address, city, state, zip) __30590 Cochise Cir., Murrieta, CA 92563__ and is legally described as: _____ (APN: _____ ).

2.2    If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be completed or corrected to meet the requirements of _____ ("**Title Company**"), which shall issue the title policy hereinafter described.

2.3    The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which pursuant to applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: electrical distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution systems (lines, jacks and connections only); space heaters; heating, ventilating, air conditioning equipment ("**HVAC**"); air lines; fire sprinkler systems; security and fire detection systems; carpets; window coverings; wall coverings; and _____ (collectively, the "**Improvements**").

2.4    The fire sprinkler monitor: ☑ is owned by Seller and included in the Purchase Price, ☐ is leased by Seller, and Buyer will need to negotiate a new lease with the fire monitoring company, ☐ ownership will be determined during Escrow, or ☐ there is no fire sprinkler monitor.

2.5    Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings, and _____ all of which shall be removed by Seller prior to Closing.

**3.   Purchase Price.**

3.1    The purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be __$14,000,000__ , payable as follows: *(Strike any not applicable)*

(a)   Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all cash transaction, the Purchase Price):

$6,600,000

(b)   Amount of "New Loan" as defined in paragraph 5.1, if any:

$7,400,000

(c)   Buyer shall take title to the Property subject to and/or assume the following existing deed(s) of trust ("**Existing Deed(s) of Trust**") securing the existing promissory note(s) ("**Existing Note(s)**"):

(i)    An Existing Note ("**First Note**") with an unpaid principal balance as of the Closing of approximately:

_____

Said First Note is payable at _____ per month, including interest at the rate of _____ % per annum until paid (and/or the entire unpaid balance is due on _____ ).

(ii)   An Existing Note ("**Second Note**") with an unpaid principal balance as of the Closing of approximately:

_____

Said Second Note is payable at _____ per month, including interest at the rate of _____ % per annum until paid (and/or the entire unpaid balance is due on _____ ).

(d)   Buyer shall give Seller a deed of trust ("**Purchase Money Deed of Trust**") on the property, to secure the promissory note of Buyer to Seller described in paragraph 6 ("**Purchase Money Note**") in the amount of:

_____

Total Purchase Price:                                                                                                                    $14,000,000

3.2    If Buyer is taking title to the Property subject to, or assuming, an Existing Deed of Trust and such deed of trust permits the beneficiary to demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer agrees to pay such fees up to a

INITIALS                                                           INITIALS

© 2019 AIR CRE.  All Rights Reserved.
OFA-20.20, Revised 10-22-2020

EXHIBIT "6"
PAGE 222

maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.

**4.    Deposits.**

4.1    ☑ Buyer has delivered to Broker a check in the sum of  $4,488,000 , payable to Escrow Holder, to be delivered by Broker to Escrow Holder ☐

within 2 or _____ business days after both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or within 2 or _____ business days after both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder Buyer shall deliver to Escrow Holder a check in the sum of _____ . If said check is not received by Escrow Holder within said time period then Seller may elect to unilaterally terminate this transaction by giving written notice of such election to Escrow Holder whereupon neither Party shall have any further liability to the other under this Agreement. Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.

4.2    Additional deposits:

(a)    Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of _____ to be applied to the Purchase Price at the Closing.

(b)    Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (m) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of _____ to be applied to the Purchase Price at the Closing.

(c)    If an Additional Deposit is not received by Escrow Holder within the time period provided then Seller may notify Buyer, Escrow Holder, and Brokers, in writing that, unless the Additional Deposit is received by Escrow Holder within 2 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

4.3    Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "**Deposit**"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity. Buyer's Federal Tax Identification Number is _____ . NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

4.4    Notwithstanding the foregoing, within 5 days after Escrow Holder receives the monies described in paragraph 4.1 above, Escrow Holder shall release $100 of said monies to Seller as and for independent consideration for Seller's execution of this Agreement and the granting of the contingency period to Buyer as herein provided. Such independent consideration is non-refundable to Buyer but shall be credited to the Purchase Price in the event that the purchase of the Property is completed.

4.5    Upon waiver of all of Buyer's contingencies the Deposit shall become non-refundable but applicable to the Purchase Price except in the event of a Seller breach, or in the event that the Escrow is terminated pursuant to the provisions of Paragraph 9.1(n) (Destruction, Damage or Loss) or 9.1(o) (Material Change).

**5.    Financing Contingency.**  *(Strike if not applicable)*

5.1    This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least  52.86%  % of the Purchase Price, on terms acceptable to Buyer. Such loan ("New Loan") shall be secured by a first deed of trust or mortgage on the Property. If this Agreement provides for Seller to carry back junior financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days following receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.

5.2    **If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in writing within**  30  **days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.**

5.3    If Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.

**6.    ~~Seller Financing. (Purchase Money Note).~~**  *~~(Strike if not applicable)~~*

~~6.1    If Seller approves Buyer's financials (see paragraph 6.5) the Purchase Money Note shall provide for interest on unpaid principal at the rate of _____ % per annum, with principal and interest paid as follows: _____ . The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) and/or the New Loan, expressly called for by this Agreement.~~

~~6.2    The Purchase Money Note or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 10.3 (b)):~~

~~(a)    Prepayment. Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~

~~(b)    Late Charge. A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.~~

~~(c)    Due On Sale. In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~

~~6.3    If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense prepare and record on Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~

~~6.4    WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING. IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.~~

~~6.5    Seller's obligation to provide financing is contingent upon Seller's reasonable approval of Buyer's financial condition. Buyer to provide a current financial statement and copies of its Federal tax returns for the last 3 years to Seller within 10 days following the Date of Agreement. Seller has 10 days following receipt of such documentation to satisfy itself with regard to Buyer's financial condition and to notify Escrow Holder as to whether or not Buyer's financial condition is acceptable. If Seller fails to notify Escrow Holder, in writing, of the disapproval of this contingency within said time period, it shall be conclusively presumed that Seller has approved Buyer's financial condition. If Seller is not satisfied with Buyer's financial condition or if Buyer fails to deliver the required documentation then Seller may notify Escrow Holder in writing that Seller financing will not be available, and Buyer shall have the option, within 10 days of the receipt of such notice, to either terminate this transaction or to purchase the Property without Seller financing. If Buyer fails to notify Escrow Holder within said time period of its election to terminate this transaction then Buyer shall be conclusively presumed to have elected to purchase the Property without Seller financing. If Buyer elects to terminate, Buyer's Deposit shall be refunded less Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.~~

INITIALS                                                          INITIALS

© 2019 AIR CRE.  All Rights Reserved.

OFA-20.20, Revised 10-22-2020

Last Edited: 1/22/2021 1:39 PM

Page 2 of 10

**EXHIBIT "6"**
**PAGE 223**

**7.    Real Estate Brokers.**

7.1    Each Party acknowledges receiving a Disclosure Regarding Real Estate Agency Relationship, confirms and consents to the following agency relationships in this transaction with the following real estate broker(s) ("**Brokers**") and/or their agents ("Agent(s)"):

Seller's Brokerage Firm _____ License No. _____ is the broker of (check one): ☐ the Seller; or ☐ both the Buyer and Seller (dual agent).

Seller's Agent _____ License No. _____ is (check one): ☐ the Seller's Agent (salesperson or broker associate); or ☐ both the Seller's Agent and the Buyer's Agent (dual agent).

Buyer's Brokerage Firm _____ License No. _____ is the broker of (check one): ☐ the Buyer; or ☐ both the Buyer and Seller (dual agent).

Buyer's Agent _____ License No. _____ is (check one): ☐ the Buyer's Agent (salesperson or broker associate); or ☐ both the Buyer's Agent and the Seller's Agent (dual agent).

The Parties acknowledge that other than the Brokers and Agents listed above, there are no other brokers or agents representing the Parties or due any fees and/or commissions under this Agreement.  Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the date inserted for reference purposes at the top of page 1.

7.2    Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker, agent or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers and Agents named in paragraph 7.1, and no broker, agent or other person, firm or entity, other than said Brokers and Agents is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party.  Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, agent, finder or other similar party, other than said named Brokers and Agents by reason of any dealings or act of the Indemnifying Party.

**8.    Escrow and Closing.**

8.1    Upon acceptance hereof by Seller, this Agreement, including any counteroffers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow.  Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein.  Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions.  In the event that there is any conflict between the provisions of the Agreement and the provisions of any additional escrow instructions the provisions of the Agreement shall prevail as to the Parties and the Escrow Holder.

8.2    As soon as practical after the receipt of this Agreement and any relevant counteroffers, Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 and 20.2 and advise the Parties and Brokers, in writing, of the date ascertained.

8.3    Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code.  In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.

8.4    Subject to satisfaction of the contingencies herein described, Escrow Holder shall close this escrow (the "**Closing**") by recording a general warranty deed (a grant deed in California) and the other documents required to be recorded, and by disbursing the funds and documents in accordance with this Agreement.

8.5    Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes.  Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance.  (See also paragraph 11.)

8.6    Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing.  The matters contained in paragraphs 9.1 subparagraphs (b), (c), (d), (e), (g), (i), (n), and (o), 9.4, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however, matters of agreement between the Parties only and are not instructions to Escrow Holder.

8.7    If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2 or disapproval of any other matter subject to Buyer's approval, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement.  In the event of such termination, Buyer shall, subject to the provisions of paragraph 8.10, be promptly refunded all funds deposited by Buyer with Escrow Holder, less only the $100 provided for in paragraph 4.4 and the Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.  If this transaction is terminated as a result of Seller's breach of this Agreement then Seller shall pay the Title Company and Escrow Holder cancellation fees and costs.

8.8    The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9    Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10    If this Escrow is terminated for any reason other than Seller's breach or default, then as a condition to the return of Buyer's deposit, Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property.

**9.    Contingencies to Closing.**

9.1    The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies.  **IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING, OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT**.  Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer.  Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives.  With regard to subparagraphs (a) through (m) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided.

(a)    *Disclosure.*  Seller shall make to Buyer, through Escrow, all of the applicable disclosures required by law (See AIR CRE ("**AIR**") standard form entitled "**Seller's Mandatory Disclosure Statement**") and provide Buyer with a completed Property Information Sheet ("**Property Information Sheet**") concerning the Property, duly executed by or on behalf of Seller in the current form or equivalent to that published by the AIR within 10 or _____ days following the Date of Agreement.  Buyer has 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed.

INITIALS                                INITIALS

© 2019 AIR CRE.  All Rights Reserved.
OFA-20.20, Revised 10-22-2020

EXHIBIT "6"
PAGE 224

(b)   *Physical Inspection.*  Buyer has 10 or _____ days following the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property.

(c)   *Hazardous Substance Conditions Report.*  Buyer has 30 or _____ days following the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A "**Hazardous Substance**" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or welfare. A "**Hazardous Substance Condition**" for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d)   *Soil Inspection.*  Buyer has 30 or _____ days following the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days following the Date of Agreement.

(e)   *Governmental Approvals.*  Buyer has 30 or _____ days following the Date of Agreement to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

(f)   *Conditions of Title.*  Escrow Holder shall cause a current commitment for title insurance ("**Title Commitment**") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Commitment ("**Underlying Documents**"), and a scaled and dimensioned plot showing the location of any easements to be delivered to Buyer within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of the Title Commitment, the Underlying Documents and the plot plan to satisfy itself with regard to the condition of title. The disapproval by Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g)   *Survey.*  Buyer has 30 or _____ days following the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association ("**ALTA**") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

(h)   *Existing Leases and Tenancy Statements.*  Seller shall within 10 or _____ days following the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "**Existing Leases**") affecting the Property, and with a tenancy statement ("**Estoppel Certificate**") in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.

(i)   *Owner's Association.*  Seller shall within 10 or _____ days following the Date of Agreement provide Buyer with a statement and transfer package from any owner's association servicing the Property. Such transfer package shall at a minimum include: copies of the association's bylaws, articles of incorporation, current budget and financial statement. Buyer has 10 days from the receipt of such documents to satisfy itself with regard to the association.

(j)   *Other Agreements.*  Seller shall within 10 or _____ days following the Date of Agreement provide Buyer with legible copies of all other agreements ("**Other Agreements**") known to Seller that will affect the Property after Closing. Buyer has 10 days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

(k)   *Financing.*  If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.

(l)   *Existing Notes.*  If paragraph 3.1(c) has not been stricken, Seller shall within 10 or _____ days following the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, "**Loan Documents**") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("**Beneficiary Statement**") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days following the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to Buyer except as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof. Likewise if Seller is to carry back a Purchase Money Note then Seller shall within 10 or _____ days following the Date of Agreement provide Buyer with a copy of the proposed Purchase Money Note and Purchase Money Deed of Trust. Buyer has 10 or _____ days following the receipt of such documents to satisfy itself with regard to the form and content thereof.

(m)   *Personal Property.*  In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days following the Date of Agreement to satisfy itself with regard to the title condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days following the Date of Agreement.

(n)   *Destruction, Damage or Loss.*  Subsequent to the Date of Agreement and prior to Closing there shall not have occurred a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this Agreement or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this Agreement, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume that no destruction, damage or loss has occurred prior to Closing.

(o)   *Material Change.*  Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change. "**Material Change**" shall mean a substantial adverse change in the use, occupancy, tenants, title, or condition of the Property that occurs after the date of this offer and prior to the Closing. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

INITIALS                                         INITIALS

© 2019 AIR CRE.  All Rights Reserved.
OFA-20.20, Revised 10-22-2020

Last Edited: 1/22/2021 1:39 PM
Page 4 of 10

(p)    *Seller Performance.* The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(q)    *Brokerage Fee.* Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("**Brokerage Fee**"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.

9.2    All of the contingencies specified in subparagraphs (a) through (m) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "**Buyer's Contingencies.**"

9.3    If any of Buyer's Contingencies or any other matter subject to Buyer's approval is disapproved as provided for herein in a timely manner ("**Disapproved Item**"), Seller shall have the right within 10 days following the receipt of notice of Buyer's disapproval to elect to cure such Disapproved Item prior to the Expected Closing Date ("**Seller's Election**"). Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the right, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this Agreement. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this Agreement. The above time periods only apply once for each Disapproved Item. Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency. Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4    The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on the Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

**10.    Documents and Other Items Required at or Before Closing.**

10.1    Five days prior to the Closing date Escrow Holder shall obtain an updated Title Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2    Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:

(a)    Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer.

(b)    If applicable, the Beneficiary Statements concerning Existing Note(s).

(c)    If applicable, the Existing Leases and Other Agreements together with duly executed assignments thereof by Seller and Buyer. The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's Interest in Lease form published by the AIR or its equivalent.

(d)    An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.

(e)    If the Property is located in California, an affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.

(f)    If applicable, a bill of sale, duly executed, conveying title to any included personal property to Buyer.

(g)    If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3    Buyer shall deliver to Seller through Escrow:

(a)    The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder in immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date provided, however, that Buyer shall not be required to deposit such monies into Escrow if at the time set for the deposit of such monies Seller is in default or has indicated that it will not perform any of its obligations hereunder. Instead, in such circumstances in order to reserve its rights to proceed Buyer need only provide Escrow with evidence establishing that the required monies were available.

(b)    If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.

(c)    The Assignment and Assumption of Lessor's Interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.

(d)    Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.

(e)    If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.

(f)    If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4    At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer. In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.

**IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.**

**11.    Prorations and Adjustments.**

11.1    *Taxes.* Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest

INITIALS                              INITIALS

EXHIBIT "6"
PAGE 226

tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2  *Insurance.*  **WARNING:** Any insurance which Seller may have maintained will terminate on the Closing.  Buyer is advised to obtain appropriate insurance to cover the Property.

11.3  *Rentals, Interest and Expenses.*  Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.

11.4  *Security Deposit.*  Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.

11.5  *Post Closing Matters.*  Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by appropriate cash payment outside of the Escrow when the amount due is determined.

11.6  *Variations in Existing Note Balances.*  In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("**Existing Note Variation**"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.

11.7  *Variations in New Loan Balance.*  In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.

11.8  *Owner's Association Fees.*  Escrow Holder shall: (i) bring Seller's account with the association current and pay any delinquencies or transfer fees from Seller's proceeds, and (ii) pay any up front fees required by the association from Buyer's funds.

**12.  Representations and Warranties of Seller and Disclaimers.**

12.1  Seller's warranties and representations shall survive the Closing and delivery of the deed for a period of 3 years, and any lawsuit or action based upon them must be commenced within such time period.  Seller's warranties and representations are true, material and relied upon by Buyer and Brokers in all respects.  Seller hereby makes the following warranties and representations to Buyer and Brokers:

(a)  *Authority of Seller.*  Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b)  *Maintenance During Escrow and Equipment Condition At Closing.*  Except as otherwise provided in paragraph 9.1(n) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted.

(c)  *Hazardous Substances/Storage Tanks.*  Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence on the Property of any Hazardous Substance, nor of the existence or prior existence of any above or below ground storage tank.

(d)  *Compliance.*  Except as otherwise disclosed in writing, Seller has no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property.

(e)  *Changes in Agreements.*  Prior to the Closing, Seller will not violate or modify any Existing Lease or Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f)  *Possessory Rights.*  Seller has no knowledge that anyone will, at the Closing, have any right to possession of the Property, except as disclosed by this Agreement or otherwise in writing to Buyer.

(g)  *Mechanics' Liens.*  There are no unsatisfied mechanics' or materialmens' lien rights concerning the Property.

(h)  *Actions, Suits or Proceedings.*  Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

(i)  *Notice of Changes.*  Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(o)) affecting the Property that becomes known to Seller prior to the Closing.

(j)  *No Tenant Bankruptcy Proceedings.*  Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.

(k)  *No Seller Bankruptcy Proceedings.*  Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

(l)  *Personal Property.*  Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.

12.2  Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property.  The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.

12.3  In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

12.4  Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk.  Seller believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.

**13.  Possession.**

Possession of the Property shall be given to Buyer at the Closing subject to the rights of tenants under Existing Leases.

**14.  Buyer's Entry.**

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times and subject to rights of tenants, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement.  No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld.  Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the re-compaction or removal of any disrupted soil or material as Seller may reasonably direct.  All such

INITIALS

INITIALS

© 2019 AIR CRE.  All Rights Reserved.

OFA-20.20, Revised 10-22-2020

EXHIBIT "6"

PAGE 227

inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

**15.  Further Documents and Assurances.**
The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement.  The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

**16.  Attorneys' Fees.**
If any Party or Broker brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees and costs.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term **"Prevailing Party"** shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

**17.  Prior Agreements/Amendments.**
  17.1  This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.
  17.2  Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

**18.  Broker's Rights.**
  18.1  If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated.  If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.
  18.2  Upon the Closing, Brokers are authorized to publicize the facts of this transaction.

**19.  Notices.**
  19.1  Whenever any Party, Escrow Holder or Brokers herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger, or by mail, postage prepaid, to the address set forth in this agreement or by facsimile transmission, electronic signature, digital signature, or email.
  19.2  Service of any such communication shall be deemed made on the date of actual receipt if personally delivered, or transmitted by facsimile transmission, electronic signature, digital signature, or email.  Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier.  If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.
  19.3  Any Party or Broker hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

**20.  Duration of Offer.**
  20.1  If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of ___Murrieta___ on the date of ___December 31, 2020___, it shall be deemed automatically revoked.
  20.2  The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.

**21.  LIQUIDATED DAMAGES.  (This Liquidated Damages paragraph is applicable only if initialed by both Parties).**
THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF ___$200,000___. UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.

| _____ | _____ |
|---|---|
| Buyer's Initials | Seller's Initials |

**22.  ARBITRATION OF DISPUTES.**  (This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)
  22.1  ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF THE DEPOSIT SHALL BE DETERMINED BY BINDING ARBITRATION ADMINISTERED BY THE JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS") IN ACCORDANCE WITH ITS COMMERCIAL ARBITRATION RULES ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. SUCH CONTROVERSY SHALL BE ARBITRATED BY A SINGLE ARBITRATOR, APPOINTED UNDER THE COMMERCIAL RULES WHO HAS HAD AT LEAST 5 YEARS OF EXPERIENCE IN THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THE ARBITRATOR SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE ARBITRATOR SHALL RENDER AN AWARD WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, WHICH MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF AND SHALL BE ACCOMPANIED BY A REASONED OPINION. THE FAILURE OR REFUSAL OF A PARTY TO PAY SUCH PARTY'S REQUIRED SHARE OF THE DEPOSITS FOR ARBITRATOR COMPENSATION OR ADMINISTRATIVE CHARGES SHALL CONSTITUTE A WAIVER BY SUCH PARTY TO PRESENT EVIDENCE OR

INITIALS                                              INITIALS

© 2019 AIR CRE.  All Rights Reserved.
OFA-20.20, Revised 10-22-2020

EXHIBIT "6"
PAGE 228

CROSS-EXAMINE WITNESSES, BUT SUCH WAIVER SHALL NOT ALLOW FOR A DEFAULT JUDGMENT AGAINST THE NON-PAYING PARTY IN THE ABSENCE OF EVIDENCE AND LEGAL ARGUMENT AS THE ARBITRATOR MAY REQUIRE FOR MAKING AN AWARD. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.

22.2  BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.

22.3  NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.



Buyer's Initials                                                    Seller's Initials

## 23.  Miscellaneous.

23.1  **Binding Effect.** This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 and 22 are each incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed. Signatures to this Agreement accomplished by means of electronic signature or similar technology shall be legal and binding.

23.2  **Applicable Law.** This Agreement shall be governed by, and paragraph 22.3 is amended to refer to, the laws of the state in which the Property is located. Any litigation or arbitration between the Parties hereto concerning this Agreement shall be initiated in the county in which the Property is located.

23.3  **Time of Essence.** Time is of the essence of this Agreement.

23.4  **Counterparts.** This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.

23.5  **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

23.6  **Conflict.** Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions. **Seller and Buyer must initial any and all handwritten provisions.**

23.7  **1031 Exchange.** Both Seller and Buyer agree to cooperate with each other in the event that either or both wish to participate in a 1031 exchange. Any party initiating an exchange shall bear all costs of such exchange. The cooperating Party shall not have any liability (special or otherwise) for damages to the exchanging Party in the event that the sale is delayed and/or that the sale otherwise fails to qualify as a 1031 exchange.

23.8  **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days.

## 24.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.

24.1  The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.

24.2  When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:

(a)  *Seller's Agent.* A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) *To the Seller:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) *To the Buyer and the Seller:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(b)  *Buyer's Agent.* A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) *To the Buyer:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) *To the Buyer and the Seller:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c)  *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not, without the express permission of the respective Party, disclose to the other Party confidential information, including, but not limited to, facts relating to either Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including Seller's willingness to accept a price less than the listing price or Buyer's willingness to pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional. Buyer has the duty to exercise reasonable care to protect Buyer, including as to those facts about the

INITIALS                                              INITIALS

© 2019 AIR CRE. All Rights Reserved.
OFA-20.20, Revised 10-22-2020

Last Edited: 1/22/2021 1:39 PM

EXHIBIT "6"
PAGE 229

Property which are known to Buyer or within Buyer's diligent attention and observation. Both Seller and Buyer should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

(d)  *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer representation agreement or separate document. Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties that may be of interest to this Buyer. Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this transaction may be brought against Broker more than one year after the Date of Agreement and that the liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3  *Confidential Information.* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**25.  Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**26.  Additional Provisions.**
Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum or addenda consisting of paragraphs _____ through _____ . (If there are no additional provisions write "NONE".)
_____

---

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

---

NOTE:
1.    THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.    IF EITHER PARTY IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

Date: 01/22/2021

**BROKER**
_____

Attn: _____
Title: _____

Address: _____
Phone: _____
Fax: _____
Email: _____
Federal ID No.: _____
Broker DRE License #: _____
Agent DRE License #: _____

**BUYER**

Pharmagold Investment LLC

By: _____
Name Printed: Thang Nguyen
Title: Manager
Phone: _____
Fax: _____
Email: _____

By: _____
Name Printed: Phuong Nguyen
Title: Manager
Phone: 714 878 2702
Fax: _____
Email: DCSmin Nguyalian

Address: _____
Federal ID No.: _____

_____
INITIALS

_____
INITIALS

© 2019 AIR CRE. All Rights Reserved.
OFA-20.20, Revised 10-22-2020

Last Edited: 1/22/2021 1:39 PM
Page 9 of 10

Property which are known to Buyer or within Buyer's diligent attention and observation. Both Seller and Buyer should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

(d)  *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer representation agreement or separate document. Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties that may be of interest to this Buyer. Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this transaction may be brought against Broker more than one year after the Date of Agreement and that the liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3  *Confidential Information.* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**25.  Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**26.  Additional Provisions.**
Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum or addenda consisting of paragraphs _____ through _____ . (If there are no additional provisions write "NONE".)

_____

---

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

---

NOTE:
1.   THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.   IF EITHER PARTY IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

Date: 01/22/2021

**BROKER**

_____

Attn: _____
Title: _____

Address: _____
Phone: _____
Fax: _____
Email: _____
Federal ID No.: _____
Broker DRE License #: _____
Agent DRE License #: _____

**BUYER**

Pharmagold Investment LLC

By: _Michael M._
Name Printed: _Michael Dao_
Title: _Manager_
Phone: _____
Fax: _____
Email: _____

By: _____
Name Printed: _Hoang Thang Nguyen_
Title: _____
Phone: _____
Fax: _____
Email: _____

Address: _____
Federal ID No.: _____

INITIALS

INITIALS

© 2019 AIR CRE. All Rights Reserved.
OFA-20.20, Revised 10-22-2020

Last Edited: 1/22/2021 1:39 PM
Page 9 of 10

**27. Acceptance.**

27.1 Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.

27.2 In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay Brokers a real estate Brokerage Fee in a sum equal to _____ % of the Purchase Price to be divided between the Brokers as follows: Seller's Broker _____ % and Buyer's Broker _____ %. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.

27.3 Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

Date: 01/22/2021

**BROKER**

_____

Attn: _____
Title: _____

Address: _____
Phone: _____
Fax: _____
Email: _____
Federal ID No.: _____
Broker DRE License #: _____
Agent's DRE License #: _____

**SELLER**

Bioxxel LLC

By: _____
Name Printed: Phuong Nguyen,
Title: Manager
Phone: 714 878 2782
Fax: _____
Email: bosamindorhail.com

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____

Address: _____
Federal ID No.: _____

AIR CRE * https://www.aircre.com * 213-687-8777 * contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS

INITIALS

© 2019 AIR CRE. All Rights Reserved.
OFA-20.20, Revised 10-22-2020

Last Edited: 1/22/2021 1:39 PM
Page 10 of 10

**EXHIBIT "7"**



1500 Quail Street, 3rd Floor
Newport Beach, CA 92660
Phone:  (714) 289-3300

Issuing Policies of Chicago Title Insurance Company

ORDER NO.:  **00780978-001-BOC**    Escrow/Customer Phone:  **(714) 289-3300**

Ticor Title Company of California    Title Officer:  **Bob Taylor - OC**
1500 Quail Street, 3rd Floor    Title Officer Phone:  **(714) 289-6402**
Newport Beach, CA 92660    Title Officer Fax:  **(714) 289-7105**
ATTN:  Shu Hoang    Title Officer Email:  **taylor@ticortitle.com**
Email:  Shu.Hoang@ticortitle.com

PROPERTY:    **30590 Cochise Circle, Murrieta, CA  92563**

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Ticor Title Company of California** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a Florida Corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***
Countersigned:

By: _____
Authorized Signature

By: _____

ATTEST _____    President

_____    Secretary

EXHIBIT "7"
PAGE 233



1500 Quail Street, 3rd Floor
Newport Beach, CA 92660
Phone:  (714) 289-3300

## PRELIMINARY REPORT

---

**EFFECTIVE DATE:**                    **January 6, 2021 at 7:30 a.m.**

**ORDER NO.:  00780978-001-BOC**

The form of policy or policies of title insurance contemplated by this report is:

   **CLTA Standard Coverage Policy**
   **ALTA Extended Loan Policy (6-17-06)**

1.    THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO
      COVERED BY THIS REPORT IS:

      **A FEE**

2.    TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS <u>VESTED IN:</u>

      **BIOXXEL LLC, a California limited liability company**

3.    THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

      **See Exhibit A attached hereto and made a part hereof.**

Ticor Title Company of California

## EXHIBIT "A"

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 12 OF PARCEL MAP NO. 23199, IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, ON FILE IN BOOK 170 PAGES 73 THROUGH 76 INCLUSIVE, OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, A CERTIFICATE OF CORRECTION BEING RECORDED MAY 15, 1992 AS INSTRUMENT NO. 177301 OF OFFICIAL RECORDS.

APN: 963-070-017

EXHIBIT "7"
PAGE 235

PRELIMINARY REPORT
YOUR REFERENCE:                                                                          Ticor Title Company of California

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A.   Property taxes, including any personal property taxes and any assessments collected with taxes, are as follows:

| | |
|---|---|
| Tax Identification No.: | 963-070-017 |
| Fiscal Year: | 2020-2021 |
| 1st Installment: | $46,119.59, paid. |
| 2nd Installment: | $46,119.59, open (Delinquent after April 10) |
| Penalty and Cost: | $4,650.02 |
| Homeowners Exemption: | $ |
| Code Area: | 094-215 |

B.   The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

1.   Water rights, claims or title to water, whether or not disclosed by the public records.

2.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Gas pipeline |
| Recording Date: | June 24, 1949 |
| Recording No: | in Book 1087, Page 124, Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

| | |
|---|---|
| and Recording Date: | May 16, 1991 |
| and Recording No: | as Instrument No. 164132, Official Records |

3.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

| | |
|---|---|
| Purpose: | Gas pipelines |
| Recording Date: | July 25, 1958 |
| Recording No: | in Book 2307, Page 118, Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

| | |
|---|---|
| and Recording Date: | May 16, 1991 |
| and Recording No: | as Instrument No. 164132, Official Records |

4.   Matters contained in that certain document

| | |
|---|---|
| Entitled: | Traffic Signalization Mitigation Schedule "E" Agreement |
| Recording Date: | May 15, 1991 |
| Recording No: | as Instrument No. 162532, Official Records |

Reference is hereby made to said document for full particulars.

EXHIBIT "7"
PAGE 236

PRELIMINARY REPORT
YOUR REFERENCE:

Ticor Title Company of California

## EXCEPTIONS
### (Continued)

5.     Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

Purpose:              Avigation
Recording Date:       May 16, 1991
Recording No:         as Instrument No. 163973, Official Records
Affects:              A portion of said land as more particularly described in said document.

6.     Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

Purpose:              Water and sewer
Recording Date:       February 10, 1995
Recording No:         as Instrument No. 44724, Official Records
Affects:              A portion of said land as more particularly described in said document.

7.     Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

Purpose:              Pipelines and other facilities
Recording Date:       April 17, 1995
Recording No:         as Instrument No. 118475, Official Records
Affects:              A portion of said land as more particularly described in said document.

8.     Matters contained in that certain document

Entitled:             Hold Harmless Agreement for Sewer
Recording Date:       December 7, 2006
Recording No:         as Instrument No. 2006-901332, Official Records

Reference is hereby made to said document for full particulars.

9.     Matters contained in that certain document

Entitled:             Hold Harmless Agreement for Water
Recording Date:       December 7, 2006
Recording No:         as Instrument No. 2006-901337, Official Records

Reference is hereby made to said document for full particulars.

10.    Matters contained in that certain document

Entitled:             Hold Harmless Agreement
Recording Date:       July 17, 2009
Recording No:         as Instrument No. 2009-371188, Official Records

Reference is hereby made to said document for full particulars.

11.    Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

Purpose:              Pipeline
Recording Date:       November 23, 2010
Recording No:         as Instrument No. 2010-563480, Official Records
Affects:              A portion of said land as more particularly described in said document.

EXHIBIT "7"
PAGE 237

# EXCEPTIONS
## (Continued)

12.    Environmental Constraint Note:  Environmental Constraint Sheet affecting this map is on file in the office of the County Surveyor, in E.C.S. in Book 22, Page 73 this affects all parcels.

13.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $5,820,000.00 |
| Dated: | October 5, 2016 |
| Trustor/Grantor | Bioxxel, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | Keystone Real Estate Lending Fund, L.P., a Delaware limited partnership |
| Recording Date: | October 17, 2016 |
| Recording No: | as Instrument No. 2016-0454541, Official Records |

A notice of default under the terms of said trust deed

| | |
|---|---|
| Executed by: | First American Title Insurance Company |
| Recording Date: | September 13, 2018 |
| Recording No: | as Instrument No. 2018-0367329, Official Records |

A notice of default under the terms of said trust deed

| | |
|---|---|
| Executed by: | First American Title Insurance Company |
| Recording Date: | October 5, 2018 |
| Recording No: | as Instrument No. 2018-0396621, Official Records |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | BREFI 30590 Chochise LLC, a California limited liability company |
| Recording Date: | October 23, 2018 |
| Recording No: | as Instrument No. 2018-0417199, Official Records |

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

| | |
|---|---|
| Trustee: | Tullius Law Group, a professional corporation |
| Recording Date: | June 11, 2020 |
| Recording No: | as Instrument No. 2020-0250477, Official Records |

A notice of trustee's sale under said deed of trust

| | |
|---|---|
| Executed by: | Tullius Law Group, a professional corporation |
| Date, Time and Place of Sale: | July 6, 2020 at 9:00 a.m. at the area in the front of 847 W. Sixth Street, Corona, CA |
| Recording Date: | June 11, 2020 |
| Recording No: | as Instrument No. 2020-0250478, Official Records |

14.    An assignment of all the moneys due, or to become due as rental, as additional security for the obligations secured by deed of trust shown as item no. 13

| | |
|---|---|
| Assigned to: | Keystone Real Estate Lending Fund, L.P., a Delaware limited partnership |
| Recording Date: | October 17, 2016 |
| Recording No: | as Instrument No. 2016-0454542, Official Records |

PRELIMINARY REPORT                                                                    Ticor Title Company of California
YOUR REFERENCE:

## EXCEPTIONS
## (Continued)

15.    A financing statement as follows:

| | |
|---|---|
| Debtor: | Bioxxel, LLC |
| Secured Party: | Keystone Real Estate Lending Fund, L.P. |
| Recording Date: | October 17, 2016 |
| Recording No: | as Instrument No. 2016-0454543, Official Records |

16.    A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

| | |
|---|---|
| County: | Riverside |
| Fiscal Year: | 2018-2019 |
| Taxpayer: | Bioxxel Investment Holding Inc |
| County Identification Number: | 0476815 |
| Amount: | $57,726.35 |
| Recording Date: | November 14, 2018 |
| Recording No: | as Instrument No. 2018-0448908, Official Records |

17.    A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

| | |
|---|---|
| County: | Riverside |
| Fiscal Year: | 2019-2020 |
| Taxpayer: | Bioxxel Investment Holding Inc |
| County Identification Number: | 0605107 |
| Amount: | $63,362.26 |
| Recording Date: | November 6, 2019 |
| Recording No: | as Instrument No. 2019-0456991, Official Records |

18.    A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

| | |
|---|---|
| County: | Riverside |
| Fiscal Year: | 2020-2021 |
| Taxpayer: | Bioxxel Investment Holdings Inc. |
| County Identification Number: | 0614535 |
| Amount: | $63,287.84 |
| Recording Date: | November 05, 2020 |
| Recording No: | as Instrument No. 2020-0548475 of Official Records |

19.    Any easements not disclosed by the public records as to matters affecting title to real property, whether or not said easements are visible and apparent.

20.    Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

PRELIMINARY REPORT
YOUR REFERENCE:                                                                    Ticor Title Company of California

## EXCEPTIONS
## (Continued)

21.    Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed
by the public records.

The Company will require, for review, a full and complete copy of any unrecorded agreement, contract,
license and/or lease, together with all supplements, assignments and amendments thereto, before issuing
any policy of title insurance without excepting this item from coverage.

The Company reserves the right to except additional items and/or make additional requirements after
reviewing said documents.


**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH
FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

**END OF EXCEPTIONS**

---

## REQUIREMENTS SECTION

1.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        Bioxxel LLC, a California limited liability company

a)    A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)    If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)    A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)    If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)    Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

2.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        Pharmagold Investment LLC (Buyer)

a)    A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)    If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)    A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)    If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)    Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

PRELIMINARY REPORT
YOUR REFERENCE:

Ticor Title Company of California
ORDER NO.:  00780978-001-BOC

## REQUIREMENTS
### (Continued)

3.      Prior to the close of escrow, the Company requires a Statement of Information to be completed by the following party(s),

        Party(s):          All Parties

      The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

4.      Furnish for review a full and complete copy of any unrecorded agreement, contract, license and/or lease together with all supplements, assignments and amendments thereto, prior to the close of this transaction.

      The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

5.      Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

      The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit/Declaration.

---

### END OF REQUIREMENTS

---

# INFORMATIONAL NOTES SECTION

1.    None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement Form 9 to an Extended Coverage Loan Policy, when issued.

2.    The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Commercial properties, known as 30590 Cochise Circle, located within the area of Murrieta, California, 92563, to an Extended Coverage Loan Policy.

3.    Note:  The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

4.    Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

5.    Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax. If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

6.    Note:  There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

---

## END OF INFORMATIONAL NOTES

Bob Taylor - OC/ry0

EXHIBIT "7"
PAGE 243

**WIRE SAFE** ™ | Inquire before you wire!

# Wire Fraud Alert

*This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.*

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
|:---:|:---:|
| *http://www.fbi.gov* | *http://www.ic3.gov* |

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

EXHIBIT "7"
PAGE 244



1500 Quail Street, 3rd Floor
Newport Beach, CA 92660
Phone:  (714) 289-3300

## Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment.  Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate.  As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative.  These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount.  These discounts only apply to transactions involving services rendered by the FNF Family of Companies.  This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Company**
CTC – Chicago Title company
CLTC – Commonwealth Land Title Company
FNTC – Fidelity National Title Company of California
FNTCCA - Fidelity National Title Company of California
TICOR – Ticor Title Company of California
LTC – Lawyer's Title Company
SLTC – ServiceLink Title Company

**Underwritten by FNF Underwriters**
CTIC – Chicago Title Insurance Company
CLTIC - Commonwealth Land Title Insurance Company
FNTIC – Fidelity National Title Insurance Company
FNTIC - Fidelity National Title Insurance Company
CTIC – Chicago Title Insurance Company
CLTIC – Commonwealth Land Title Insurance Company
CTIC – Chicago Title Insurance Company

### Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy  (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

Notice of Available Discounts (Rev. 01-15-20)
MISC0343 (DSI Rev. 03/12/20)

Last Saved:  January 15, 2021 by RY0
Escrow No.: 00780978-001-SH0-BOC

EXHIBIT "7"
PAGE 245

## FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Effective April 9, 2020

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:
• contact information (*e.g.*, name, address, phone number, email address);
• demographic information (*e.g.*, date of birth, gender, marital status);
• identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
• financial account information (*e.g.* loan or bank account information); and
• other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
• information we receive from you or your agent;
• information about your transactions with FNF, our affiliates, or others; and
• information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
• Internet Protocol (IP) address and operating system;
• browser version, language, and type;
• domain name system requests; and
• browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

### Use of Personal Information
FNF uses Personal Information for three main purposes:
• To provide products and services to you or in connection with a transaction involving you.
• To improve our products and services.
• To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

### When Information Is Disclosed
We may disclose your Personal Information and Browsing Information in the following circumstances:
• to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
• to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2020. Fidelity National Financial, Inc. All Rights Reserved
Order No. 00780978-001-SH0-BOC

EXHIBIT "7"
PAGE 246

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

### Security of Your Information
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

### Choices With Your Information
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request by email, phone, or physical mail as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents:   We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

### Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

### International Users
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

### FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice. We may use comments or feedback that you submit to us in any manner without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, send your requests to privacy@fnf.com, by phone to (888) 934-3354, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

# ATTACHMENT ONE (Revised 05-06-16)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

#### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

#### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
#### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

#### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3. The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "7"
PAGE 249

c.   that result in no loss to You; or
d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5.   Failure to pay value for Your Title.
6.   Lack of a right:
a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
b.   in streets, alleys, or waterways that touch the Land.
This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.   The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.   Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.   Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
•   For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1.   (a)   Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
(i)    the occupancy, use, or enjoyment of the Land;
(ii)   the character, dimensions, or location of any improvement erected on the Land;
(iii)  the subdivision of land; or
(iv)   environmental protection;
or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b)   Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.   Defects, liens, encumbrances, adverse claims, or other matters
(a)   created, suffered, assumed, or agreed to by the Insured Claimant;
(b)   not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c)   resulting in no loss or damage to the Insured Claimant;
(d)   attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
(e)   resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a)   a fraudulent conveyance or fraudulent transfer, or
(b)   a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).
The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

Attachment One – CA (Rev. 05-06-16)                                                                                                      Page 2

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "7"
PAGE 250

## {PART I

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.}

## PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

### 2006 ALTA OWNER'S POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)   the occupancy, use, or enjoyment of the Land;
   (ii)  the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses,  that arise by reason of:

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7. {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "7"
PAGE 251

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)   the occupancy, use, or enjoyment of the Land;
   (ii)  the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any  other substances.

**© California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

EXHIBIT "7"
PAGE 252



This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

Order: 780978                                Page 1 of 1                    Requested By: ryolo, Printed: 1/15/2021 11:21 AM
Doc: RV:A 963-7

## OWNER'S DECLARATION

Escrow No.:          00780978-001-SH0-BOC
Property Address:    30590 Cochise Circle
                     Murrieta, CA 92563

The undersigned hereby declares as follows:

1.    (Fill in the applicable paragraph and strike the other)

   a.    Declarant ("Owner") is the owner or lessee, as the case may be, of certain premises located at 30590 Cochise Circle, Murrieta, CA 92563, further described as follows:  See Preliminary Report/Commitment No.  for full legal description (the "Land").

   b.    Declarant is the _____ of _____ ("Owner"), which is the owner or lessee, as the case may be, of certain premises located at 30590 Cochise Circle, Murrieta, CA 92563, further described as follows:  See Preliminary Report/Commitment No.  for full legal description (the "Land").

2.    (Fill in the applicable paragraph and strike the other)

   a.    During the period of six months immediately preceding the date of this declaration no work has been done, no surveys or architectural or engineering plans have been prepared, and no materials have been furnished in connection with the erection, equipment, repair, protection or removal of any building or other structure on the Land or in connection with the improvement of the Land in any manner whatsoever.

   b.    During the period of six months immediately preceding the date of this declaration certain work has been done and materials furnished in connection with _____ upon the Land in the approximate total sum of $_____, but no work whatever remains to be done and no materials remain to be furnished to complete the construction in full compliance with the plans and specifications, nor are there any unpaid bills incurred for labor and materials used in making such improvements or repairs upon the Land, or for the services of architects, surveyors or engineers, except as follows: _____. Owner, by the undersigned Declarant, agrees to and does hereby indemnify and hold harmless Ticor Title Company of California against any and all claims arising therefrom.

3.    Owner has not previously conveyed the Land;  is not a debtor in bankruptcy (and if a partnership, the general partner thereof is not a debtor in bankruptcy); and has not received notice of any pending court action affecting the title to the Land.

4.    Except as shown in the above-referenced Preliminary Report/Commitment, there are no unpaid or unsatisfied mortgages, deeds of trust, Uniform Commercial Code financing statements, regular assessments, special assessments, periodic assessments or any assessment from any source, claims of lien, special assessments, or taxes that constitute a lien against the Land or that affect the Land but have not been recorded in the public records. There are no violations of the covenants, conditions and restrictions as shown in the above-referenced Preliminary Report/Commitment.

5.    The Land is currently in use as _____;  _____ occupy/occupies the Land; and the following are all of the leases or other occupancy rights affecting the Land:

   _____

6.    There are no other persons or entities that assert an ownership interest in the Land, nor are there unrecorded easements, claims of easement, or boundary disputes that affect the Land.

7.    There are no outstanding options to purchase or rights of first refusal affecting the Land.

8.    Between the most recent Effective Date of the above-referenced Preliminary Report/Commitment and the date of recording of the Insured Instrument(s), Owner has not taken or allowed, and will not take or allow, any action or inaction to encumber or otherwise affect title to the Land.

This declaration is made with the intention that Ticor Title Company of California (the "Company") and its policy issuing agents will rely upon it in issuing their title insurance policies and endorsements. Owner, by the undersigned Declarant, agrees to indemnify the Company against loss or damage (including attorneys fees, expenses, and costs) incurred by the Company as a result of any untrue statement made herein.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _____ at _____.

Signature:    _____

Owner's Declaration
MISC0220 (DSI Rev. 10/17/17)
Escrow No. : <<File #>>-<<Escrow Branch #>>-<<Escrow Officer Initials>>

Printed:  6/27/2017 2:26 PM by <<User Initials>>
Page 2

EXHIBIT "7"
PAGE 254

**EXHIBIT "8"**





## Subject Property Location

Report Date: 02/02/2021
Order ID: R29158541

| | | | |
|---|---|---|---|
| Property Address | 30590 COCHISE CIR | | |
| City, State & Zip | MURRIETA, CA 92563-2501 | | |
| County | RIVERSIDE COUNTY | Property Use | Commercial (General) |
| Mailing Address | 30590 COCHISE CIR, MURRIETA, CA 92563-2501 | Parcel Number | 963-070-017 |
| Map Reference | | | |

### Legal Description

| | |
|---|---|
| Lot | 12 |
| Section/Block | / |
| Tract No | |
| Abbrev. Description | 17.47 ACRES NET IN PAR 12 PM 170/073 PM 23199 |

### Current Ownership Information

| | | | |
|---|---|---|---|
| Owner Name(s) | BIOXXEL | Sale Price | $8,200,000 |
| | | Sale Date | 10/06/2016 |
| | | Recording Date | 10/17/2016 |
| Vesting | | Recorder Doc # | 2016-0454540 |
| | | Book/Page | |

### Loan Officer Insights

No details available

### Transaction Summary

| Trans ID | Recording Date | Document Type | Document Description | Sale Price / Loan Amount | Document Number | Buyer / Borrower | Seller |
|---|---|---|---|---|---|---|---|
| 1 | 06/11/2020 | Pre-Foreclosure | Notice of Sale | | 2020-0250478 | BIOXXEL LLC | |
| 2 | 10/23/2018 | Assignment | Assignment of Mortgage | $5,820,000 | 2018-0417199 | BIOXXEL, LLC | |
| 3 | 10/05/2018 | Pre-Foreclosure | Notice of Default | $582,000 | 2018-0396621 | BIOXXEL LLC | |
| 4 | 09/13/2018 | Pre-Foreclosure | Notice of Default | $5,820,000 | 2018-0367329 | BIOXXEL LLC | |
| 5 | 02/16/2018 | Release | Substitution of Trustee and Full Reconveyance | $5,000,000 | 2018-0059626 | BIOXXEL, LLC | |
| 6 | 07/25/2017 | Mortgage | Commercial Loan | $5,000,000 | 2017-0302467 | BIOXXEL LLC | |
| 7 | 10/17/2016 | Mortgage | Commercial Loan | $5,820,000 | 2016-0454541 | BIOXXEL LLC | |
| 8 | 10/17/2016 | Deed | Grant Deed | $8,200,000 | 2016-0454540 | BIOXXEL LLC | ABBOTT CARDIOVASCULAR SYSTEMS INC; ADVANCED CARDIOVASCULAR SYSTEMS INC |
| 9 | 07/24/2006 | Release | Release of Mortgage | $12,850,000 | 2006-0538579 | ADVANCED CARDIOVASCULAR SYSTEMS INC | |
| 10 | 04/07/2006 | Mortgage | Seller take-back | $12,850,000 | 2006-0249372 | ADVANCED CARDIOVASCULAR SYSTEMS INC | |
| 11 | 04/07/2006 | Deed | Grant Deed | | 2006-0249371 | ADVANCED CARDIOVASCULAR SYSTEMS INC | BOSTON SCIENTIFIC CORP |
| 12 | 04/02/2001 | Deed | Grant Deed | $15,000,000 | 2001-135201 | BOSTON SCIENTIFIC CORP | REISUNG ENTERPRISES INC |

EXHIBIT "8"
PAGE 255

## Transaction Details

### Foreclosure Sale Scheduled

| | | | |
|---|---|---|---|
| Transaction ID | 1 | Recorder Doc Number | 2020-0250478 | Original Loan Amount | |
| TS/Case # | 33096 | Document Type | Pre-Foreclosure | Origination Document # | 2016-0454541 |
| Trustor(s) Name | BIOXXEL LLC | Document Description | Notice of Sale | Origination Recording Date | 10/17/2016 |
| Trustee / Contact Name | | Recording Date | 06/11/2020 | Unpaid Balance | $6,645,085 |
| Mailing Address | | Auction Place of Sale | 847 W SIXTH STREET, CORONA | Foreclosure Sale Scheduled Date | 06/10/2020 |
| Phone Number | 213-787-5958 | Auction Date | 07/06/2020 | Publish Date | |

### Mortgage Assignment

| | | | |
|---|---|---|---|
| Transaction ID | 2 | Recorder Doc Number | 2018-0417199 | Original Loan Amount | $5,820,000 |
| Effective Date | 10/18/2018 | Document Type | Assignment | Origination Doc # | 2016-0454541 |
| Borrower(s) Name | BIOXXEL, LLC | Document Description | Assignment of Mortgage | Origination Recording Date | 10/17/2016 |
| | | Recording Date | 10/23/2018 | Original Lender | KEYSTONE REAL ESTATE LENDING FUND LP |
| Assignor Name | KEYSTONE REAL ESTATE LENDING FUND, L.P., | Assignee Name | BREFI 30590 COCHISE LLC | | |

### Foreclosure 1st Legal Action

| | | | |
|---|---|---|---|
| Transaction ID | 3 | Recorder Doc Number | 2018-0396621 | Original Loan Amount | $582,000 |
| TS/Case # | 923492 | Document Type | Pre-Foreclosure | Origination Document # | 2016-0454541 |
| Trustor(s) Name | BIOXXEL LLC | Document Description | Notice of Default | Origination Recording Date | 10/17/2016 |
| Trustee / Contact Name | FIRST AMERICAN TITLE INSURANCE CO | Recording Date | 10/05/2018 | Beneficiary Name | |
| Mailing Address | 4380 LA JOLLA VILLAGE DR # 110, SAN DIEGO, CA 92122 | Foreclosure 1st Legal Date | | Delinquent Amount | $4,830,294 |
| Phone Number | 310-440-4100 | Publish Date | | Delinquent Amount As of | 10/04/2018 |

### Foreclosure 1st Legal Action

| | | | |
|---|---|---|---|
| Transaction ID | 4 | Recorder Doc Number | 2018-0367329 | Original Loan Amount | $5,820,000 |
| TS/Case # | 923492 | Document Type | Pre-Foreclosure | Origination Document # | 2016-0454541 |
| Trustor(s) Name | BIOXXEL LLC | Document Description | Notice of Default | Origination Recording Date | 10/17/2016 |
| Trustee / Contact Name | RAINES FELDMAN | Recording Date | 09/13/2018 | Beneficiary Name | |
| Mailing Address | 1800 AVE OF THE STARS 12TH FLOOR, LOS ANGELES, CA 90067 | Foreclosure 1st Legal Date | | Delinquent Amount | $6,061,823 |
| Phone Number | | Publish Date | | Delinquent Amount As of | 08/30/2018 |

### Mortgage Release

| | | | |
|---|---|---|---|
| Transaction ID | 5 | Recorder Doc Number | 2018-0059626 | Loan Amount | $5,000,000 |
| Effective Date | 02/13/2018 | Document Type | Release | Origination Doc # | 2017-0302467 |
| Borrower(s) Name | BIOXXEL, LLC | Document Description | Substitution of Trustee and Full Reconveyance | Origination Recording Date | 07/25/2017 |
| Current Lender | US METRO BANK | Recording Date | 02/16/2018 | Original Lender | US METRO BANK |

EXHIBIT "8"
PAGE 256

## Transaction Details (cont.) (2)

### Mortgage

| | | | | | |
|---|---|---|---|---|---|
| Transaction ID | 6 | Recorder Doc Number | 2017-0302467 | Recorder Book/Page | |
| Mortgage Date | 07/18/2017 | Document Type | Mortgage | Rate Change Freq | |
| Loan Amount | $5,000,000 | Document Description | Commercial Loan | 1st Periodic Floor Rate | |
| Loan Type | Commercial Loan | Recording Date | 07/25/2017 | 1st Periodic Cap Rate | |
| Origination Lender Name | US METRO BANK | Origination Interest Rate | | Lifetime Cap Rate | |
| Origination Lender Type | Bank | First Rate Change Date | | Change Index | |
| Type Financing | Other | Maturity Date | | IO Period | |
| Borrower 1 | BIOXXEL LLC | Balloon Rider | | Prepayment Penalty Rider | |
| Borrower 2 | | Fixed/Step Rate Rider | | Prepayment Penalty Term | |
| Additional Borrowers | | Adj Rate Rider | | Adj Rate Index | |
| Vesting | | | | | |

### Mortgage

| | | | | | |
|---|---|---|---|---|---|
| Transaction ID | 7 | Recorder Doc Number | 2016-0454541 | Recorder Book/Page | |
| Mortgage Date | | Document Type | Mortgage | Rate Change Freq | |
| Loan Amount | $5,820,000 | Document Description | Commercial Loan | 1st Periodic Floor Rate | |
| Loan Type | Commercial Loan | Recording Date | 10/17/2016 | 1st Periodic Cap Rate | |
| Origination Lender Name | KEYSTONE REAL ESTATE LENDING FUND LP | Origination Interest Rate | | Lifetime Cap Rate | |
| Origination Lender Type | Not Known | First Rate Change Date | | Change Index | |
| Type Financing | | Maturity Date | | IO Period | |
| Borrower 1 | BIOXXEL LLC | Balloon Rider | | Prepayment Penalty Rider | |
| Borrower 2 | | Fixed/Step Rate Rider | | Prepayment Penalty Term | |
| Additional Borrowers | | Adj Rate Rider | | Adj Rate Index | |
| Vesting | | | | | |

EXHIBIT "8"
PAGE 257

## Transaction Details (cont.) (3)

### Transfer

| | | | | | |
|---|---|---|---|---|---|
| Transaction ID | 8 | Recorder Doc Number | 2016-0454540 | Partial Interest Transferred | |
| Sale Date | 10/06/2016 | Document Type | Deed | Type of Transaction | Undetermined Transfer |
| Sale Price | $8,200,000 | Document Description | Grant Deed | Multiple APNs on Deed | |
| Recorder Book/Page | | Recording Date | 10/17/2016 | Property Use | Commercial (General) |
| Buyer 1 | BIOXXEL LLC | Buyer 1 Entity | | Buyer Vesting | |
| Buyer 2 | | Buyer 2 Entity | | Buyer Mailing Address | 331 VINELAND AVE, CITY OF INDUSTRY, CA 91746-2321 |
| Seller 1 | ABBOTT CARDIOVASCULAR SYSTEMS INC | Seller 1 Entity | Company or Corporation | Seller Mailing Address | |
| Seller 2 | ADVANCED CARDIOVASCULAR SYSTEMS INC | Seller 2 Entity | | Legal City/ Muni/ Township | MURRIETA |
| Legal Recorder's Map Ref | PM23199 MB170PG73-76 | Legal Subdivision | | Legal Section/ Twn/ Rng/ Mer | |
| Legal Brief Description/ Unit/ Phase/ Tract | | | | Title Company Name | CHICAGO TITLE COMPANY |

### Mortgage Release

| | | | | | |
|---|---|---|---|---|---|
| Transaction ID | 9 | Recorder Doc Number | 2006-0538579 | Loan Amount | $12,850,000 |
| Effective Date | | Document Type | Release | Origination Doc # | 2006-0249372 |
| Borrower(s) Name | ADVANCED CARDIOVASCULAR SYSTEMS INC | Document Description | Release of Mortgage | Origination Recording Date | 04/07/2006 |
| Current Lender | CHICAGO TITLE COMPANY | Recording Date | 07/24/2006 | Original Lender | BOSTON SCIENTIFIC CORP |

### Mortgage

| | | | | | |
|---|---|---|---|---|---|
| Transaction ID | 10 | Recorder Doc Number | 2006-0249372 | Recorder Book/Page | |
| Mortgage Date | | Document Type | Mortgage | Rate Change Freq | |
| Loan Amount | $12,850,000 | Document Description | Seller take-back | 1st Periodic Floor Rate | |
| Loan Type | Seller take-back | Recording Date | 04/07/2006 | 1st Periodic Cap Rate | |
| Origination Lender Name | BOSTON SCIENTIFIC CORP | Origination Interest Rate | | Lifetime Cap Rate | |
| Origination Lender Type | Seller | First Rate Change Date | | Change Index | |
| Type Financing | | Maturity Date | | IO Period | |
| Borrower 1 | ADVANCED CARDIOVASCULAR SYSTEMS INC | Balloon Rider | | Prepayment Penalty Rider | |
| Borrower 2 | | Fixed/Step Rate Rider | | Prepayment Penalty Term | |
| Additional Borrowers | | Adj Rate Rider | | Adj Rate Index | |
| Vesting | | | | | |

EXHIBIT "8"
PAGE 258

## Transaction Details (cont.)  (4)

### Transfer

| | | | | |
|---|---|---|---|---|
| Transaction ID | 11 | Recorder Doc Number | 2006-0249371 | Partial Interest Transferred |  |
| Sale Date | 03/29/2006 | Document Type | Deed | Type of Transaction | Non Residential Transfer |
| Sale Price | | Document Description | Grant Deed | Multiple APNs on Deed |  |
| Recorder Book/Page | | Recording Date | 04/07/2006 | Property Use |  |
| Buyer 1 | ADVANCED CARDIOVASCULAR SYSTEMS INC | Buyer 1 Entity | Company or Corporation | Buyer Vesting |  |
| Buyer 2 | | Buyer 2 Entity | | Buyer Mailing Address | 3200 LAKESIDE DR, SANTA CLARA, CA 95054-2807 |
| Seller 1 | BOSTON SCIENTIFIC CORP | Seller 1 Entity | Company or Corporation | Seller Mailing Address | 1 BOSTON SCIENTIFIC PL, NATICK, MA 01760-1536 |
| Seller 2 | | Seller 2 Entity | | Legal City/ Muni/ Township |  |
| Legal Recorder's Map Ref | PM23199 MB170PG73-76 | Legal Subdivision | | Legal Section/ Twn/ Rng/ Mer |  |
| Legal Brief Description/ Unit/ Phase/ Tract | | | | Title Company Name | CHICAGO TITLE COMPANY |

### Transfer

| | | | | |
|---|---|---|---|---|
| Transaction ID | 12 | Recorder Doc Number | 2001-135201 | Partial Interest Transferred |  |
| Sale Date | 03/23/2001 | Document Type | Deed | Type of Transaction | Non Residential Transfer |
| Sale Price | $15,000,000 | Document Description | Grant Deed | Multiple APNs on Deed |  |
| Recorder Book/Page | | Recording Date | 04/02/2001 | Property Use |  |
| Buyer 1 | BOSTON SCIENTIFIC CORP | Buyer 1 Entity | Company or Corporation | Buyer Vesting |  |
| Buyer 2 | | Buyer 2 Entity | | Buyer Mailing Address |  |
| Seller 1 | REISUNG ENTERPRISES INC | Seller 1 Entity | Company or Corporation | Seller Mailing Address |  |
| Seller 2 | | Seller 2 Entity | | Legal City/ Muni/ Township | UNINCORPORATED |
| Legal Recorder's Map Ref | PM23199 MB170PG73-76 | Legal Subdivision | | Legal Section/ Twn/ Rng/ Mer |  |
| Legal Brief Description/ Unit/ Phase/ Tract | | | | Title Company Name | FIRST AMERICAN TITLE CO |

## Transaction History Legend

 Transfer

 Mortgage

 Mortgage Assignment

 Foreclosure Activity

 Mortgage Release

## Disclaimer

THIS REPORT IS INTENDED FOR USE BY YOU AS AN END USER SOLELY FOR YOUR INTERNAL BUSINESS PURPOSES. YOU SHALL NOT RESELL, RELICENSE OR REDISTRIBUTE THIS REPORT, IN WHOLE OR IN PART. THE USE OF THIS REPORT BY ANY PARTY OTHER THAN YOURSELF FOR ANY PURPOSE IS STRICTLY PROHIBITED. THIS REPORT IS PROVIDED AS-IS WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE. BLACK KNIGHT SHALL HAVE NO LIABILITY IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS REPORT. BLACK KNIGHT DOES NOT REPRESENT OR WARRANT THAT THE REPORT IS COMPLETE OR FREE FROM ERROR. YOU UNDERSTAND AND ACKNOWLEDGE THAT THE AVAILABILITY, COMPLETENESS AND FORMAT OF THE DATA ELEMENTS MAY VARY SUBSTANTIALLY FROM AREA-TO-AREA. THE INFORMATION CONTAINED IN THIS REPORT IS DERIVED FROM PUBLICLY AVAILABLE SOURCES FOR THE SUBJECT PROPERTY OR COMPARABLE PROPERTIES LISTED ABOVE AND HAS NOT BEEN INDEPENDENT VERIFIED BY BLACK KNIGHT THROUGH ANY FORM OF INSPECTION OR REVIEW. THIS REPORT DOES NOT CONSTITUTE AN APPRAISAL OF ANY KIND AND SHOULD NOT BE USED IN LIEU OF AN INSPECTION OF A SUBJECT PROPERTY BY A LICENSED OR CERTIFIED APPRAISER. THIS REPORT CONTAINS NO REPRESENTATIONS, OPINIONS OR WARRANTIES REGARDING THE SUBJECT PROPERTY'S ACTUAL MARKETABILITY, CONDITION (STRUCTURAL OR OTHERWISE), ENVIRONMENTAL, HAZARD OR FLOOD ZONE STATUS, AND ANY REFERENCE TO ENVIRONMENTAL, HAZARD OR FLOOD ZONE STATUS IS FOR INFORMATIONAL PURPOSES ONLY AND SHALL BE INDEPENDENTLY VERIFIED BY THE END USER. THE INFORMATION CONTAINED HEREIN SHALL NOT BE UTILIZED: (A) TO REVIEW OR ESTABLISH A CONSUMER'S CREDIT AND/OR INSURANCE ELIGIBILITY OR FOR ANY OTHER PURPOSE THAT WOULD CAUSE THE REPORT TO CONSTITUTE A "CONSUMER REPORT" UNDER THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681 ET SEQ.; OR (B) IN CONNECTION WITH CERTIFICATION OR AUTHENTICATION OF REAL ESTATE OWNERSHIP AND/OR REAL ESTATE TRANSACTIONS. ADDITIONAL TERMS AND CONDITIONS SHALL APPLY PURSUANT TO THE APPLICABLE AGREEMENT.

## Copyright

CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET. TM SM ® TRADEMARK(S) OF BLACK KNIGHT IP HOLDING COMPANY, LLC, OR AN AFFILIATE.
© 2021 BLACK KNIGHT TECHNOLOGIES, LLC. ALL RIGHTS RESERVED.

EXHIBIT "8"
PAGE 260

**EXHIBIT "9"**

| Vendor | Phone | Address | Description | Account / Contact |
|---|---|---|---|---|
| EMWD | 800-426-3693 | 2270 Trumble Road, Perris - CA  92572 | Irigation | 91577-05 |
| | | | Building Water #1 | 91578-04 |
| | | | Building Water #2 | 223776-03 |
| | | | Fire Alarm Water #1 | 91580-05 |
| | | | Fire Alarm Water #2 | 223777-03 |
| Socal Gas | 800-427-2000 | PO BOX 1626, Monterey Park - CA 91754 | Gas | 074 324 7352 3 |
| Frontier Communication | 800-801-6652 | PO BOX 709. South Windsor, CT - 06074 | Fire Alarm Phone | 951-325-8845-102716-5 |
| Waste Management | 800-423-9986 | PO BOX 43530, Phoenix - AZ 85080 | Trash | 17-59895-53007 |
| SOCAL EDISON | 800-990-7788 | PO BOX 300, Rosemead - CA 91772-001 | Electric (Regular Acc) | 2-39-124-6162 |
| | | | Electric (Deposit Acc) | 2-39-124-6527 |
| ADT Alarm | 800521-1734 | PO BOX 371878, Pittsburgh - PA 15250 | Security Alarm | 402196704 |
| Telenet VOIP | 310-253-9000 | 850 Parkview Drive North, El Segundo - CA 90245 | Fire Alarm Monitor | M91853 |
| AQMD | 909-396-2000 | 21865 Copley Dr, Diamond Bar - CA 91765 | Electric Generator | State of California |
| Executive Plumbing Drain | 951-837-9511 | 31655 Dylan Rd, Winchester - CA 92596 | Plumber | |

EXHIBIT "9"

PAGE 261

**EXHIBIT "10"**

**BioXXel LLC, Chapter 11 Debtor In Possession**
**Forecasted Monthly Revenue and Expenses (Cash Basis, Rounded to Nearest $100)**
**Subject Property:  30590 Cochise Circle, Murrieta, CA 92563**

| | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 |
|---|---|---|---|---|---|---|
| **Cash - BOM** | **25,000** | **44,930** | **64,860** | **37,890** | **57,820** | **77,750** |
| | | | | | | |
| **Rental Income** | | | | | | |
| II-VI Optical | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Royal Health USA | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Medlab Pharma, Inc. | 4,900 | 4,900 | 4,900 | 4,900 | 4,900 | 4,900 |
| Pharmaxx, Inc. (3) | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 |
| Pharmaxx Medical, Inc. (3) | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| International Pharmaceutical Dist. Co. (3) | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| ExxelUSA, Inc. (3) | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| **Total Rental Income** | **83,900** | **83,900** | **83,900** | **83,900** | **83,900** | **83,900** |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| CRO and Accounting Support | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 |
| Bank Service Charges | 20 | 20 | 20 | 20 | 20 | 20 |
| Fire Alarm | 150 | 150 | 150 | 150 | 150 | 150 |
| Insurance Expense | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| License and Permit | 50 | 50 | 50 | 50 | 50 | 50 |
| Repairs and Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Security | 150 | 150 | 150 | 150 | 150 | 150 |
| Taxes - Property Assessment | - | - | 46,100 | - | - | - |
| Telephone Expense | 600 | 600 | 600 | 600 | 600 | 600 |
| Utilities | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Interest | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Income Taxes | - | - | 800 | - | - | - |
| **Total Operating Expenses** | **63,970** | **63,970** | **110,870** | **63,970** | **63,970** | **63,970** |
| | | | | | | |
| **Cash - EOM** | **44,930** | **64,860** | **37,890** | **57,820** | **77,750** | **97,680** |
| | | | | | | |
| **Administrative Fees Accrued, but not Paid** | **-** | **32,300** | **59,600** | **81,900** | **99,200** | **111,500** |
| 25% Holdback - CRO and Accounting Support | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Debtor Counsel - Marshack Hays | 25,000 | 20,000 | 15,000 | 15,000 | 10,000 | 5,000 |
| Debtor Counsel - BB&K | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Broker - Onyx (Marketing Expenses) | 5,000 | 5,000 | 5,000 | - | - | - |
| **Total Administrative Fees Accrued, but not Paid** | **32,300** | **59,600** | **81,900** | **99,200** | **111,500** | **118,800** |

**NOTES AND ASSUMPTIONS:**

(1)  The above information is based upon management's best estimates.  Actual results may differ from those projected.

(2)  The CRO believes that the DIP can move quickly towards a sale of the property or some other restructuring event and is hopeful that this can be accomplished in approximately 90-120 days.  Upon closing that transaction, the accrued administrative fees, CRO's success fee, and broker's fee will be paid.

(3)  The CRO is in the process of negotiating market rate month-to-month leases with these related party tenants owned by Mr. Phuong Nguyen.  Therefore, the rental amounts shown herein are subject to change.  While the payment of back rent is a possibility resultant from these negotiations, such rent has not been included in these projections to maintain conservatism.

2/4/2021

**BioXXel LLC, Chapter 11 Debtor In Possession**
**Forecasted Monthly Revenue and Expenses (Cash Basis, Rounded to Nearest $100)**
**Subject Property: 30590 Cochise Circle, Murrieta, CA 92563**

| | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 |
|---|---|---|---|---|---|---|
| **Cash - BOM** | **25,000** | **33,230** | **41,460** | **2,790** | **11,020** | **19,250** |
| | | | | | | |
| **Rental Income** | | | | | | |
| II-VI Optical | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Royal Health USA | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Medlab Pharma, Inc. | 4,900 | 4,900 | 4,900 | 4,900 | 4,900 | 4,900 |
| Pharmaxx, Inc. (3) | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 |
| Pharmaxx Medical, Inc. (3) | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| International Pharmaceutical Dist. Co. (3) | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| ExxelUSA, Inc. (3) | 500 | 500 | 500 | 500 | 500 | 500 |
| **Total Rental Income** | **59,200** | **59,200** | **59,200** | **59,200** | **59,200** | **59,200** |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| CRO and Accounting Support | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 |
| Bank Service Charges | 20 | 20 | 20 | 20 | 20 | 20 |
| Fire Alarm | 150 | 150 | 150 | 150 | 150 | 150 |
| Insurance Expense | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| License and Permit | 50 | 50 | 50 | 50 | 50 | 50 |
| Repairs and Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Security | 150 | 150 | 150 | 150 | 150 | 150 |
| Taxes - Property Assessment | - | - | 46,100 | - | - | - |
| Telephone Expense | 600 | 600 | 600 | 600 | 600 | 600 |
| Utilities | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Interest | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 |
| Income Taxes | - | - | 800 | - | - | - |
| **Total Operating Expenses** | **50,970** | **50,970** | **97,870** | **50,970** | **50,970** | **50,970** |
| | | | | | | |
| **Cash - EOM** | **33,230** | **41,460** | **2,790** | **11,020** | **19,250** | **27,480** |
| | | | | | | |
| **Administrative Fees Accrued, but not Paid** | **-** | **32,300** | **59,600** | **81,900** | **99,200** | **111,500** |
| 25% Holdback - CRO and Accounting Support | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 |
| Debtor Counsel - Marshack Hays | 25,000 | 20,000 | 15,000 | 15,000 | 10,000 | 5,000 |
| Debtor Counsel - BB&K | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Broker - Onyx (Marketing Expenses) | 5,000 | 5,000 | 5,000 | - | - | - |
| **Total Administrative Fees Accrued, but not Paid** | **32,300** | **59,600** | **81,900** | **99,200** | **111,500** | **118,800** |

**NOTES AND ASSUMPTIONS:**

(1) The above information is based upon management's best estimates.  Actual results may differ from those projected.

(2) The CRO believes that the DIP can move quickly towards a sale of the property or some other restructuring event and is hopeful that this can be accomplished in approximately 90-120 days.  Upon closing that transaction, the accrued administrative fees, CRO's success fee, and broker's fee will be paid.

(3) The CRO is in the process of negotiating market rate month-to-month leases with these related party tenants owned by Mr. Phuong Nguyen.  Therefore, the rental amounts shown herein are subject to change.  While the payment of back rent is a possibility resultant from these negotiations, such rent has not been included in these projections to maintain conservatism.

2/4/2021

**EXHIBIT "11"**

1 | MATTHEW W. GRIMHSAW, #210424
grimshaw@marshackhays.com
2 | DAVID A. WOOD, #272406
dwood@marshackhays.com
3 | LAILA MASUD, #311731
lmasud@marshackhays.com
4 | MARSHACK HAYS LLP
870 Roosevelt, Irvine, CA 92620
5 | Telephone: 949-333-7777
Facsimile: 949-333-7778
6 |
Proposed Attorneys for
7 | BIOXXEL, LLC.

8 | UNITED STATES BANKRUPTCY COURT

9 | CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

10 | In re

11 | BIOXXEL, LLC,

12 |          Debtor and
          Debtor-in-Possession.

Case No. 8:21-bk-10256-TA

Chapter 11

PROPOSED ORDER ON DEBTOR AND
DEBTOR-IN-POSSESION'S
EMERGENCY MOTION FOR ORDER
authorizing use of cash collateral AND
DETERMINING THAT ITS SECURED
CREDITOR IS ADEQUATELY
PROTECTED

Hearing:
Date:      February 10, 2021
Time:      10:00 a.m.
Ctrm:      5B[1] - ZoomGov

19 |       A hearing was held on February 10, 2021, at 10:00 a.m., before the Honorable Theodor C.

20 | Albert, United States Bankruptcy Judge for the Central District of California, in Courtroom 5B

21 | located at 411 West Fourth St., Santa Ana, CA, on Debtor and Debtor-In-Possession's Emergency

22 | Motion for Order Authorizing Use of Cash Collateral and Determining that its Secured Creditor is

23 | Adequately Protected; filed February 5, 2021 as Docket #____ ("Motion"). Appearances were made

---

[1] Pursuant to General Order 20-06, no in person hearings will be held in any matter until further notice. The Court will continue to hear matters via telephone and video. Until further notice, because of the COVID-19 pandemic, all of Judge Albert's hearings will be conducted using ZoomGov audio and video. Hearing participants and members of the public may view and listen to hearings before Judge Albert using ZoomGov free of charge.  Video and audio connection information for each hearing will be provided on Judge Albert's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=TA. For more details on appearing via ZoomGov, please see the "Notice of Video and Telephonic Appearance Procedures" in the Telephonic Instructions section of this page.

1

4811-5333-2374, v. 2

1   as noted on the record.

2       The Court having read and considered the Motion, heard the statements of counsel, and for

3   the reasons stated in the Motion, and with good cause shown,

4       IT IS ORDERED:

5      1.  The Motion is granted;

6      2.  The Debtor is authorized to use cash collateral according to its Budget[2], subject to a 10%

7           variance, except that Debtor is not required to make monthly payment to BREF despite

8           the Budget's inclusion of monthly interest payment(s); and

9      3.  BREF is entitled to adequate protection and is adequately protected by the equity cushion

10           in the Property.

11                      ###

---

[2] Capitalized terms not defined here shall have the meaning ascribed to them in the Motion.

2

4811-5333-2374, v. 2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **DEBTOR AND DEBTOR-IN-POSSESION'S EMERGENCY MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL AND DETERMINING THAT ITS SECURED CREDITOR IS ADEQUATELY PROTECTED; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JOSHUA TEEPLE IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 5, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

⊠ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On **February 5, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 5, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**[PURSUANT TO AMENDED GENERAL ORDER 20-06,
COURTESY COPIES WILL BE DELIVERED BY MAIL IF PLEADING IS OVER <u>25</u> PAGES.]**

⊠ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 5, 2021 | Cynthia Bastida | /s/ Cynthia Bastida |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:
   - **ATTORNEY FOR U.S. TRUSTEE (SA):** Michael J Hauser michael.hauser@usdoj.gov
   - **ATTORNEY FOR CREDITOR BREF1 30590 CHOCHISE, LLC:** Jennifer R Tullius jtullius@tulliuslaw.com
   - **U.S. TRUSTEE (SA):** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
   - **ATTORNEY FOR DEBTOR BIOXXEL, LLC:** David Wood dwood@marshackhays.com,
     dwood@ecf.courtdrive.com; lbuchananmh@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: CONTINUED:

**VIA OVERNIGHT:**

| | | |
|---|---|---|
| **DEBTOR**<br>BIOXXEL, LLC<br>ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE<br>23832 ROCKFIELD BLVD, STE 245<br>LAKE FOREST, CA 92630-2884 | **PRESIDING JUDGE'S COPY**<br>HONORABLE THEODOR C. ALBERT<br>UNITED STATES BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE<br>411 WEST FOURTH STREET, SUITE 5085 / COURTROOM 5B<br>SANTA ANA, CA 92701-4593 | **U.S. TRUSTEE**<br>UNITED STATES TRUSTEE (SA)<br>411 W FOURTH ST., SUITE 7160<br>SANTA ANA, CA 92701-4500 |
| **20 LARGEST CREDITOR / UTILITY PROVIDER**<br>EASTERN MUNICIPAL WATER DISTRICT<br>ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE<br>2270 TRUMBLE ROAD<br>PERRIS, CA 92570 | **20 LARGEST CREDITOR / UTILITY PROVIDER**<br>EASTERN MUNICIPAL WATER DISTRICT FACILITIES CORPORATION<br>C/O PAUL D JONES, AGENT FOR SERVICE OF PROCESS<br>2270 TRUMBLE ROAD<br>PERRIS, CA 92570 | **20 LARGEST CREDITOR / UTILITY PROVIDER**<br>SOUTHERN CALIFORNIA EDISON<br>BUSINESS CUSTOMERS<br>ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE<br>P.O. BOX 300<br>ROSEMEAD, CA 91772-0001 |
| **20 LARGEST CREDITOR / UTILITY PROVIDER**<br>SOUTHERN CALIFORNIA EDISON COMPANY<br>ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE<br>2244 WALNUT GROVE AVE<br>ROSEMEAD, CA 91770 | **20 LARGEST CREDITOR / UTILITY PROVIDER**<br>SOUTHERN CALIFORNIA EDISON COMPANY<br>C/O CRISTINA LIMON, AGENT FOR SERVICE OF PROCESS<br>2244 WALNUT GROVE AVE<br>ROSEMEAD, CA 91770 | **20 LARGEST CREDITOR / UTILITY PROVIDER**<br>SOUTHERN CALIFORNIA GAS CO.<br>ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE<br>REMITTANCE PROCESSING ML 711D<br>1801 S. ATLANTIC BLVD.<br>MONTEREY PARK, CA 91754-5207 |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

**20 LARGEST CREDITOR / UTILITY PROVIDER**
SOUTHERN CALIFORNIA GAS COMPANY
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
555 WEST 5TH STREET
LOS ANGELES, CA 90013

**20 LARGEST CREDITOR / UTILITY PROVIDER**
SOUTHERN CALIFORNIA GAS COMPANY
C/O CSC - LAWYERS INCORPORATING SERVICE
2710 GATEWAY OAKS DRIVE, SUITE 150N
SACRAMENTO, CA 95833

**UTILITY PROVIDER**
FRONTIER COMMUNICATION
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
PO BOX 709
SOUTH WINDSOR, CT 06074

**UTILITY PROVIDER**
FRONTIER COMMUNICATION
C/O CSC - LAWYERS INCORPORATING SERVICE
2710 GATEWAY OAKS DRIVE, SUITE 150N
SACRAMENTO, CA 95833

**UTILITY PROVIDER**
WASTE MANAGEMENT
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
PO BOX 43530
PHOENIX, AZ 85080

**UTILITY PROVIDER**
WASTE MANAGEMENT COLLECTION AND RECYCLING, INC.
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
1001 FANNIN STREET
HOUSTON, TX 77002

**UTILITY PROVIDER**
WASTE MANAGEMENT COLLECTION AND RECYCLING, INC.
C/O CT CORPORATION SYSTEM
818 WEST SEVENTH STREET, SUITE 930
LOS ANGELES, CA 90017

**UTILITY PROVIDER**
ADT ALARM
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
PO BOX 371878
PITTSBURGH, PA 15250

**UTILITY PROVIDER**
ADT LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
1501 YAMATO ROAD
BOCA RATON FL 33431

**UTILITY PROVIDER**
ADT LLC
C/O C T CORPORATION SYSTEM
818 WEST SEVENTH STREET, SUITE 930
LOS ANGELES, CA 90017

**UTILITY PROVIDER**
TELENET VOIP
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE
850 PARKVIEW DRIVE NORTH
EL SEGUNDO, CA 90245

**UTILITY PROVIDER**
TELENET VOIP, INC.
C/O EMMELINE ADIZON, AGENT FOR SERVICE OF PROCESS
850 PARKVIEW DRIVE NORTH
EL SEGUNDO, CA 90245

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                      **F 9013-3.1.PROOF.SERVICE**

**UTILITY PROVIDER**
SOUTH COAST AQMD
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
21865 COPLEY DRIVE
DIAMOND BAR, CA 91765

**UTILITY PROVIDER**
SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT BUILDING
CORPORATION
C/O SUJATA JAIN, AGENT FOR
SERVICE OF PROCESS
21865 COPLEY DRIVE
DIAMOND BAR, CA 91765

**UTILITY PROVIDER**
EXECUTIVE PLUMBING DRAIN
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
31655 DYLAN ROAD
WINCHESTER, CA 92596

**UTILITY PROVIDER**
EXECUTIVE PLUMBING AND
DRAIN, INC.
C/O ANA KAROLINE ONTIVEROS,
AGENT FOR SERVICE OF
PROCESS
31655 DYLAN ROAD
WINCHESTER, CA 92596

**20 LARGEST CREDITOR / TENANT**
EXXELUSA, INC.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

**20 LARGEST CREDITOR / TENANT**
EXXELUSA, INC.
C/O PHUONG NGUYEN, AGENT
FOR SERVICE OF PROCESS
660 S ABERDEEN ST
ANAHEIM, CA 92807

**20 LARGEST CREDITOR / TENANT**
INTERNATIONAL
PHARMACEUTICAL DISTRIBUTION
CO., LTD.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

**20 LARGEST CREDITOR / TENANT**
INTERNATIONAL PHARMACEUTICAL
DISTRIBUTION CO., LTD.
C/O PHUONG VY NGUYEN, AGENT
FOR SERVICE OF PROCESS
30590 COCHISE CIR
MURRIETA, CA 92563

**20 LARGEST CREDITOR / TENANT**
PHARMAXX
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

**20 LARGEST CREDITOR / TENANT**
PHARMAXX, INC.
C/O PHUONG NGUYEN, AGENT
FOR SERVICE OF PROCESS
660 S ABERDEEN ST
ANAHEIM, CA 92807

**TENANT**
II-VI OPTICAL
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

**TENANT**
ROYAL HEALTH USA
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                        F 9013-3.1.PROOF.SERVICE

**TENANT**
MEDLAB PHARMA, INC.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

**TENANT**
MEDLAB PHARMA, INC.
C/O CUONG ANH NGUYEN, AGENT
FOR SERVICE OF PROCESS
8742 PARK STREET, SUITE A
BELLFLOWER, CA 90706

**TENANT**
PHARMAXX MEDICAL INC.
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
30590 COCHISE CIRCLE
MURRIETA, CA 92563-2501

**TENANT**
PHARMAXX MEDICAL INC.
C/O GENE JIN SU, AGENT FOR
SERVICE OF PROCESS
21060 BLOSSOM WAY
DIAMOND BAR, CA 91765

**20 LARGEST CREDITOR**
CATHERINE VAN
8 SUNDOWN PASS
IRVINE, CA 92604-2829

**20 LARGEST CREDITOR**
LAW OFFICE OF JACK BAO
QUOC NGUYEN
14361 BEACH BOULEVARD,
SUITE 211
WESTMINSTER, CA 92683-8141

**20 LARGEST CREDITOR**
NATIONAL BUSINESS
INVESTIGATIONS
DBA MPS SECURITY
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
27247 MADISON AVE, SUITE 106
TEMECULA, CA 92590-5674

**20 LARGEST CREDITOR**
NATIONAL BUSINESS
INVESTIGATIONS, INC.
DBA MPS SECURITY
C/O MICHAEL DEAN JULIAN, AGENT
FOR SERVICE OF PROCESS
25020 LAS BRISAS ROAD
MURRIETA, CA 92562

**20 LARGEST CREDITOR**
AVID GLOBAL CORPORATION
C/O COUNSEL TO AVID GLOBAL
CORP.
420 EXCHANGE, STE. 270
IRVINE, CA 92602-1316

**20 LARGEST CREDITOR**
STREAM KIM HICKS WRAGE &
ALFARO, PC
3403 TENTH STREET, SUITE 700
RIVERSIDE, CA 92501-3641

**20 LARGEST CREDITOR**
WARE MALCOMB
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE
10 EDELMAN
IRVINE, CA 92618-4312

**INTERESTED PARTY**
KONE ELEVATOR
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
11165 KNOTT AVENUE
CYPRESS, CA 90630

**INTERESTED PARTY**
KONE INC.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
ONE KONE COURT
MOLINE, IL 61265

**INTERESTED PARTY**
KONE INC.
C/O CSC - LAWYERS
INCORPORATING SERVICE
2710 GATEWAY OAKS DRIVE, SUITE
150N
SACRAMENTO, CA 95833

**INTERESTED PARTY**
LIBERTY MUTUAL INSURANCE
COMPANY
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
175 BERKELEY STREET
BOSTOM, MA 02116

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

**INTERESTED PARTY**
LIBERTY MUTUAL INSURANCE
COMPANY
C/O CSC - LAWYERS
INCORPORATING SERVICE
2710 GATEWAY OAKS DRIVE,
SUITE 150N
SACRAMENTO, CA 95833

**INTERESTED PARTY**
SEQUOIA CPA
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE
767 N HILL STREET, STE 208
LOS ANGELES, CA 90012

**INTERESTED PARTY**
MASINO CONSULTING
ATTN: OFFICER, A MANAGING
OR GENERAL AGENT, OR TO
ANY OTHER AGENT
AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE
31805 TEMECULA PARKWAY,
SUITE 210
TEMECULA, CA 92592

**INTERESTED PARTY**
MASINO INDUSTRIAL
CONSULTING, INC.
C/O CHRISTOPHER J. MASINO,
AGENT FOR SERVICE OF
PROCESS
40625 CHAPARRAL DRIVE
TEMECULA, CA 92592

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**